IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

WILLIAM THORPE, FREDERICK
HAMMER, DMITRY KHAVKIN, GERALD
MCNABB, GARY WALL, VERNON
BROOKS, BRIAN CAVITT, DEREK
CORNELISON, CHRISTOPHER
COTTRELL, PETER MUKURIA, STEVEN
RIDDICK, and KEVIN SNODGRASS, each
individually and as representatives of a
class of similarly situated persons,

        *Plaintiffs*,

        v.

VIRGINIA DEPARTMENT OF
CORRECTIONS, HAROLD CLARKE,
RANDALL C. MATHENA, H. SCOTT
RICHESON, A. DAVID ROBINSON,
HENRY J. PONTON, MARCUS ELAM,
DENISE MALONE, STEVE HERRICK,
TORI RAIFORD, JEFFREY KISER, and
CARL MANIS, each individually and in
their official capacities,

        *Defendants*.

CASE NO.  3:19cv332

## CLASS ACTION COMPLAINT

1.    Named Plaintiffs William Thorpe, Frederick Hammer, Dmitry Khavkin, Gerald McNabb, Gary Wall, Vernon Brooks, Brian Cavitt, Derek Cornelison, Christopher Cottrell, Peter Mukuria, Steven Riddick, and Kevin Snodgrass bring this action against the Virginia Department of Corrections ("VDOC") and the individual defendants, on behalf of themselves and others similarly situated. These men have been isolated in solitary confinement at Virginia's twin maximum-security prisons, Red Onion and Wallens Ridge State Prisons—and have remained in long-term solitary confinement for between two

-1-

and 23 years.  No Virginia sentencing statute or regulation requires VDOC to place these men in long-term solitary confinement based on their crimes or sentences.

## PRELIMINARY STATEMENT

2.      As a result of their long-term solitary confinement, the Named Plaintiffs have suffered severe physical and mental health damage, including weight loss, auditory and visual hallucinations, emotional distress, Post-Traumatic Stress Disorder, severe sensory deprivation, and suicidal thoughts.

3.      As understood by the U.S. Supreme Court and the U.S. Department of Justice, "solitary confinement"—including when referred to as "segregation," "administrative segregation," "restrictive housing," or "isolation"—entails: (1) removal from the general inmate population; (2) placement alone in a locked room or cell; (3) inability to leave the room or the cell for the vast majority of the day; and (4) near-total deprivation of contact with other humans.  For the purposes of this Complaint, "solitary confinement," "administrative segregation," and "restrictive housing" are used interchangeably.

4.      Different state prison systems differ as to the exact conditions of solitary confinement.  Some lock prisoners in their cells not for 23 hours a day, but 22.  Others lock prisoners in their cells for 20 hours per day.  Some solitary confinement cells are windowless; some have small slits for windows; some still have small slits that have been fogged over.  All fit the definition of solitary confinement.

5.      It is well recognized in court decisions, by the U.S. Department of Justice, and among experts in the field of prison science that the practice of long-term solitary confinement inflicts wide-ranging and often permanent physical and psychological harms on prisoners.

6.      Extensive scientific research demonstrates that people consistently suffer a number of dysfunctional psychological states and outcomes when deprived of meaningful social contact and a normal range of sensory input (such as exposure to natural light, outdoor sounds, and varying colors) for long periods.  According to experts in the field, these harms can manifest in as little as 10 days.

7.      Almost forty years ago, VDOC was sued by a class of prisoners held in solitary confinement at Virginia's then maximum-security prison—the Mecklenburg Correctional Center ("Mecklenburg").  VDOC was using a so-called "Phase Program" which it touted as a scientifically based "behavioral modification" program, whereby prisoners could advance through "phases" of solitary confinement with varying levels of privileges and ultimately become eligible for return to the general prison population.  The class alleged that VDOC used the Phase Program to warehouse prisoners in solitary confinement, causing mental and physical harms.  For prisoners deemed particularly "disruptive," VDOC had a so-called "Special Management Unit," where prisoners generally spent their entire incarceration in a more draconian form of solitary confinement, without the opportunity to obtain additional privileges, and with additional attendant harms. In *Brown v. Landon*, Case No. 81-0853-R (E.D. Va.), the prisoners alleged that, through the Phase Program and Special Management Unit, VDOC violated their

-3-

Constitutional rights to due process and freedom from cruel and unusual punishment.

8.     In 1984, the Virginia Board of Corrections issued a comprehensive report documenting that its solitary confinement system at Mecklenburg was a failure.  Among other things, the report documented that in designing the Phase Program, VDOC ignored correctional and mental health science and the recommendations of independent psychologists, and instead opted for a program devised by a VDOC "internal task force."  The report showed that VDOC then used its solitary confinement program as part of a scheme to fill empty or under-used prison space at Mecklenburg.  That report also documented the arbitrary administration of the Phase Program and revealed how the Phase Program incentivized abusive practices by prison administrators and employees, resulting in prisoners languishing in long-term solitary confinement indefinitely.

9.     In the wake of that report, VDOC reached a comprehensive settlement in the *Brown* case.  The Settlement Agreement in *Brown* was intended to carry out VDOC's pledge to "ensure that the systematic degeneration of the correctional operations which occurred at [Mecklenburg] does not occur again at any institution in the Virginia Department of Corrections."

10.     Under the Settlement Agreement, VDOC stated that it "has discontinued the phase program and does not intend to reinstate any similar program in the future."

11.    Under the Settlement Agreement, VDOC also agreed without qualification that the Special Management Unit "has been and will remain abolished."

12.    When VDOC ended its solitary confinement practices at Mecklenburg, it replaced the Phase Program and Special Management Unit with general-population units.   Mecklenburg, however, was not designed to hold inmates in general population—it was a maximum-security facility designed to hold prisoners in long-term solitary confinement.  Upon information and belief, Mecklenburg required much higher staffing levels—and these changes rendered the prison uneconomical.

13.    In response, VDOC demolished Mecklenburg.  However, rather than move away from solitary confinement as it had promised to do, VDOC launched plans to replace Mecklenburg with two larger maximum-security (so-called "super-max") prisons—Red Onion and Wallens Ridge State Prisons—that would be designed to support long-term solitary confinement.

14.    In 1998 and 1999, when Red Onion and Wallens Ridge respectively opened, VDOC's then-Director made clear that solitary confinement in those prisons had no rehabilitative component.  Referring to the prisoners, the Director said:   "What are they going to be rehabilitated for?  To die gracefully in prison? . . . Let's face it; they're here to die in prison."  Ignoring the Settlement Agreement, VDOC then set about re-implementing the arbitrary and indefinite system of solitary confinement that had failed at Mecklenburg.  VDOC eventually introduced another phase program that—just as at Mecklenburg—warehoused

prisoners in indefinite solitary confinement.  This second phase program faced scrutiny from non-governmental and governmental entities alike, including the U.S. Department of Justice.

15.    In 2012, after its failed attempt at a second phase program, VDOC introduced the Step-Down Program.  As with the failed Phase Program at Mecklenburg, VDOC touted the Step-Down Program as using behavioral modification techniques to improve inmate behavior.  But the Step-Down Program is simply another version of the failed Phase Program, which also includes a more draconian pathway akin to the abandoned Special Management Unit.

16.    The current Step-Down Program is a system of vague standards, contradictory goals, and malleable jargon used to conceal what is nothing more than an indefinite or permanent solitary confinement regime.  Like the failed Mecklenburg solitary confinement program that VDOC had pledged to abolish permanently, VDOC's Step-Down Program offers prisoners no predictable way to progress out of solitary confinement while also making it virtually impossible to hold VDOC accountable for how the solitary confinement program is operated or administered.

17.    The history of Virginia's use of long-term solitary confinement in its super-max prisons suggests that, upon information and belief, the real purpose of the Step-Down Program is to allow VDOC to fill underused prison space to justify the significant cost of keeping Red Onion and Wallens Ridge open.

18.     As with the earlier Phase Program that failed at Mecklenburg, VDOC's solitary confinement practices continue to cause widespread harms and trauma to prisoners, who languish in solitary confinement for years or even decades with no meaningful social contact.   These harms and traumas include weight loss, auditory and visual hallucinations, emotional distress, Post-Traumatic Stress Disorder, severe sensory deprivation, and suicidal thoughts.

19.     The Named Plaintiffs seek to enforce VDOC's promise not to use any version of solitary confinement that is "similar to" the Phase Program or Special Management Unit.   The Named Plaintiffs also seek an end to VDOC's unconstitutional solitary confinement system unless and until VDOC can show that it is capable of administering and operating a constitutional solitary confinement system.

TABLE OF CONTENTS

JURISDICTION AND VENUE ............................................................10

I.      The Named Plaintiffs ..........................................................10

II.     Defendants ........................................................................17

FACTS ............................................................................................25

I.      VDOC Rejects Science in Implementing Long-Term Solitary Confinement through the Original Phase Program.........................................25

II.     The Documented Failure of VDOC's Phase Program................................30

III.    *Brown v. Landon*:  VDOC Settles a Prisoner Class Action by Abolishing the SMU and Ending the Phase Program. ...............................................33

IV.     VDOC Sets Out To Ignore the Settlement Agreement.............................35

V.      VDOC Re-Institutes Long-Term Solitary Confinement at Red Onion and Wallens Ridge.................................................................37

VI.     Long-Term Solitary Confinement at Red Onion and Wallens Ridge. .......40

        A.      Prisoners Are Locked in a Cell Smaller than a Parking Space.......41

        B.      Imposed Severe Social Isolation. ......................................42

        C.      Daily Cavity Searches and Lack of Humanizing Physical Contact.........................................................................44

        D.      Prisoners Spend Their Hour of Out-of-Cell Time in a "Dog Cage."..................................................................44

        E.      Denial of Meaningful Work, Productive Activities, Parole, and Good Time Credit .............................................................45

        F.      VDOC Holds Prisoners in Solitary for Indefinite and Lengthy Periods. .......................................................................47

**VII.**   **VDOC Changes The Phase Program to Address Public Criticism of Solitary Confinement: "Progressive Housing Phase Program."** ............................ 47

**VIII.**   **Following Another Investigation, VDOC Changes The Phase Program Again: "Segregation Reduction Step-Down Program."** ............................ 49

      A.     Vague and Overbroad "Pathway" Criteria. ...................................... 52

      B.     Illusory and Inadequate Reviews. .................................................... 59

      C.     Permanent Solitary Confinement of IM Prisoners. ........................ 68

      D.     VDOC's Step-Down Program Lacks a Scientific Basis. .................. 71

**IX.**   **VDOC's Solitary Confinement Conditions and Step-Down Program Cause Serious Mental and Physiological Harms** ................................................. 75

**CLASS ALLEGATIONS** ...................................................................... 79

**CAUSES OF ACTION** ......................................................................... 86

**RELIEF SOUGHT** ............................................................................... 95

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over Plaintiffs' federal-law claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3).

21.     Venue is proper under 28 U.S.C. § 1391(b)(1) because one or more of the Defendants is subject to the court's personal jurisdiction with respect to this action, and under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

**I.      The Named Plaintiffs**

22.     The Named Plaintiffs are or have been incarcerated in solitary confinement by VDOC at Red Onion State Prison ("Red Onion") and/or Wallens Ridge State Prison ("Wallens Ridge") between August 1, 2012 and the present (and in some cases for longer than that).

23.     The Named Plaintiffs bring this action on behalf of themselves and the classes of prisoners who are, have been, or will be incarcerated in solitary confinement at Red Onion and Wallens Ridge.  The Named Plaintiffs and class members are similarly situated with respect to their legal claims and harms.  Each of the Named Plaintiffs was originally sentenced to confinement in the general population and was later transferred to solitary confinement.  None of the Named Plaintiffs is serving a death sentence.  State law does not dictate that the Named Plaintiffs' convictions or sentences require imprisonment in solitary confinement.

24. **William Thorpe**.  Mr. Thorpe has spent approximately twenty-four years in solitary confinement at several VDOC institutions.  He was first placed in solitary confinement at Mecklenburg, then underwent transfers to Red Onion, Wallens Ridge, and back again to Red Onion, where he is now on the IM Pathway (as defined below).  Mr. Thorpe suffers from physical and mental harms known to be associated with long-term solitary confinement, including constant anxiety, problems with his eyesight, depression, agitation, anger, mood swings, bouts of disorientation, an inability to concentrate, weight loss, a rapid heartbeat, sweating, shortness of breath, digestive problems, restlessness, and insomnia.  Mr. Thorpe was involved in protests of the conditions at Mecklenburg and is within the class defined in *Brown v. Landon*.  Mr. Thorpe has also been told that he will not leave solitary confinement on the IM Pathway, regardless of whether or not he commits any disciplinary infractions.  Mr. Thorpe, who is currently 58 years old and set for release on May 11, 2057, faces the rest of his life in solitary confinement.

25. **Frederick Hammer.**  Mr. Hammer has spent approximately eight years in solitary confinement at Red Onion on the IM Pathway.  In 2011, Mr. Hammer was serving time in the general population of Wallens Ridge and had not committed any disciplinary infractions since he entered prison in 2009.  Prison staff told Mr. Hammer that he would be in a lock down unit for a few days.  Instead, he was transferred to Red Onion in 2011 and has remained in solitary confinement ever since.  Mr. Hammer suffers from physical and mental harms known to be associated with long-term solitary confinement, including anxiety, depression, agitation, anger, mood swings, bouts of disorientation, an inability to

concentrate, thoughts of suicide or other self-harm, shortness of breath, headaches or migraines, restlessness, and insomnia. Mr. Hammer is serving multiple life sentences. Red Onion staff have told Mr. Hammer repeatedly that he will remain in solitary confinement for the rest of his life due to press attention concerning his crimes.

26. **Dmitry Khavkin.** Mr. Khavkin spent approximately six years in solitary confinement at Red Onion. Red Onion staff originally assigned Mr. Khavkin to the IM Pathway, then reassigned him to the SM Pathway (as defined below) in October 2018. Mr. Khavkin suffers from physical and mental harms known to be associated with long-term solitary confinement, including depression, anxiety, Post-Traumatic Stress Disorder, schizoaffective disorder, psychosis, hallucinations, insomnia, hearing voices, agitation, mood swings, bouts of disorientation, an inability to concentrate, a rapid heartbeat, sweating, shortness of breath, digestive problems, headaches or migraines, and restlessness. He has lost at least 30 pounds while in solitary confinement. Mr. Khavkin is often confused, frightened, isolated, and is occasionally suicidal. Mr. Khavkin will be released from prison on August 11, 2049, when he is 66 years old. Shortly after Mr. Khavkin agreed to act as a class representative, VDOC transferred him to general population.

27. **Gerald McNabb**. Mr. McNabb has spent approximately three years in solitary confinement at Red Onion on the IM Pathway. Mr. McNabb was subjected to solitary confinement at Mecklenburg as part of the Phase Program and is within the class defined in *Brown v. Landon.* Mr. McNabb suffers from

physical and mental harms known to be associated with long-term solitary confinement, including anxiety, anger, bouts of disorientation, an inability to concentrate, weight loss, shortness of breath, headaches or migraines, and restlessness.  Mr. McNabb is serving a life sentence.

28.  **Gary Wall**.  Mr. Wall has spent approximately three years in solitary confinement at Red Onion on the IM Pathway.  Mr. Wall suffers from physical and mental harms known to be associated with long-term solitary confinement, including anxiety attacks, depression, weight loss, Post-Traumatic Stress Disorder, inability to concentrate, high blood pressure, pacing in his cell, insomnia, restlessness, and regular migraines.  Mr. Wall will be released from prison on April 19, 2032, when he is 57 years old.

29.  **Vernon Brooks.**  Mr. Brooks has spent approximately four years in solitary confinement at Red Onion on the IM Pathway.  In 2014, Mr. Brooks was transferred to Red Onion as a general population inmate, but Red Onion staff instead had him re-classified to Level "S" solitary confinement (defined below) for reasons unknown to Mr. Brooks.  Mr. Brooks suffers from physical and mental harms known to be associated with long-term solitary confinement, including pacing, agitation, inability to concentrate, weight loss, insomnia, and short-term memory lapses.  Mr. Brooks will be released from prison on August 5, 2037, when he is 53 years old.

30.  **Brian Cavitt.**  Mr. Cavitt has spent approximately two years in solitary confinement at Red Onion on the IM Pathway.  Mr. Cavitt was transferred to Red Onion from a facility in Massachusetts.  Mr. Cavitt suffers from physical

and mental harms known to be associated with long-term solitary confinement, including pacing in his cell, anxiety, depression, bouts of disorientation and/or vertigo, insomnia, weight loss, and constant headaches.  Mr. Cavitt has been diagnosed with oppositional defiant disorder.  Mr. Cavitt is serving a life sentence. Upon his arrival to Red Onion, prison staff told Mr. Cavitt that he would never see general population in the State of Virginia.

31.  **Derek Cornelison.**  Mr. Cornelison has spent approximately two and one-half years in solitary confinement at Red Onion on the IM Pathway.  Mr. Cornelison suffers from physical and mental harms known to be associated with long-term solitary confinement, including anxiety, depression, agitation, irrational anger, mood swings, bouts of disorientation, an inability to concentrate, sweating, shortness of breath, digestive problems, claustrophobia, headaches or migraines, restlessness, and insomnia.  Mr. Cornelison also has thoughts of suicide or other self-harm and has lost twenty pounds since his placement in long-term solitary confinement.  Mr. Cornelison will be released from prison on December 26, 2045, when he is 61 years old.

32.  **Christopher Cottrell.**  Mr. Cottrell has spent approximately seven years in solitary confinement at Red Onion on the SM Pathway. Mr. Cottrell suffers from physical and mental harms known to be associated with long-term solitary confinement, including anxiety, pacing in his cell, anger, thoughts of suicide or other self-harm, and weight loss.  Mr. Cottrell will be released from prison on July 14, 2021, when he is 52 years old.  Although his release date is less than five years away, Mr. Cottrell does not receive the transitional re-entry

program and services otherwise available to prisoners at VDOC with release dates within five years.

33. **Peter Mukuria.**  Mr. Mukuria has spent approximately seven years in solitary confinement at Red Onion on the IM Pathway.  Mr. Mukuria suffers from physical and mental harms known to be associated with long-term solitary confinement, including memory loss, severe anxiety, insomnia, racing thoughts, feelings of desperation, depression, agitation, irrational anger, mood swings, bouts of disorientation, an inability to concentrate, weight loss, digestive problems, headaches or migraines, restlessness, and insomnia.  He also suffers from thoughts of suicide or other self-harm and has engaged in self-harming behavior. Mr. Mukuria has been told by Red Onion staff that he will never see general population.  Mr. Mukuria will be released from prison on September 20, 2049, when he is 63 years old.

34. **Steven Riddick**.  Mr. Riddick has spent over four years in solitary confinement at Red Onion on the SM Pathway.  Mr. Riddick suffers from physical and mental harms known to be associated with long-term solitary confinement, including schizophrenia, major depressive disorder, anxiety, dizziness, blurred vision, persistent chest pain, hearing voices, agitation, irrational anger, mood swings, bouts of disorientation, an inability to concentrate, a rapid heartbeat, high blood pressure, sweating, shortness of breath, digestive problems, headaches or migraines, restlessness, and insomnia.  Mr. Riddick has lost 75 pounds while in solitary confinement.  Mr. Riddick will be released from prison on December 6, 2058, when he is 84 years old.

35.   **Kevin Snodgrass**.  Mr. Snodgrass spent approximately four years in solitary confinement at Red Onion on the SM Pathway.  Mr. Snodgrass was transferred to Wallens Ridge in May 2018.  Mr. Snodgrass suffers lingering effects from years spent in solitary confinement, including paranoia, anxiety, issues with social interaction, and increased tension around guards.  Mr. Snodgrass will be released from prison on October 16, 2053, when he is 72 years old.

36.   As described further below, the mental and physiological harms caused by long-term solitary confinement are many and well-known.  These harms far exceed the rigors of ordinary prison life.  Moreover, these harms can manifest in a period of weeks, if not days.  The Named Plaintiffs have each spent years in solitary confinement and have each exhibited mental and physiological health symptoms common to the serious harms caused by long-term solitary confinement, including, but not limited, to the harms outlined above.  The full extent of the harm caused to the Named Plaintiffs is not yet known.  Upon information and belief, VDOC has never attempted to assess the impact of its solitary confinement practices on the health of prisoners, does not maintain a medical doctor or psychiatrist on staff at either Red Onion or Wallens Ridge, and has not sought to prevent or ameliorate the harms of solitary confinement as to any of the Named Plaintiffs or members of the class.  The Named Plaintiffs and the members of the class are each at a substantial risk of serious harm due to VDOC's solitary confinement policies and practices.

## II.   Defendants

37.   **VDOC.**  Defendant VDOC is the executive agency responsible for operating and maintaining correctional facilities within Virginia.   Defendant VDOC provides supervision and control over state correctional facilities and their programs and reentry services, which includes the Step-Down Program.[1] Defendant VDOC is responsible for issuing regulations, policies, directives, and operating procedures governing the operation of state correctional facilities, and Defendant VDOC has issued operating procedures governing the Step-Down Program at Red Onion and Wallens Ridge.   Defendant VDOC is statutorily required to establish and maintain a clinical treatment program for certain prisoners within its custody, including clinical assessments of the prisoners and the development of appropriate treatment plans.   Defendant VDOC is also responsible for developing and implementing a comprehensive reentry plan for each inmate in its custody.  Defendant VDOC is a party to the *Brown* Settlement Agreement.   Defendant VDOC has its regular place of business in Richmond, Virginia.

38.   **Harold Clarke.**  Defendant Harold Clarke is the Director of VDOC. He is responsible for supervising and managing VDOC and its system of state correctional facilities, including Red Onion and Wallens Ridge.[2] Defendant Clarke is responsible for implementing and overseeing policies and procedures to determine long- and short-range goals for the correctional facilities in Virginia,

---

[1] 6 Va. Admin. Code § 15 (2019).

[2] Va. Code Ann. § 53.1-10(1) (2018).

and for reviewing and approving all policies and procedures designed to promote the safety and security of prisoners assigned to restrictive housing in state correctional facilities.  Upon information and belief, Defendant Clarke has the discretionary authority to assign any prisoner to any VDOC institution. Defendant Clarke's regular place of business is at VDOC headquarters in Richmond, Virginia.  He is sued in his individual and official capacity.

39.     Defendant Clarke was involved in the creation of Operating Procedure ("O.P.") 830.A, the VDOC Segregation Reduction Step-Down Program, the Restrictive Housing Reduction Step-Down Program Operations Strategy Manual, and subsequent updates (collectively the "Step-Down Program"). Defendant Clarke knows or has reason to know that the Step-Down Program permits long-term solitary confinement without a legitimate penological purpose, and knows or has reason to know that long-term solitary confinement causes severe mental and physical harms.

40.     **Randall C. Mathena.**  Defendant Randall C. Mathena is the VDOC Security Operations Manager.   Between October 2011 and January 2015, Defendant Mathena was the Warden at Red Onion.  As the former Warden of Red Onion, Defendant Mathena was responsible for the care and custody of prisoners at Red Onion, for supervising daily operational activities, and for ensuring staff compliance with VDOC policies and procedures.  Defendant Mathena also was involved in the development and implementation of the Step-Down Program.  As the current VDOC Security Operations Manager, Defendant Mathena is chairperson of the External Review Team ("ERT"), which is responsible for

performing reviews of prisoner classifications and pathway assignments in the Step-Down Program at Red Onion and Wallens Ridge. Defendant Mathena knows or has reason to know that the Step-Down Program permits long-term solitary confinement without a legitimate penological purpose, and knows or has reason to know that long-term solitary confinement causes severe mental and physical harms. Defendant Mathena's regular place of business is at VDOC headquarters in Richmond, Virginia. He is sued in his individual and official capacity.

41. **H. Scott Richeson.** Defendant H. Scott Richeson is the VDOC Deputy Director of Reentry and Programs. Defendant Richeson is or has been a member of the ERT. Defendant Richeson has been responsible for reviewing and approving updates to the Step-Down Program. Defendant Richeson is responsible for supervising the mental health services within VDOC. Defendant Richeson knows or has reason to know that the Step-Down Program permits long-term solitary confinement without a legitimate penological purpose, and knows or has reason to know that solitary confinement causes severe mental and physical harms. Defendant Richeson's regular place of business is at VDOC headquarters in Richmond, Virginia. She is sued in her individual and official capacity.

42. **A. David Robinson.** Defendant A. David Robinson is the VDOC Chief of Corrections Operations. Defendant Robinson is responsible for the daily operations and overall safety of Virginia's correctional facilities, including supervising VDOC's "restrictive housing" program and compliance with federal laws. Defendant Robinson is a member of the ERT and has been responsible for approving all staff members of the ERT. Defendant Robinson also has been

responsible for reviewing and approving updates to the Step-Down Program. Defendant Robinson knows or has reason to know that the Step-Down Program permits long-term solitary confinement without a legitimate penological purpose, and knows or has reason to know that solitary confinement causes severe mental and physical harms. Defendant Robinson's regular place of business is at VDOC headquarters in Richmond, Virginia. He is sued in his individual and official capacity.

43. **Henry J. Ponton.** Defendant Henry J. Ponton is the VDOC Regional Operations Chief for the Western Region and was the former Regional Operations Administrator in 2015 and 2016. As Regional Operations Chief, Defendant Ponton is responsible for approving the reassignment or transfer of any inmate to Red Onion and Wallens Ridge for placement in Level S.[3] He has ultimate authority over decisions made by the Dual Treatment Team ("DTT")[4] regarding whether a prisoner should advance through the Step-Down Program. Defendant Ponton has been a member of the ERT. Defendant Ponton has been involved in developing, reviewing, and approving updates to the Step-Down Program. Defendant Ponton knows or has reason to know that the Step-Down Program permits long-term solitary confinement without a legitimate penological purpose, and knows or has reason to know that solitary confinement causes severe mental and physical harms. Defendant Ponton's regular place of business is in Roanoke, Virginia. He is sued in his individual and official capacity.

---

[3] Security Level S is the security level VDOC uses for prisoners in long-term solitary confinement. *See infra* ¶ 134.

[4] *See infra* ¶ 136 (describing the Dual Treatment Team).

44. **Marcus Elam.** Defendant Marcus Elam is the VDOC Regional Administrator for the Western Region. Defendant Elam is responsible for approving any inmate at Red Onion and Wallens Ridge for placement in Level S, and reviews determinations by the wardens of Red Onion and Wallens Ridge to assign prisoners from the Level S security classification. Defendant Elam has served as a member of the ERT. Defendant Elam has been responsible for reviewing and approving updates to the Step-Down Program. Defendant Elam knows or has reason to know that the Step-Down Program permits long-term solitary confinement without a legitimate penological purpose, and knows or has reason to know that solitary confinement causes severe mental and physical harms. Defendant Elam's regular place of business is in Roanoke, Virginia. Defendant Elam is sued in his individual and official capacity.

45. **Denise Malone.** Defendant Denise Malone is the Chief of Mental Health Services for VDOC, which is responsible for stabilization of the mentally ill and minimization of psychiatric deterioration in the correctional setting. Defendant Malone is responsible for the supervision of all mental health clinical supervisors, including the supervisors responsible for the provision of mental health services at Red Onion and Wallens Ridge. Defendant Malone is also responsible for VDOC mental health treatment and associated policies and procedures and for the appropriate classification of VDOC prisoners based on mental health needs. Upon information and belief, Defendant Malone is responsible for ensuring that all VDOC policies and procedures, including the Step-Down Program, comply with the mission of VDOC's Mental Health Services and its goal of minimizing psychiatric deterioration within VDOC correctional

-21-

facilities. Defendant Malone is a member of the ERT. Defendant Malone is responsible for handling grievance appeals, for approving the mental health program and trainings at VDOC institutions, and for supervising and administering disciplinary actions for Qualified Mental Health Professionals ("QMHP"). Defendant Malone knows or has reason to know that the Step-Down Program permits long-term solitary confinement without a legitimate penological purpose, and knows or has reason to know that solitary confinement pursuant to the Step-Down Program causes severe mental and physical harms. Defendant Malone's regular place of business is in Richmond, Virginia. She is sued in her individual and official capacity.

46. **Steve Herrick.** Defendant Steve Herrick is the Health Services Director within VDOC. Defendant Herrick is responsible for the supervision of all health care personnel within VDOC, including at Red Onion and Wallens Ridge. Defendant Herrick is also responsible for maintaining adequate personnel and infrastructure at all correctional facilities as required to provide adequate and preventative health care. Defendant Herrick was formerly responsible for overseeing all mental health services within VDOC institutions, which, upon information and belief, includes the Step-Down Program's mental health activities as well as the classification of prisoners with mental health issues at Red Onion and Wallens Ridge. Defendant Herrick knows or has reason to know that the Step-Down Program permits long-term solitary confinement without a legitimate penological purpose, and knows or has reason to know that solitary confinement causes severe mental and physical harms. Defendant Herrick's regular place of

business is in Richmond, Virginia.  He is sued in his individual and official capacity.

47.  **Tori Raiford.**  Defendant Tori Raiford is the Statewide Restrictive Housing Coordinator for VDOC and was Unit Manager of D Building at Red Onion until October 2015.  In her role as a Unit Manager, Defendant Raiford was a member of the DTT and the ERT, and reviewed Institutional Classification Authority ("ICA") reports.[5]  As the Statewide Restrictive Housing Coordinator, Defendant Raiford is responsible for designing, planning, implementing, and overseeing operations of VDOC's solitary confinement or "restrictive housing" program.  Defendant Raiford knows or has reason to know that the Step-Down Program permits long-term solitary confinement without a legitimate penological purpose, and knows or has reason to know that solitary confinement causes severe mental and physical harms. Defendant Raiford's regular place of business is at VDOC headquarters in Richmond, Virginia.  Defendant Raiford is sued in her individual and official capacity.

48.  **Jeffrey Kiser.**  Defendant Jeffrey Kiser is the Warden of Red Onion. He also was the Assistant Warden of Red Onion from 2011 to 2012.  As Warden, Defendant Kiser has the ultimate responsibility for the care and custody of prisoners at Red Onion, for supervising daily operational activities, and for ensuring staff compliance with VDOC policies and procedures, including the Step-Down Program, and specifically, the activities of Red Onion staff and employees administering and operating the Step-Down Program, including Unit Managers,

---

[5] *See infra* ¶¶ 175-78 (describing the role of the ICA).

QMHPs, and psychologists used by Red Onion.  As Warden, Defendant Kiser is also the Facility Unit Head of Red Onion and has ultimate responsibility over DTT decisions regarding a prisoner's progress through the Step-Down Program. Defendant Kiser was involved in developing and updating the Step-Down Program.  Defendant Kiser knows or has reason to know that the Step-Down Program permits long-term solitary confinement without a legitimate penological purpose, and knows or has reason to know that solitary confinement causes severe mental and physical harms.  Defendant Kiser's regular place of business is at Red Onion in Pound, Virginia.  He is sued in his individual and official capacity.

49.   **Carl Manis.**  Defendant Carl Manis is the Warden of Wallens Ridge. As Warden, Defendant Manis has the ultimate responsibility for the care and custody of prisoners at Wallens Ridge, for supervising daily operational activities, and for ensuring staff compliance with VDOC policies and procedures, including the Step-Down Program, and specifically, the activities of Wallens Ridge staff and employees administering and operating the Step-Down Program, including Unit Managers, QMHPs, and psychologists used by Wallens Ridge.  As Warden, Defendant Manis is also the Facility Unit Head of Wallens Ridge and has ultimate responsibility over the DTT and the Building Management Committee ("BMC")[6] or Unit Manager decisions regarding a prisoner's progress through the Step-Down Program.  Defendant Manis was involved in developing and updating the Step-Down Program.  Defendant Manis knows or has reason to know that the Step-Down Program permits long-term solitary confinement without a legitimate

---

[6] *See infra* ¶¶ 169-73 (describing the role of the BMC).

penological purpose, and knows or has reason to know that solitary confinement causes severe mental and physical harms.  Defendant Manis's regular place of business is at Wallens Ridge in Big Stone Gap, Virginia.  He is sued in his individual and official capacity.

## FACTS

**I.     VDOC Rejects Science in Implementing Long-Term Solitary Confinement through the Original Phase Program.**

### A.     Long-Term Solitary Confinement at the Mecklenburg Correctional Center.

50.     Upon information and belief, VDOC's use of solitary confinement "behavior modification" programming originated shortly before 1977.  That year, VDOC opened Mecklenburg.  According to a special study later commissioned by the Virginia Board of Corrections, VDOC designed Mecklenburg "to be a special purpose maximum security facility for the Commonwealth's most disruptive inmates."[7]

51.     Prisoners held in Mecklenburg solitary confinement units had their movement stringently controlled and constantly monitored.[8]  They lived alone in single cells, where they spent the great majority of their time.[9]  They were permitted occasional out-of-cell showers and recreation,[10] but were not permitted

---

[7] Ex. 1, Commonwealth of Va. Bd. of Corr., Mecklenburg Correctional Center Study Committee 46 (1984) [hereinafter 1984 Mecklenburg Study Committee Report].

[8] *Shrader v. White*, No. 82-0247-R, 1983 U.S. Dist. LEXIS 15888, at *32-33 (E.D. Va. June 29, 1983).

[9] *Id.*

[10] *Id.*

to interact with other prisoners.[11]  Prisoners could, at most, converse with a guard through a slot in their cell door used to pass the inmate his tray of food, which the inmate would consume alone in his cell. [12]

52.    VDOC built Mecklenburg to house 360 prisoners.  But VDOC included "no specific projection of bedspace need for the 'disruptive-type' inmate . . . in the planning for the total number of cells to be constructed at [Mecklenburg]."[13]   In fact, as of 1984, VDOC "indicated that the number of disruptive 'Mecklenburg-type' inmates within the Virginia correctional system [was] approximately 190, or less than two percent of the total combined inmate population."[14]

53.    Mecklenburg's physical scale made it an expensive facility to run securely, requiring high staffing levels and significant operational costs.  VDOC needed to fill Mecklenburg to justify the facility's costs, including its high staffing levels.

54.    VDOC filled empty beds at Mecklenburg with prisoners who fit neither the "dangerous" nor "disruptive" classifications for solitary confinement.[15] As ultimately documented in the 1984 Mecklenburg Study Committee Report,[16] VDOC went on a state-wide scouting mission to identify prisoners incarcerated at

---

[11] *Id.*

[12] Ex. 2, Settlement Agreement at 4-5; *Brown v. Hutto*, No. 81-0853-R (E.D. Va. Apr. 5, 1985).

[13] Ex. 1, 1984 Mecklenburg Study Committee Report, *supra* note 7, at 41.

[14] *Id.* at 27.

[15] *Id.* at 25, 46.

[16] The 1984 VDOC Study Committee was appointed by the Chairman of the Virginia Board of Corrections in August 1984 to examine a series of incidents that occurred at Mecklenburg during the spring and summer of 1984.  *Id.* at E-1.

other prisons for transfer to Mecklenburg. "[O]n a routine basis . . . undocumented telephone calls often were made to different Regions and institutions throughout the Commonwealth requesting inmate referrals to [Mecklenburg]."[17] VDOC then assigned "inmates to the facility primarily for the purpose of utilizing available bedspace."[18]

### B. VDOC Ignores Expert Advice in Implementing Solitary Confinement at Mecklenburg.

55. VDOC placed prisoners in solitary confinement in Mecklenburg in one of two programs: the Special Management Unit ("SMU") and the Phase Program.

56. Prisoners that VDOC deemed to be particularly disruptive were assigned to the SMU. Those prisoners assigned to the SMU could remain in solitary confinement conditions permanently.[19] VDOC policy did not provide for returning SMU prisoners to the general population. Upon information and belief, VDOC used the SMU to house prisoners in long-term solitary confinement well after they no longer presented a security risk.

57. Upon information and belief, all other prisoners at Mecklenburg were initially assigned to the long-term solitary confinement "Phase Program," which VDOC touted as a highly structured "behavior modification program."[20]

---

[17] *Id.* at 47-48.

[18] *Id.* at E-5. "[A]lmost from the time the facility first opened in 1977, inmates other than the most disruptive also [had] been confined there—at least in part because of . . . the availability of bedspace at [Mecklenburg]." *Id.* at 25. In 1984, "less than 50% of the inmates at the facility [were] disruptive inmates transferred from other institutions." *Id.* at 26.

[19] *See id.* at 58-62.

[20] *Id.* at 50.

58.     VDOC consulted independent psychologists to assist in the initial design of the Phase Program, but then ignored their recommendations.   As originally conceived, the program's goal was to change prisoner behavior through a model based on positive reinforcement.   That is, prisoners would earn additional privileges by demonstrating behaviors deemed appropriate, rather than losing privileges by committing inappropriate behaviors.[21]   The program also sought to normalize interactions between prison staff and prisoners.[22]

59.     But, before Mecklenburg even opened, VDOC abandoned the original, clinician-designed Phase Program and established a new "internal DOC Task Force" to redesign the Phase Program without the assistance of independent experts.[23]   VDOC represented that this version of the Phase Program, which eventually took effect at Mecklenburg, was a "behavior modification" program to "treat and resocialize these individuals so they could be returned to the general prison population of other institutions in the Commonwealth."[24]

60.     As ultimately constituted, the Phase Program consisted of five levels, with prisoners earning additional privileges at each step, and eligibility for return to the general prison population at the last.[25]

---

[21] *See id.* at 30.

[22] *See id.* at 30-31.

[23] *See id.* at 31.

[24] *Id.* at 46.

[25] *See id.* at 34-38, 46.

61.    According to the 1984 Mecklenburg Study Committee Report findings, privileges available at each of the Phase Program's levels were as follows:[26]

Orientation: 3 showers per week—no changes of clothes—meals in cell—limited educational opportunities—no out-of-cell activity—no work opportunities

Phase I:    3 showers per week—no changes of clothes—meals in cell—in-cell "self-study"—no out-of-cell activity—no work opportunities

Phase II:   3 showers per week—no changes of clothes—meals in cell—in-cell "self-study"—up to 2 hours once per week out-of-cell activities—work at discretion of Assistant Superintendent

Phase III:  4 showers per week—3 changes of clothes—meals in groups of twelve—some group study—up to 3 hours group T.V. per night—work at discretion of Assistant Superintendent

Phase IV:   daily showers—3 changes of clothes—meals in groups of twelve to twenty-four—some group study—up to 5 hours group T.V. per night—mandatory work[27]

62.    Despite these limited privileges, the Phase Program maintained considerable restrictions over the inmates at all times. [28]

63.    The 1984 Mecklenburg Study Committee found that the Phase Program did not promote the Program's original rehabilitative purposes.[29] Unlike

---

[26] *Id.* at 35, tbl. 1.

[27] In July 1978, VDOC prison officials abolished Phase IV. *Id.* at 34.

[28] *Id.* at 32.

[29] *Id.* at 54-55.

the program designed by the psychologists, the Phase Program rewarded prisoners not for displays of positive behavior but for long-term avoidance of negative behaviors.[30]  In order to progress to the next Phase level, prisoners were required to comply with all prison rules, policies, and regulations (regardless of whether violating the rule posed any danger), and to maintain positive "interpersonal relations with staff."[31]  Prisoners were also required to show "satisfactory progress in programs assigned."[32]  Staff retained discretion to revoke an inmate's privileges, regress him in Phase level, or even require him to restart the Program entirely, if they decided the inmate did not exhibit sufficient compliance in these categories.

64.    Even compliance with all three of these behavioral categories would not guarantee an inmate's advancement to the next step.  The Phase Program required prisoners to spend a mandatory minimum period of time in solitary confinement at each level (e.g., 60 days for Phase I; 120 days for Phase II; and 90 days for Phase III).

65.    Prisoners in the SMU were not eligible for the Phase Program at all— upon information and belief, they remained in long-term solitary confinement indefinitely.

## II.    The Documented Failure of VDOC's Phase Program.

66.    The 1984 Mecklenburg Study Committee found that VDOC used its Phase Program as part of a scheme to fill empty prison beds by placing in solitary

---

[30] *Id.* at 52.

[31] *Id.* at 36-37.

[32] *Id.*

confinement prisoners who did not present a security risk, and then keeping them there for as long as possible.

67. VDOC's purposely imprecise Phase Program "assignment criteria" led to "inappropriate inmate placements in the Phase Program . . . (i.e., for reasons other than that the inmate had been 'disruptive')."[33]

68. The 1984 Mecklenburg Study Committee consulted with independent mental health experts to examine the Phase Program.[34] These experts were unanimously "critical of the behavior modification program as it [was] being implemented at [Mecklenburg]."[35] According to the experts, the Phase Program was fundamentally flawed because the incentives were of an "almost entirely negative orientation, rewarding inmates for long-term avoidance of negative, disruptive behaviors—and punishing them severely if they engaged in such behaviors by almost always forcing them to start over at the beginning of the Phase—rather than supporting their development of desirable, adaptive behaviors."[36]

69. Additionally, the Phase Program's standards for inmate advancement were ambiguous and vested prison staff with too much discretion over denying inmate progression through the Program. For example, staff members could penalize prisoners based on their subjective view that the prisoners did not exhibit satisfactory interpersonal relationships with staff and

---

[33] *Id.* at 55.

[34] *See, e.g., id.* at 51-52.

[35] *Id.* at 52.

[36] *Id.*

other prisoners, or satisfactory progress in programs.[37]  The Program's subjective evaluation criteria were exacerbated by VDOC's failure to train program staff and guards adequately.  The result was an unwritten policy of arbitrarily preventing prisoners from advancing through the Phase Program, thus leaving them in solitary confinement indefinitely.

70.    Prison officials' significant discretion to hold prisoners at the lower Phases of the Phase Program or to demote prisoners who had advanced, resulted in nearly the same draconian conditions as those suffered by prisoners in the SMU. An expert engaged by the Virginia Board of Corrections summarized his conclusions: "One wonders whether it is better not to attempt the [Phase] [P]rogram at all, than to do it wrong."[38]

71.    Having reviewed the 1984 Mecklenburg Study Committee's Report, the Virginia Board of Corrections recommended that VDOC "[a]ssemble a team to reassess and redesign the [Mecklenburg] Phase Program consistent with appropriate clinical practice.  The program team should include DOC personnel responsible for both correctional security and treatment, as well as other individuals with special expertise who are not employees of DOC."[39]

---

[37] Am. Suppl. Compl. ¶ 47, *Brown v. Hutto*, No. 81-0853-R (E.D. Va. July 29, 1982) [hereinafter *Hutto* Compl.]; *see also id.* ¶ 44.

[38] Ex. 1, 1984 Mecklenburg Study Committee Report, *supra* note 7, at 53.

[39] *Id.* at E-4 (emphasis in original).

**III.**   <u>Brown v. Landon</u>:  VDOC Settles a Prisoner Class Action by Abolishing the SMU and Ending the Phase Program.

72.   In August 1981, prisoners represented by the American Civil Liberties Union's National Prison Project filed suit in this Court against the VDOC director, among others, on behalf of a class including "all prisoners who are or will be confined at the Mecklenburg Correctional Center . . . , an institution operated by Commonwealth of Virginia Department of Corrections."[40]   The class alleged that the "totality of the conditions" at Mecklenburg fell "beneath standards of human decency, inflict[ed] needless suffering on prisoners and create[d] an environment which threatens prisoners' mental and physical well being and result[ed] in the unnecessary deterioration of prisoners confined there."[41]   The Phase Program "exacerbated" these conditions by permitting arbitrary imposition of solitary confinement "on prisoners for indefinite periods in the absence of objective criteria for release to other Department of Corrections institutions."[42]

73.   The class alleged that these practices violated the prisoners' rights to due process and the Eighth Amendment's bar on cruel and unusual punishments.[43]

74.   In the wake of the 1984 Mecklenburg Study Committee Report, the VDOC defendants entered into a Settlement Agreement with "[a] class of all prisoners who are, or will be, confined in the Mecklenburg Correctional Center of

---

[40] *Hutto* Compl. ¶ 1.

[41] *Id.*

[42] *Id.* ¶ 2.

[43] *Id.* ¶ 94.

the Virginia Department of Corrections."[44]  The Settlement Agreement binds VDOC, "their agents, employees, and successors in office."[45]  With respect to its permanent features, the Settlement Agreement contains no sunset provision.

75.    The Settlement Agreement binds VDOC on a department-wide basis, and as to all successors, to permanently abolish the SMU, and commit that it will "remain abolished."[46]

76.    The Settlement Agreement also binds VDOC to permanently "discontinue[] the phase program" and VDOC stated that it did "not intend to reinstate any similar program in the future."[47]

77.    The parties submitted the Settlement Agreement to the Court, which issued a consent decree on April 5, 1985.

78.    When it closed the SMU and abolished the Phase Program, VDOC transferred all prisoners into "C Custody"—a general-population classification it created for maximum-security prisoners at Mecklenburg.  Upon information and belief, VDOC built an outdoor recreation yard at Mecklenburg and permitted C Custody prisoners to move between their cells, the pod floor, and the outdoor recreation yard.

---

[44] Order Granting Class Certification, *Brown v. Hutto*, No. 81-0835-R (E.D. Va. Feb. 8, 1982).

[45] Ex. 3, Settlement Agreement at 1, *Brown v. Landon*, No. 81-0853-R (E.D. Va. Apr. 5, 1985) [hereinafter 1985 Settlement Agreement].

[46] *Id.* ¶ 3.

[47] *Id.* ¶ 1.

79.    The Virginia Board of Corrections committed to "ensur[ing] that the systematic degeneration of the correctional operations which occurred at the Mecklenburg Correctional Center does not occur again at any institution in the Virginia Department of Corrections."[48]

## IV.    VDOC Sets Out To Ignore the Settlement Agreement.

80.    After VDOC abolished the Phase Program and the SMU under the Settlement Agreement it faced a new problem:  As the Virginia Joint Legislative Audit Review Commission[49] found, Mecklenburg's annual per prisoner cost of $33,152 made "housing general population inmates [in single cells] . . . a very costly and inefficient use of maximum-segregation beds."[50]

81.    The State then called upon VDOC to "improve the cost effectiveness of Mecklenburg's operation" by finding ways to fill empty beds with a prisoner population that "need[ed] the high staffing complement and close supervision characteristic of Mecklenburg,"[51] or by "seek[ing] relief from the consent decree" provisions requiring VDOC to reform its solitary confinement practices.[52]

---

[48] Ex. 1, 1984 Mecklenburg Study Committee Report, *supra* note 7, at E-2.

[49] The Virginia General Assembly's Joint Legislative Audit and Review Commission is empowered by the Code of Virginia to review the operations of state agencies "to evaluate the effectiveness of programs in accomplishing legislative intent," to "[s]tudy on a continuing basis the operations, practices and duties of state agencies, as they relate to efficiency in the utilization of space, personnel, equipment and facilities," and to make reports and recommendations on, *inter alia*, the "[w]ays in which the agencies may operate more economically and efficiently." Va. Code Ann. § 30-58.1.

[50] Ex. 4, Va. Gen. Assembly Joint Legislative Audit & Rev. Comm'n, *The Capital Outlay Planning Process and Prison Design in the Department of Corrections* III (1987) [hereinafter 1987 General Assembly JLARC Report].

[51] *Id.* at 50.

[52] *Id.*

82. VDOC never sought relief from the Court from the terms of the Settlement Agreement with regard to reinstituting any program similar to the Phase Program or the SMU, and Mecklenburg remained economically inefficient.

83. Instead, VDOC undertook to replace Mecklenburg with two new super-max prisons—later named Red Onion and Wallens Ridge. Upon information and belief, these two new prisons were designed to accommodate long-term solitary confinement throughout the prisons. Since 2012, different areas of both prisons have been set aside for long-term solitary confinement use. Upon information and belief, in operating Red Onion and Wallens Ridge, VDOC has faced issues similar to those it faced at Mecklenburg in terms of finding ways to fill empty beds with a prisoner population that needs the high staffing complement and close supervision characteristic of maximum security prisons that also implement long-term solitary confinement.

84. Throughout the next decade, while the Settlement Agreement and Consent Decree were fully in force, VDOC undertook extensive policymaking, planning, and construction efforts to open Red Onion and Wallens Ridge, which VDOC asserted, as it had claimed as to Mecklenburg, would "house inmates who are higher custody or who have a history of poor behavior in other DOC institutions."[53]

---

[53] Ex. 5, Va. Gen. Assembly Joint Legislative Audit & Rev. Comm'n, *Review of DOC Nonsecurity Staffing and the Inmate Programming Schedule* 2 (1997) [hereinafter 1997 General Assembly JLARC Report].

85.    In February 1997, VDOC moved to terminate the Consent Decree based on the Prison Litigation Reform Act, 42 U.S.C. § 1997e, arguing that "the decree ha[d] become moot, largely through the VDOC's implementation of state-wide Department Operating Policies ('DOPs') which address the operational elements of the Decree."[54]  Those policies related to the parts of the Settlement Agreement that only addressed continuing aspects of long-term solitary confinement at Mecklenburg.

86.    At no point, however, did VDOC seek relief from the permanent aspects of the Settlement Agreement relating to termination of the Phase Program or the SMU.

## V.    VDOC Re-Institutes Long-Term Solitary Confinement at Red Onion and Wallens Ridge.

87.    Soon after Mecklenburg began winding down its solitary-confinement units in the late-1980s pursuant to the Settlement Agreement, the coal mines in Wise and Dickenson Counties began to close shop.  In 1998 and 1999, less than three years after approximately 4,000 local residents lost their jobs due to mine closures, VDOC opened Wallens Ridge and Red Onion in Wise County. Red Onion was constructed on the site of an abandoned strip-mine.  Then-Governor James Gilmore III praised the prisons as "an economic boon" for Wise County.[55]

---

[54] Mem. Supp. Mot. Terminate Consent Decree 7, *Brown v. Landon*, No. 81-0853-R (E.D. Va. Feb. 14, 1997).

[55] Joseph T. Hallinan, *Going Up The River* 206 (2003).

88.     VDOC designed Red Onion and Wallens Ridge to accommodate 1,200 prisoner beds each.   Upon information and belief, as with Mecklenburg, no statistics at that time suggested that the Commonwealth of Virginia needed or would need space to house 2,400 inmates who were higher custody or who have a history of poor behavior in other Virginia prisons.

89.     Upon information and belief, VDOC would have known that lower-security institutions required fewer guards and staff members to operate—some VDOC prisons have been operated with a ratio of .58 staff members for every prisoner.[56]  Institutions like Mecklenburg, on the other hand, necessarily require a more costly, higher ratio of guards and staff to prisoners.   In fact, at Mecklenburg, VDOC employed more staff than prisoners, at 1.2 staff members for every prisoner, and at a cost of over $76,000 per prisoner, adjusted for inflation.[57]

90.     Despite the findings of the 1984 Mecklenburg Study Committee that VDOC had improperly housed prisoners in long-term solitary confinement for economic reasons, and despite knowing that Virginia's "dangerous" prison population is exceedingly low, upon information and belief, VDOC did not design Red Onion and Wallens Ridge to be cheaper, or more flexible, general-population facilities.   The reason why is known only to VDOC.   But, by replacing one maximum security prison that also implements long-term solitary confinement that it could not fill or justify with two such prisons, VDOC not only revived—but

---

[56] Ex. 6, Va. Gen. Assembly Joint Legislative Audit & Rev. Comm'n, *Security Staffing and Procedures in Virginia's Prisons* 258 (1986).
[57] Ex. 7, Va. Gen. Assembly Joint Legislative Audit & Rev. Comm'n, *Correctional Issues in Virginia: Final Summary Report* 21 (1986).

exacerbated—its economic incentives for keeping prisoners in long-term solitary confinement.

91.    VDOC also dropped any pretense that its solitary confinement regime was designed to rehabilitate prisoners for release to the general population of other institutions, or to society at large.  After the prisons opened, then-VDOC Director Angelone remarked of prisoners housed at Red Onion and Wallens Ridge: "What are they going to be rehabilitated for?  To die gracefully in prison?"  Director Angelone concluded:  "Let's face it; they're here to die in prison."[58]

92.    Even before opening Red Onion and Wallens Ridge, however, VDOC faced the very same problem it had faced at Mecklenburg:  It could not fill the beds in Red Onion and Wallens Ridge.[59]  Upon information and belief, VDOC then decided to solve this problem in various ways.  VDOC loosened its classification criteria to allow for prisoners to be placed in long-term solitary confinement based on factors unrelated to a prisoner's behavior in prison.  The factors included a prisoner's crime of conviction, length of sentence, or even lack of a high school diploma, none of which related to any valid penological purpose.  VDOC also progressively lowered the length of prison sentence required to merit placement in Red Onion and Wallens Ridge.  Upon information and belief, within months of Red Onion's opening, one-fifth of the prisoners housed there were serving sentences not of 80 years, but ten.  VDOC then lowered the bar even further,

---

[58] Margaret Edds, *Punishing Crime; "Supermaxes" Deserve Super Scrutiny*, The Virginian-Pilot, Jan. 10, 1999.
[59] Judith A. Greene, *Entrepreneurial Corrections: Incarceration as a Business Opportunity*, *in Invisible Punishment* 13 (Maurer and Chesney-Lind eds., 2002)

transferring prisoners to Red Onion and Wallens Ridge who were serving as few as five years. Thus, shortly after Red Onion and Wallens Ridge opened, VDOC's brand for these institutions, "worst of the worst," had become all but meaningless.

93. Despite adopting relaxed criteria, VDOC still was not able to fill Red Onion or Wallens Ridge. VDOC therefore sought to import more than three thousand prisoners from other jurisdictions, entering into interstate compacts with the District of Columbia, Hawaii, Maryland, Michigan, Vermont, Delaware, Pennsylvania, Connecticut, New Mexico, Wyoming, and the U.S. Virgin Islands, among others. Upon information and belief, these prisoners are in long-term solitary confinement at Red Onion and Wallens Ridge even if there was no legitimate penological purpose for housing them there.

## VI.    Long-Term Solitary Confinement at Red Onion and Wallens Ridge.

94. As recognized by the U.S. Supreme Court and the U.S. Court of Appeals for the Fourth Circuit, life in a super-max prison is "synonymous with extreme isolation."[60]

95. Conditions at Red Onion and Wallens Ridge are no exception. But, as with Mecklenburg, the conditions of long-term solitary confinement at Red Onion and Wallens Ridge go beyond what the general population in maximum security prisons experience by depriving prisoners of almost every aspect of ordinary prison life.

---

[60] *Incumaa v. Stirling*, 791 F.3d 517, 530 (4th Cir. 2017) (Thacker, J.) (quoting *Wilkinson v. Austin*, 545 U.S. 209, 214 (2005)).

### A. Prisoners Are Locked in a Cell Smaller than a Parking Space.

96.     Unlike prisoners in VDOC's general population, prisoners in solitary confinement at Red Onion and Wallens Ridge spend nearly all of their waking hours within the four walls of a single 8' x 10' cell—about half the size of an average parking space.  The prisoners are alone within their cell for the vast majority of the day, approximately 22 to 24 hours a day.

97.     The cell features a solid steel door with a tray for food and a small window.  The cell contains only a desk, toilet, and sink.  The single exterior window is covered with opaque white film that prevents any view of the outside world.

98.     Prisoners receive their meals in their cell, through a food slot in the door.  Unlike prisoners in VDOC's general population, they eat alone and in the same cramped quarters where they urinate, defecate, and sleep.

99.     While VDOC deprives prisoners in solitary confinement of most contact with the outside world, the closed environment bombards prisoners' senses with overwhelmingly noxious smells and unceasing noise.  At all hours of the day, prisoners cry, scream, wail, and beat on their solitary metal door.  The noise then ricochets off the concrete and steel construction of the cell pod.

100.    Prisoners cannot control the artificial lighting in their cell, which stays on all hours of the day and is bright enough to read by, even during sleeping hours.  The pervasive light, smell, and noise guarantee that prisoners do not sleep restfully.

**B.     Imposed Severe Social Isolation.**

101.   Daily existence at these facilities is devoid of meaningful physical contact and social interaction.

102.   The cells are designed to prevent contact.  Cell doors are lined with strips along their sides and bottoms, which thwart communication with others. Prisoners in adjacent cells can only communicate by a necessary accident of prison design:  the HVAC vents.

103.   Most of a prisoner's interaction is with the prison staff who conduct status checks with each prisoner during periodic rounds through the cellblock. During these rounds, guards and Qualified Mental Health Professionals ("QMHPs") knock on the prisoner's cell-front window and ask the prisoner a cursory question or give a brief greeting at the cell front, through the food slot. This interaction is limited to establishing whether the prisoner is still alive or at imminent risk of committing self-harm.  As confirmed under oath by VDOC staff, they are generally trained to look for "living, breathing, moving flesh."[61]  These cell front check-ins afford no privacy whatsoever and lead prisoners not to respond candidly about their suffering in prolonged solitary confinement.    These interactions are not meaningful human interactions.

104.   Prisoners who threaten to harm themselves are placed alone in a bare "strip cell" with no clothes or bedding, strapped to a gurney, and fed a liquid

---

[61] Dep. Tr. Ronald Stanley at 12:10-11, *DePaola v. Clarke*, No. 7:16-cv-00485 (Oct. 4, 2018); *see also* Dep. Tr. John T. Fleming at 17:13-15, *DePaola*, No. 7:16-cv-00485 (Sept. 27, 2018) ("So you just go from cell to cell making sure you see living, breathing flesh.").

diet until they report (truthfully or otherwise) that they no longer intend to harm themselves.  Staff then return the prisoners to their solitary confinement cells.

105.   Prisoners in long-term solitary confinement are entitled by policy to only one hour of non-contact visitation with family and friends per week.  Visits are held in a visitation booth behind a thick layer of Plexiglas.  Prisoners can talk to only one person at a time through a telephone at the booth.  Physical contact is neither possible nor permitted.  Prisoners in general population face none of these restrictions.

106.   VDOC has not provided for privileged and confidential legal visitation at either Red Onion or Wallens Ridge.  Though Red Onion and Wallens Ridge contain a visitation booth that allows prisoners to speak with their visitor through a narrow slot, which can also be used to exchange documents, prison staff often prohibit legal visits at this booth.  Instead, attorneys are at times required to conduct legal visits with their clients at the sealed and segregated booth used for general visitation, as described above, and must speak with their clients through a telephone that is, upon information and belief, monitored by prison staff.  Prison staff also at times require attorneys to visit with their clients in the booth located nearest the visitation guard post, allowing staff to overhear privileged and confidential conversations.  VDOC officials limit legal visits to Mondays and Thursdays, and to one hour on Tuesdays and Wednesdays.

**C.    Daily Cavity Searches and Lack of Humanizing Physical Contact.**

107.    Prisoners in long-term solitary confinement at Red Onion and Wallens Ridge endure dehumanizing, daily cavity searches.

108.    Before leaving his cell, a prisoner is forced to strip naked before two officers, who inspect his head, hair, mouth, torso, pelvic area, legs, and feet.  Then the prisoner is obliged to open his mouth, raise his arms, turn around, spread his legs, raise his penis and testicles, turn around to face the back of the cell, spread his buttocks, bend over so that the guard can inspect the prisoner's anus, and then squat and cough.  Upon information and belief, prisoners in VDOC's general population are not subject to this frequency of body cavity searches.

**D.    Prisoners Spend Their Hour of Out-of-Cell Time in a "Dog Cage."**

109.    During the Class Period (defined below), prisoners in solitary confinement left their cells only for a 15-minute shower three times per week, or for one hour of "outdoor recreation" per day, which was often revoked at the guards' discretion.[62]

110.    When taken to "outdoor recreation," prisoners are led in shackles by a leash to the outdoor recreation "yard," in which stand a number of 5' x 9' "recreation cages" that resemble dog kennels.  Prisoners spend their period of "outdoor recreation" in these cages, which are empty and lack any recreational

---

[62] During pre-litigation investigation of this action, VDOC revised its policy such that inmates are permitted two hours of "outdoor recreation." Ex. 8, Va. Dep't of Corr., *Restrictive Housing Reduction Step-Down Program: Red Onion State Prison and Wallens Ridge State Prison* 43 (updated Sept. 2017) [hereinafter 2017 Step-Down Plan].

equipment. When more than one prisoner is present on the recreation yard, they are not placed near each other. Prisoners also are not permitted to talk to each other.

111. If prisoners need to use a bathroom during recreation time, they must forfeit the remainder of their recreation time. During the winter, the recreation space is unheated and, as VDOC does not provide solitary confinement prisoners with suitable winter clothes, this renders the recreation space unsuitable for use.

112. Because VDOC utilizes so-called "off" days (i.e. days when no showers or recreation are made available) and because staff often deny prisoners access to recreation or shower regardless of what official policy dictates, prisoners may spend 24 to 48 hours in their cells continuously.

113. Upon information and belief, prisoners in VDOC's general population do not face these restrictions.

**E. Denial of Meaningful Work, Productive Activities, Parole, and Good Time Credit.**

114. While in solitary confinement, VDOC denies prisoners all "productive activities," such as structured art and creative writing programs. As an alternative to "outdoor recreation," prisoners who have spent a minimum of nine months in solitary confinement for SM prisoners, or 18 months for IM prisoners, may be required to roll sporks and salt-and-pepper packets into a napkin while shackled to a chair by the hands and feet. Alternatively, they may be required to clean showers while shackled. If a prisoner refuses to work, prison staff revoke

his privileges and extend the time he must serve in solitary confinement (see *infra* paragraphs 154-167, 202).

115.   By contrast, upon information and belief, general population prisoners have access to productive activities and voluntary work opportunities.

116.   VDOC allows prisoners demonstrating good behavior to earn "good time credit" towards a reduction in their overall sentence.  Prisoners placed in solitary confinement at Red Onion and Wallens Ridge, however, are not permitted to earn good time credit, or they earn credit at a significantly reduced rate.  Upon information and belief, prisoners housed in VDOC's general population earn good time credit at a faster rate.

117.   Prisoners sentenced before 1995 are eligible for parole in Virginia. However, VDOC denies parole to otherwise parole-eligible prisoners while they are in solitary confinement at Red Onion and Wallens Ridge.  Hence, for example, when VDOC places a prisoner in solitary confinement because of his crime, VDOC effectively permanently denies that prisoner any opportunity for parole, no matter how well-behaved that prisoner then may be within the institution.

118.   Upon information and belief, parole-eligible prisoners housed in VDOC's general population do not face such restrictions.

**F.** **VDOC Holds Prisoners in Solitary for Indefinite and Lengthy Periods.**

119.    As with the failed Phase Program and SMU at Mecklenburg, VDOC's policies render solitary confinement at Red Onion and Wallens Ridge long-term, arbitrary, and indefinite.

120.    VDOC has held some prisoners, including Plaintiffs Thorpe and McNabb, in solitary confinement for well over a decade. Remaining infraction free, completing all required programming, and refraining from any acts approaching violent behavior does not guarantee a return to general population. As discussed *infra* in paragraphs 154-167, VDOC's use of mandatory minimum solitary confinement periods guarantees that prisoners will endure lengthy solitary confinement regardless of their behavior there, as do the arbitrary, irrational, and largely illusory review procedures.

121.    The conditions of confinement and resulting mental and physical harms that prolonged solitary confinement inflicts on prisoners are atypical and severe compared to the experience of prisoners in VDOC's general population.

**VII. VDOC Changes The Phase Program to Address Public Criticism of Solitary Confinement: "Progressive Housing Phase Program."**

122.    Red Onion and Wallens Ridge had been open less than a year when, in 1999, Human Rights Watch ("HRW") released a report identifying major operational deficiencies and human rights violations in both prisons. The report found that VDOC designed the two prisons to "exceed reasonable security

precautions" and populated them "[i]n a blatant effort to fill large super-maximum security facilities whose capacity exceeds the state's needs . . . ."[63]

123.    HRW observed that staff used excessive violence with prisoners for even minor issues or misunderstandings.[64] Responding to "allegations of improper treatment at Red Onion and Wallens Ridge," the U.S. Department of Justice ("DOJ") initiated an investigation into Red Onion for use of excessive force.[65]

124.    Following a class-action suit filed by the ACLU of Connecticut, the Connecticut Department of Corrections withdrew its prisoners from Red Onion and Wallens Ridge and cancelled its interstate compact with Virginia.[66]

125.    After the DOJ announcement and Connecticut's cancellation of its agreement with Virginia, VDOC instituted a so-called "Progressive Housing Phase Program" at Red Onion. The Progressive Housing Phase Program was similar to the discredited Phase Program at Mecklenburg. Like the Mecklenburg program, prisoners were not eligible to leave solitary confinement at Red Onion or Wallens Ridge until they graduated from the new Progressive Housing Phase Program.

---

[63] Hum. Rts. Watch, *U.S.: Red Onion State Prison: Super-Maximum Security Confinement in Virginia* 3 (May 1, 1999), https://www.hrw.org/legacy/reports/1999/redonion/ [hereinafter HRW Report].

[64] *Id.* ("Prison staff use force unnecessarily, excessively, and dangerously. Inmates are fired at with shotguns and have been injured for minor misconduct, non-threatening errors, or just behavior that guards have misinterpreted. These inmate actions should—and in most other prisons would—be handled by staff without weapons.").

[65] Maria Glod, *U.S. Investigates Virginia Prison; Red Onion Inmates' Allegations Involve Excessive Force*, Wash. Post, Oct. 3, 2000, https://www.washingtonpost.com/archive/local/2000/10/03/us-investigates-virginia-prison/09d9ef75-41da-4a8e-ad93-687241bd1873/.

[66] *Bowing to ACLU Lawsuit, CT Officials Will Move Prisoners Out of Notorious Virginia "Supermax,"* ACLU, July 24, 2001, https://www.aclu.org/news/bowing-aclu-lawsuit-ct-officials-will-move-prisoners-out-notorious-virginia-supermax.

126.    Like the original Phase Program at Mecklenburg, VDOC promoted the Progressive Housing Phase Program as a reformative regime that employed privilege incentives to motivate behavioral change in prisoners, leading to their return to general population.  But, in practice, as VDOC confirmed in a 2018 sworn deposition, the Progressive Housing Phase Program led to little more than "warehousing offenders" in solitary confinement at Red Onion.[67]

## VIII.  Following Another Investigation, VDOC Changes The Phase Program Again: "Segregation Reduction Step-Down Program."

127.    In 2011, State Senator Adam Ebbin and Delegates Charniele Herring and Patrick Hope visited Red Onion.[68]   The three legislators observed that "prisoners in isolation are confined in an 80-square-foot cell 23 hours a day, seven days a week . . . [;] typically get one hour a day for recreation five days a week, confined to a 96-square-foot, chain-link-fenced area that can be described only as a cage . . . [; and] eat alone in their cells."[69]  Delegate Hope remarked, "I believe

---

[67] Dep. Tr. Amee Duncan at 36:7-11, *DePaola*, No. 7:16-cv-00485 (Oct. 3, 2018) [hereinafter A. Duncan Dep. Tr.] ("The development of the program, there was no clear pathway and explanation, I guess so to speak, for an offender to know this is how you earn your way to a lower Level Security. So really at that time, Red Onion warehoused offenders.").  Though Red Onion has since modified the Progressive Housing Phase Program and renamed it the "Segregation Reduction Step-Down Plan," VDOC's website page for Red Onion states that inmates "[m]ust complete [the] Progressive Housing Phase Program prior to transfer to a less secure facility."  *Compare infra* para. 130, *with* Va. Dep't of Corr., *Western Region, Red Onion State Prison*, https://vadoc.virginia.gov/facilities/western/redonion/.

[68] Adam Ebbin, Charniele Herring & Patrick Hope, *Why All Virginians Should Care About the Overuse of Solitary Confinement*, Wash. Post, Jan. 20, 2012, https://www.washingtonpost.com/opinions/why-all-virginians-should-care-about-the-overuse-of-solitary-confinement/2012/01/19/gIQAnTeuEQ_story.html?utm_term=.7e1899068e36&wpisrc=emailtoafriend.

[69] *Id.*

Virginia has been engaged in a form of psychological torture of certain prisoners in segregation."[70]

128.    The three legislators wrote a letter to the DOJ requesting an inquiry into Virginia's use of solitary confinement.[71]  In March 2012, within days of the publication of the legislators' observations in *The Washington Post*, VDOC promised to "appoint a team of experts to examine each prisoner and design personalized case plans, add more levels of review before inmates are placed in solitary confinement, and transfer some inmates to a nearby prison."[72]  VDOC also promised to introduce correctional rehabilitation services to Red Onion.[73]

129.    Shortly thereafter, in July 2012, the DOJ announced and warned VDOC that it was considering whether a pattern-or-practice investigation of the use of isolation at Red Onion or VDOC would be warranted.[74]

130.    In August 2012, VDOC announced the "Segregation Reduction Step-Down Program"—yet another so-called behavioral modification phase program. The Step-Down Program is little more than a rerun of VDOC's prior failed phase

---

[70] Anita Kumar, *Legislators Asks for Federal Probe of Use of Solitary in Va. Prisons*, Wash. Post, Mar. 20, 2012), https://www.washingtonpost.com/blogs/virginia-politics/post/legislators-asks-for-federal-probe-of-use-of-solitary-in-va prisons/2012/03/20/gIQAYbaAQS_blog.html?utm_term=.7dbba3bc2633.

[71] *Id.*

[72] Anita Kumar, *Virginia Plans Changes in Prisoner Isolation Process*, Wash. Post, Mar. 30, 2012, https://www.washingtonpost.com/local/dc-politics/virginia-plans-changes-in-prisoner-isolation-process/2012/03/30/gIQAMzpFmS_story.html?utm_term=.5169ef23ee4c.

[73] *Id.*

[74] Anita Kumar, *Justice Considers Whether to Investigate Red Onion Prison*, Wash. Post, Jul. 9, 2012, https://www.washingtonpost.com/blogs/virginia-politics/post/justice-considers-whether-to-investigate-red-onion-prison/2012/07/09/gJQAmbrtYW_blog.html.

programs, the Progressive Housing Phase Program and the Mecklenburg Phase Program.

131. As explained further below, the Step-Down Program is a rerun of the Mecklenburg Phase Program—only with a different name. The Mecklenburg Phase Program purportedly targeted the same population, VDOC's "most disruptive" prisoners; the Step-Down Program is for VDOC prisoners "who have presented the most serious disciplinary problems."[75] The Mecklenburg Phase Program had the same stated purpose, "to change the behavior of inmates"[76]; the Step-Down Program's stated purpose is to "motivate increasingly good behavior by deterring unwanted behavior."[77] The Mecklenburg Phase Program supposedly used the same methodology in which prisoners earned "increasing privileges associated with each [phase] level" by demonstrating "compliance with institutional rules"[78]; Step-Down Program prisoners supposedly "earn additional privileges" at each phase by demonstrating compliance with disciplinary rules, "responsible behavior goals," and programming.[79] The Mecklenburg Phase Program purportedly used "behavioral modification" techniques with a "negative orientation"[80]; the Step-Down Program seeks to "change [a prisoner's] thinking

---

[75] Ex. 1, 1984 Mecklenburg Study Committee Report, *supra* note 7, at 6; Ex. 8, 2017 Step-Down Plan, *supra* note 62, at 43.

[76] Ex. 1, 1984 Mecklenburg Study Committee Report, *supra* note 7, at 48.

[77] Ex. 8, 2017 Step-Down Plan, *supra* note 62, at 47.

[78] Ex. 1, 1984 Mecklenburg Study Committee Report, *supra* note 7, at 16.

[79] Ex. 9, Va. Dep't of Corr., Segregation Reduction Step-Down Program, O.P. 830.A, at 3-5 (Feb. 15, 2018) [hereinafter 2018 O.P. 830.A]

[80] Ex. 1, 1984 Mecklenburg Study Committee Report, *supra* note 7, at 52.

and attitude"[81] and permits staff to force an inmate to restart the Program if he fails to comply with any of its requirements.

132.   As determined by the 1984 Mecklenburg Study Committee, the Mecklenburg Phase Program allowed VDOC to subject prisoners to solitary confinement for illegitimate reasons.  The Step-Down Program has VDOC once again using long-term solitary confinement without a valid penological purpose. Indeed, VDOC rejected valid behavioral science in designing both the Mecklenburg Phase Program and the Step-Down Program.

133.   Today, the Step-Down Program remains in force at Red Onion and Wallens Ridge.  VDOC once again promoted this Step-Down Program as a "new, unique, creative, and effective" landmark reform program for rehabilitating prisoners in solitary confinement.  But, as at Mecklenburg before, the Step-Down Program has caused and continues to cause widespread harm and trauma to Named Plaintiffs and a class of other prisoners, who are left to languish in long-term solitary confinement for years or even decades.

A.   Vague and Overbroad "Pathway" Criteria.

134.   At Red Onion and Wallens Ridge, VDOC created new security levels for prisoners in solitary confinement.  Upon the determination that a prisoner should be placed in long-term solitary confinement, the prisoner is classified Security Level S.  Once classified as Security Level S, an inmate's only "pathway"

---

[81] *See* Ex. 10, Va. Dep't of Corr., *Restrictive Housing Reduction Step-Down Program: Red Onion State Prison and Wallens Ridge State Prison* 32 (updated Aug. 2015) [hereinafter 2015 Step-Down Plan].

back to the general population is by participating in and progressing through the Step-Down Program's various phases. By its terms, the Step Down Program applies to both Red Onion and Wallens Ridge and has done so from its inception to the present. Upon information and belief, both Red Onion and Wallens Ridge now and will in the future apply the Step Down Program to any prisoners classified as Level S within their respective institutions.

135.   The Step-Down Program consists of two separate "Pathways": **Special Management** ("SM") and **Intensive Management** ("IM").

136.   After a prisoner is classified Security Level S and arrives at Red Onion or Wallens Ridge, a committee named the **Dual Treatment Team** ("DTT") is required to conduct a battery of assessments to determine whether to place the prisoner in SM or IM "based on their identified risk level."  According to VDOC policies, the DTT consists of at least the following personnel from both Red Onion and Wallens Ridge:  the Chief of Housing and Programs, a Unit Manager, the Institutional Program Manager, the Intelligence Officer, and a QMHP.  Upon information and belief, the DTT routinely sits as a committee of one decision-maker, usually the Unit Manager of the building where the inmate will be housed.

137.   VDOC policy requires Red Onion staff to explain key aspects of the Step-Down Program to incoming prisoners during "orientation."  For example, Red Onion staff are required to explain the relative goals of the prisoner's specific pathway and how the prisoner may earn his return to the general population. However, in a sworn deposition, VDOC admitted that its staff did not attempt to comply with this aspect of the policy until at least the latter half of 2017.  Thus,

the majority of prisoners assigned or transferred to Red Onion and potentially Wallens Ridge in long-term solitary confinement were enrolled in the Step-Down Program with little to no understanding of its contours or requirements.

138.   Below is a chart created by VDOC to depict the Step-Down Program. As VDOC's Rule 30(b)(6) designee confirmed under oath, this chart accurately depicts the Step-Down Program's IM and SM pathways:



---

82 *See id.* at 16.

139.   The criteria for placement in either the IM or SM Pathways are vague, overbroad, and include inappropriate criteria.  As noted above, VDOC staff can and do place prisoners in solitary confinement for reasons having nothing to do with a prisoner's actual prison behavior or legitimate penological purposes.

140.   <u>SM Pathway Criteria</u>.  VDOC places prisoners in the SM Pathway if they "display an institutional adjustment history indicating":

    **A.**    "repeated disruptive behavior at lower level facilities"; or

    **B.**    "a history of fighting with staff or offenders"; "and/or"

    **C.**    "violent resistance towards a staff intervention resulting in harm to staff, but without the intent to invoke serious harm or the intent to kill"[83]

141.   <u>IM Pathway Criteria</u>.  VDOC places prisoners in the IM pathway if they:

    **A.**    display a "routinely disruptive and threatening pattern of behavior and attitude"; or

    **B.**    demonstrate "potential for extreme and/or deadly violence" against other inmates or staff, as evidenced by their "institutional adjustment history" or "most often" through "an extensive criminal history and lifestyle"; or

    **C.**    are incarcerated for a "high profile and notorious crime that most often involved serious violence may be at risk from other offenders that believe they will earn a reputation for assaulting or killing the high profile offender."[84]

---

[83] Ex. 8, 2017 Step-Down Plan, *supra* note 62, at 29.  A previous version of the Step-Down Plan phrased this criterion as follows: "violent resistance towards a staff intervention resulting in harm to staff, but without the intent to invoke serious ham or the intent to kill, or serious damage to the facility, and where reasonable interventions at the lower security level have not been successful in eliminating disruptive behavior."  Ex. 11, Va. Dep't of Corr., *Restrictive Housing Reduction Step-Down Program* 25 (updated Mar. 4, 2014) [hereinafter 2014 Step-Down Plan].

[84] Ex. 8, 2017 Step-Down Plan, *supra* note 62, at 27-28.

142.    Although VDOC policy provides these criteria "to help make an informed judgment on an [inmate's] level of dangerousness and their initial assignment to IM or SM status," ultimately the DTT makes "a professional judgment" when assigning prisoners to the SM or IM Pathway.[85]  But the Step-Down Program's SM and IM Pathway Criteria are vague, subjective, and overlapping.  For example:

143.    VDOC policy advises that the DTT should place a prisoner in the IM (rather than SM) Pathway based on an undefined and necessarily subjective finding of "intent."  VDOC policy does not define what behavior is "disruptive," let alone "routinely" (IM Pathway) rather than "repeatedly" (SM Pathway) disruptive.  Upon information and belief, VDOC staff do not consider whether a prisoner's behavior is symptomatic of mental illness before placing him in solitary confinement.  In fact, the "disruptive behavior" category requires VDOC staff to place mentally ill prisoners in solitary confinement for exhibiting such behavior.

144.    Utilizing the Criteria's reliance on "adjustment history," VDOC has placed prisoners in solitary confinement based on infractions they committed in prison long ago, well after the prisoners no longer demonstrate a continuing security risk.  And, by focusing on "criminal history," VDOC may place and has placed prisoners in solitary confinement on the IM Pathway solely on the basis of conduct committed while outside of prison—including *nonviolent crimes*—or

---

[85] *Id.* at 52.

length of their sentence, even if the prisoners demonstrate no significant institutional risk while in prison.

145.    Moreover, by allowing staff to consider whether the prisoner committed a "high profile and notorious crime" and "*may be* at risk from other offenders," (emphasis added), VDOC policy permits long-term solitary confinement on the IM Pathway, with attendant restrictions and lack of privileges, of inmates who belong in a protective custody unit or simply require additional security precautions for their safety and do not belong in a maximum security setting at all.

146.    The DTT's decision to place a prisoner on the SM or IM Pathway carries grave consequences because of mandatory minimums built into VDOC's policies:  While an SM prisoner can complete his Pathway after a *minimum* of **15** months in solitary confinement, it takes an IM prisoner a *minimum* of **30** months in solitary confinement to finish his Pathway.  VDOC staff routinely hold prisoners in solitary confinement well beyond these mandatory minimums.

147.    While VDOC policy allows prisoners assigned to the SM Pathway the prospect of return to the general population, VDOC policy does not permit IM prisoners to rejoin the general population.  As explained *infra* VIII.C., if a prisoner is properly placed (according to VDOC policy) in the IM Pathway, VDOC policy does not allow him to be reassigned to the SM Pathway.  The IM Pathway ends at a unit named the "**IM-SL-6 Closed Pod**" ("Closed Pod"), where, as a matter of VDOC policy, the vast majority of IM prisoners will serve the rest of their sentences.

148.   VDOC misleadingly labels the IM-SL-6 Closed Pod as "general population."[86]  In reality, IM-SL-6 Closed Pod is a long-term solitary confinement unit with conditions not meaningfully different from those alleged above.  VDOC policy dictates that prisoners in the IM-SL-6 Closed Pod "will continue to be managed" under the same conditions as those in Security Level S, "to include single celled housing, segregated recreation, and out of cell restraints."[87]  Prisoners are held in the same 8' x 10' cell, eat all of their meals in their cells, and face a cavity search each time they leave their cells.

149.   While a "mentally ill, developmentally disabled or mentally retarded"[88] prisoner whom VDOC places in solitary confinement on the SM Pathway may hope to eventually progress to a housing unit that is intended for his specific needs—the "**Shared Allied Management**"[89] ("SAM") **Pod**—albeit after spending an extended period inappropriately housed in solitary confinement, similar prisoners in the IM Pathway do not even have this hope, as the IM Pathway cannot lead to the SAM Pod.  In order to be eligible for the SAM Pod, the inmate must successfully complete the Step-Down Program on the SM Pathway.

150.   Similarly, if VDOC determines that a prisoner on the SM Pathway who has otherwise completed the Step-Down Program should not be returned to the general population, that prisoner may progress to a specialized housing unit

---

[86] Ex. 9, 2018 O.P. 830.A, *supra* note 79, at 2.
[87] *Id.* at 7.
[88] Ex. 8, 2017 Step-Down Plan, *supra* note 62, at 32.
[89] VDOC also inconsistently refers to the SAM Pod as the "Secure Allied Management Pod" (*id.*) and the "Secured Allied Management Pod" (Ex. 9, 2018 O.P. 830.A, *supra* note 79, at 2).

for such prisoners—the **Secure Integration Pod** ("SIP")—but the IM Pathway does not include the SIP.

151.   After completing Phase SM-2, SM prisoners may progress to Step-Down Phase 1 (also known as SM-SL6 part 1), where they remain housed in single cells and subject to cavity searches.  But they may move "[u]nrestrained to shower and recreation"; receive programming in small-group sessions comprised primarily of the "*Thinking for a Change*" behavioral modification program, administered by Red Onion guards; and are eligible for group meals.  Ultimately, an SM prisoner may progress to Step-Down Phase 2 (also known as SM-SL6 part 2) and have a cellmate.  Upon completion of Step-Down Phase 2, the SM prisoner may progress to general population.  The IM Pathway, however, does not lead to the Step-Down Phases.

### B.   Illusory and Inadequate Reviews.

152.   In each Pathway, the prisoner must progress through Phases 0, 1, 2, and SL-6 (for SM prisoners, SM-SL-6; for IM prisoners, IM-SL-6).  Phase SL-6 is further broken down into part 1 and part 2.

153.   Regardless of their Phase level, prisoners in the IM and SM Pathways experience solitary-cell housing[90]; daily degrading cavity searches; lengthy periods of social isolation without meaningful human contact; lack of work, educational, and recreational opportunities; no or reduced ability to accrue good-time credit; and a lack of meaningful mental health examinations and

---

[90] This excludes a handful of prisoners on Phase SM-SL-6 part 2, who spend a brief time locked in a cell with a fellow prisoner before transfer to the general population.

resources.  Thus, upon information and belief, conditions experienced by prisoners at any Phase in the Step-Down Program are atypically and significantly harsher in comparison to those experienced by prisoners in VDOC's general population.

154.  **Illusory Reviews**.  Belying any notion of scientific or legitimate penological purpose, VDOC has instituted a system that ensures that no matter how well an inmate in solitary confinement behaves, he must spend an excessive and unwarranted minimum number of months in each of the many Phases of solitary confinement.  The excessive amount of time that a prisoner must spend in each phase, combined with the number of phases, serves no legitimate penological purpose.

155.  To determine whether a prisoner should remain in solitary confinement, VDOC directs its staff to evaluate whether the prisoner has remained in his current Phase for the mandatory minimum period.  SM prisoners must spend at least three months each in Phases SM-0, -1, and -2, and three months each in SM-SL-6 part 1 and 2.  IM prisoners must spend at least six months each in Phases IM-0, -1, and -2, and one year each in IM-SL-6 part 1 and 2.  If the prisoner has not spent the mandatory minimum of time in his current Phase, he remains at that Phase, regardless of his behavior.

156.  Prisoners must also demonstrate "progress" in three categories (**"Step-Down Categories"**): (1) programming; (2) disciplinary infractions; and (3) "responsible behavioral goals."  Success in the first category is measured by a prisoner's progress through a fill-in-the-blank, self-directed workbook entitled *The Challenge Series*, which runs nine volumes.  The second category requires

prisoners to remain free of any disciplinary infractions.  The third category, "behavioral goals," evaluates prisoners based on whether they maintain some standard of personal hygiene, stand during daily counts, keep their cells in order, and exhibit "satisfactory" rapport with staff and other prisoners.  Upon information and belief, this third category, in particular, is subject to virtually unfettered, arbitrary discretion by guards.

157.   Prison staff, supervised by the Unit Manager, rate prisoners in each of the three categories on a weekly basis.  Utilizing a so-called "Status Rating Chart," the Unit Manager and his/her designees provide the inmate with a grade of "poor, acceptable, or good."

158.   VDOC does not permit prisoners to obtain a copy of their Status Rating Charts.  Upon information and belief, VDOC officials have destroyed Status Rating Charts, even during the course of ongoing litigation, preventing opposing parties and courts from scrutinizing the justification for retaining a prisoner in solitary confinement.

159.   Just as in the abolished Mecklenburg Phase Program, if a Unit Manager decides that a prisoner performs poorly in any of the three Step-Down Categories, the Unit Manager may void all of the prisoner's progress in the Step-Down Program immediately and without notice, reassigning him to a lower Phase—including Phase 0.  The prisoner then must repeat the Step-Down Program anew, including the required programming (for example, by filling in the blanks in the *Challenge Series* workbooks again).  The prisoner's mandatory minimum solitary confinement period is also then reset, adding a potential 15

months or more to the prisoner's solitary confinement, depending on the Pathway and Phase to which he is assigned.

160.   For example, prisoners who complete all nine volumes of the *Challenge Series* and remain free of all infractions have been forced to restart the program for failure to meet "responsible behavioral goals," such as poor hygiene or "disrespect."  Moreover, prisoners who remain free of all infractions and display good performance in the "behavior goals" category, but who refuse or are otherwise unable to fill in the blanks in all nine of *The Challenge Series* workbooks, have been forced to restart the Program or been barred from advancing.

161.   The Step-Down Program's categorical rating system amounts to a vague, subjective, and discretionary decision-making process that has no penological purpose.

162.   Whether a prisoner finishes filling in the blanks in a workbook bears no significant relationship to whether that prisoner poses a substantial security risk to the general population, and it cannot provide a legitimate penological justification for ongoing solitary confinement.  The programming category also makes no allowance for the particular circumstances of prisoners.  Prisoners who cannot complete the workbook series because of educational background, learning disability, cognitive disability, mental illness, or language barrier are evaluated on the same criteria as prisoners without those disabilities or barriers.  When such prisoners inevitably fail to complete programming, VDOC continues to hold them in solitary confinement.

163.   The disciplinary infraction category allows VDOC to retain a prisoner in solitary confinement if he commits *any* disciplinary infraction—no matter how minor.   For example, VDOC has required prisoners to restart the Step-Down Program for failure to shave their beard, use of "insolent language," refusal to work, refusal to complete the *Challenge Series*, and "refusal to participate in reentry planning."   VDOC also condones retaining prisoners in solitary confinement for refusing to participate in educational or psychological testing, lying about any matter, failing to stand for count procedures, possessing pornography, self-tattooing, or fiddling with a towel hook in their cell.

164.   The disciplinary infraction category does not accommodate prisoners who cannot comply with institutional rules due to an intellectual disability or language barriers.   Nor does it account for the unique stressors indefinite solitary confinement causes.   VDOC locks a prisoner in a solitary cell for several months, cites him with an infraction when he eventually violates a rule, and then uses that infraction to keep the prisoner in solitary confinement—despite that prisoner posing no substantial security risk to the general population.

165.   VDOC officials have admitted in sworn trial testimony that the "responsible behavior" category is "very discretionary" and "very subjective."[91] This category permits VDOC staff to retain a prisoner in solitary confinement based on inherently subjective judgments such as whether a prisoner displays

---

[91] Tr. Evid. Hr'g at 295–96, *Snodgrass v. Gilbert*, 2017 U.S. Dist. LEXIS 207119, No. 7:16-cv-00091, (W.D. Va. Dec. 15, 2017), ECF No. 84 ("THE COURT: It's actually very discretionary, would you not think, very subjective? THE WITNESS: It is, ma'am. Yes, ma'am. THE COURT: Something that someone might take as disrespectful, might not have been meant as disrespectful; do you concede that? THE WITNESS: I concede that, ma'am.").

good hygiene, keeps a clean cell, maintains a good relationship with prison staff, or demonstrates sufficient "respect." Upon information and belief, VDOC staff use this vague Step-Down Category to justify retaining prisoners in solitary confinement for no valid penological purpose.

166.   For example, staff at Red Onion have falsely charged prisoners with infractions and regressed them to Phase 0. When the infraction was later overturned upon appeal, however, the staff justified keeping the prisoner at Phase 0 for lack of "respect." This is precisely the type of unfettered and arbitrary discretion that was documented in the 1984 Mecklenburg Study Committee Report, which then caused VDOC to permanently abolish its long-term solitary confinement programs at Mecklenburg.

167.   Although VDOC periodically reviews the status of prisoners in long-term solitary confinement, VDOC does not base its decision to continue a prisoner's solitary confinement on whether the particular prisoner poses a continuing substantial danger to the general population. Rather, VDOC asks whether the prisoner has "progressed" according to the subjective, vague, and irrelevant Step-Down Categories. As such, these periodic reviews violate the prisoners' rights to substantive and procedural due process under the Fifth and Fourteenth Amendments to the U.S. Constitution.

168.   **Procedural Inadequacies.**   VDOC's periodic reviews lack constitutionally sufficient procedural protections.

169.    Periodic reviews are conducted in secret, with no notice to the prisoner and no opportunity to be heard.  The so-called "Building Management Committee" ("BMC") reviews whether a prisoner's progress in the three Step-Down Categories merits progression to the next phase.  Though O.P. 830.A suggests that the BMC includes several different staff members, upon information and belief, as a matter of practice, the Unit Manager often holds these internal status reviews as a committee of one.[92]

170.    While O.P. 830.A suggests that the BMC holds internal status review sessions on a monthly basis, the policy does not require a set schedule for these reviews.  As confirmed under oath by a member of the Red Onion staff, in practice, the Unit Manager holds BMC internal status reviews on an ad hoc informal basis every 30 days, or whenever "an incident occurs."[93]

171.    During this review session, the Unit Manager/BMC takes note of whether the prisoner has remained at his current Phase level for the mandatory minimum period of time.  If the inmate has not remained at his current Phase level for at least the mandatory minimum period, the Unit Manager automatically retains the prisoner in long-term solitary confinement regardless of the prisoner's behavior.

---

[92] Indeed, a Unit Manager can immediately reduce a prisoner Phase level or "internal status" independent from the BMC.  Ex. 9, 2018 O.P. 830.A, *supra* note 79, at 5 ("When an offender received [sic] a serious disciplinary offense or refuses over a period of time to meet standards for responsible behavior or program participation, the Building Supervisor or higher authority can decide to immediately lower an offender's status.").

[93] Walter Swiney Dep. at 13:20-23, *DePaola*, No. 7:16-cv-00485 (Oct. 4, 2018) ("Q. Okay. How frequently does the building committee meet to discuss prisoner IM status? A. It's met monthly. And if there is, an incident occurs, upon review of the incident.").

172.   The Unit Manager/BMC also reviews the prisoner's Status Rating Chart—which, as explained above, lists the Unit Manager's weekly ratings of the prisoner's compliance with the Step-Down Categories.  The Unit Manager/BMC then decides whether to regress or advance his Phase level (if the prisoner has spent the mandatory minimum of time at that Phase level).  According to VDOC policy, these decisions are to be documented on a form entitled Classification Hearing Docket – DOC 11F.  Upon information and belief, in practice, the Unit Manager/BMC often does not document a basis for these internal status decisions.

173.   The Unit Manager/BMC conducts internal status reviews behind closed doors, without any involvement of the prisoner whose fate is under consideration.  VDOC policy does not require prior notice to prisoners of reviews that can affect their internal status or Phase level.  Nor are prisoners permitted to submit statements or evidence before the Unit Manager/BMC renders an internal status review decision.  Upon information and belief, VDOC does not provide prisoners access to the DOC 11F form pertaining to their internal status reviews.   Thus, VDOC denies prisoners the most important procedural mechanisms to prevent erroneous decisions: notice of the factual basis for the decision and a fair opportunity for rebuttal.  Many prisoners have no meaningful opportunity to understand why they remain in solitary confinement, or how they can shape their behavior in order to rejoin the general population.

174.   **Review Decisions Are Not Multilayered or Subject to Appeal**. Prisoners have no ability to grieve or appeal review decisions by the Unit Manager/BMC affecting their internal status.  VDOC maintains that internal

status decisions (and denial of access to the DOC 11F form) are "nongrievable" issues. As confirmed under oath by VDOC's 30(b)(6) representative and Red Onion staff, the process is devoid of any due process for the prisoners, which enables the Unit Manager/BMC to act without accountability and with unlimited discretion.[94]

175. According to VDOC policy, the ICA, composed of a correctional officer and a counselor, conducts a review every 90 days in order to "ensure the *reclassification* of Level S [prisoners] is consistent with policy." ICA hearings are held at the prisoner's cell door, and the prisoner is not allowed to present witnesses or evidence.

176. In contrast to the "internal status" decisions made by the Unit Manager/BMC, the ICA reviews only whether a change is required in the prisoner's "external status." "External status" refers to the security-level classification in the VDOC-wide system that determines the prisoner's assignment to a maximum security prison or lower level facility.[95] During the hearing, which lasts only moments, the prisoner is handed an already prepared ICA review form, indicating his progress through the Step-Down Program.

---

[94] *See* A. Duncan Dep. Tr. at 191:1-5 ("Q. . . . No due process is required either if you're seeking to move the prisoner from IM-2 to IM-0? A. No, because it is a privilege status"); *see also* W. Swiney Dep. Tr. 18:1-15 ("[Q.] [I]f the building committee decided at that time to change the status of a prisoner, would that be the final decision or would that be reviewable by some other person or some other group within Red Onion? A. As far as internal status, is that your question? The building committee. Q. All right. And just so we're on the same page, what do you mean by internal status? A. The IM0 1 2, that's an internal status. Q. So if the building committee were to decide that a prisoner should move from IM0 to IM1, that decision would be final by the building committee, correct? A. Yes.").

[95] VDOC uses at least seven security levels, with Level 1 being the lowest and Level S (the classification for IM and SM prisoners at Red Onion and Wallens Ridge) being the highest.

177.   The Step-Down Program, however, is the only avenue through which prisoners in long-term solitary confinement at Red Onion and Wallens Ridge can gain eligibility for assignment to a lower security level classification.  As such, the ICA's "external status" review is entirely dependent on a prisoner's "internal status"—whether the Unit Manager/BMC has decided that the prisoner has fulfilled all requirements of the Step-Down Program.

178.   The ICA's reviews serve primarily to document whether or not the Unit Manager/BMC has allowed a prisoner to complete the Step-Down Program. The ICA's 90-day written reports, unsurprisingly, often repeat non-substantive "rationales" for a prisoner's long-term solitary confinement, such as "Remain Segregation," or "needs a longer period of stable adjustment."

### C.     Permanent Solitary Confinement of IM Prisoners.

179.   As with the Mecklenburg SMU permanently abolished by VDOC in the 1980s, prisoners whom the Unit Manager or DTT place in the IM Pathway according to the Pathway Criteria stated above, *supra* paragraphs 134-151, face permanent solitary confinement and are ineligible for the Step-Down Program or return to the general population.  Relying on a prisoner's past disruptive behavior, a single act of violence, or his crime of conviction, VDOC prejudges these men as permanently incapable of reform, "whether or not they have been compliant and well behaved for even extensive periods of time," and notwithstanding "even an extensive period without receiving institutional charges."[96]

---

[96] Ex. 8, 2017 Step-Down Plan, *supra* note 62, at 29, 46.

180.   As confirmed under oath by a VDOC Rule 30(b)(6) representative and member of the Red Onion staff, the farthest an IM prisoner may advance is Phase IM-SL-6, which "is the lowest security level for the IM pathway population."[97] Incarceration at Phase IM-SL-6 entails housing in the so-called IM Closed Pod, where the vast majority of IM prisoners are destined to serve the rest of their sentences.  While VDOC officials have described in sworn testimony the Closed Pod as the "best quality of life" that "most" IM prisoners can hope for, conditions in the IM Closed Pod are not meaningfully different from those in IM Phases 0 through 2.[98]

181.   As stated *supra* paragraph 148, the Closed Pod is in fact a solitary confinement unit.  Upon information and belief, conditions in the Closed Pod are, accordingly, atypical and significantly harsher than the general population units in VDOC's prisons.

182.   In 2017, after facing several legal challenges to the IM Pathway, VDOC amended its policies to emphasize that the ERT reviews the status of each IM inmate.  VDOC asserts that the ERT decides whether to assign particular IM prisoners to the SM Pathway and allow them the opportunity to rejoin the general population.  VDOC has also asserted that the ERT provides an independent check on the review decisions of the Unit Manager, ICA, BMC, and DTT.

---

[97] A. Duncan Dep. Tr. 101:25-102:11 ("Q. . . . Under the description of the IM pathway, there again it says that IM SL-6 is the lowest security level for the IM pathway population, correct? A. Yes. Q. And that's an accurate statement, right? A. Yes. Q. And the IM SL-6 that's referred to in this document is the closed pod, correct? A. Yes."); *see also* A. Duncan Dep. Tr. 87:11-14 ("A. The closed pod is, again, the IM pathway back to a population setting. At this time, that is as far as an IM offender -- an offender on an IM pathway, that is as far as they can progress.").
[98] *Id.* at 87:11-22.

183.   The ERT, in fact, does not perform an independent check on these review decisions, nor does it review whether there is a continuing reason for retaining an IM prisoner in long-term solitary confinement.  Upon information and belief, the ERT examines whether the *original* decision to place the prisoner on the IM Pathway was justified based on offenses that the prisoner committed years prior, even before entering prison.  The ERT may only reassign a prisoner to the SM Pathway if the DTT erred when it originally decided to place the prisoner in the IM Pathway, or if officials subsequently cleared the prisoner of involvement in the acts that originally justified his IM Pathway assignment. Upon information and belief, as a matter of VDOC policy, the Step-Down Program does not permit VDOC staff to change a prisoner's Pathway for any other reason.

184.   According to VDOC policy, the ERT includes the VDOC Security Operations Manager, the Regional Operations Chief, the Chief of Offender Management, the Manager of Classification and Records, the Reentry and Programs Administrator, the Chief of Mental Health Services, and the Chief Nurse.  In fact, the same local Red Onion and Wallens Ridge personnel who decide whether an IM prisoner can advance in Phase level, most notably the Unit Manager, attend the ERT's meetings and shape their agenda.  For example, these personnel determine which prisoners will be reviewed, compile all information available to the ERT during its meetings, and have ultimate discretion to recommend or veto an IM prisoner's assignment to the SM Pathway.

185.   Thus, although VDOC policy requires providing IM prisoners with reviews every month (by the Unit Manager or BMC), every 90 days (by the ICA),

and every six months (by the ERT), upon information and belief, the outcome of these reviews is often predetermined: IM prisoners will remain in solitary confinement until their sentence ends. VDOC does not provide IM prisoners with a meaningful review of whether there is a valid, continuing penological justification for retaining them in solitary confinement.

186.   VDOC asserts that the ERT reviews the status of each IM prisoner every six months. Upon information and belief, that claim is false. To this day, the ERT has not provided many IM prisoners with a review, despite years of solitary confinement. Many IM prisoners have never seen or heard of the ERT.

187.   By policy, VDOC does not permit prisoners to attend ERT review meetings, nor does it allow prisoners prior notice that the ERT is reviewing their status. The ERT does not provide prisoners with written explanations of its decisions. ERT decisions are not subject to appeal or complaint through VDOC's prisoner grievance procedures.

**D.   VDOC's Step-Down Program Lacks a Scientific Basis.**

188.   VDOC asserts that it created the Step-Down Program after studying "the body of science called evidence based practices." VDOC states that this "body of science" is "proven to reduce criminal behavior by focusing on risk reduction in addition to traditional risk control." [99]

---

[99] VDOC, *Virginia DOC Administrative Segregation Step Down Program: "Partnering Science with Corrections"* 2 (2012).

189.   VDOC's policies and manuals, however, do not identify any body of science or evidence relied upon in formulating the Step-Down Program.  That is because the Step-Down Program—including its reliance on indefinite solitary confinement, Pathway Criteria, mandatory minimum periods, Step-Down Categories, incentive system, and permanent IM solitary confinement regime— has no valid basis in science.

190.   After introducing the Step-Down Program, VDOC has stated in writing that "no trustworthy instrument or set of criteria has been found . . . to predict with certainty [an IM prisoner's] level of dangerousness towards staff or other" prisoners.[100]  VDOC claimed that "[t]he potential for extreme or deadly violence is not eliminated despite the [prisoner]'s daily institutional behavior that may be generally compliant with a pattern of institutional adjustment even when providing more than a year of compliant, polite, and cooperative behavior and attitude," because "good behavior while managed with Security Level S restraints has not been shown to be a reliable predictor for how dangerous [prisoners] behave once the restraints are removed."[101]

191.   Nonetheless, from 2014, VDOC stated that its "research staff and NorthPointe scientists [were] focusing on identifying predictors that correlate with the level of risk for violence."[102]  "[I]n the interim," VDOC "decided that the safest

---

[100] Ex. 10, 2015 Step-Down Plan, *supra* note 81, at 26.

[101] Ex. 8, 2017 Step-Down Plan, *supra* note 62**Error! Bookmark not defined.**, at 28-29.

[102] Ex. 11, 2014 Step-Down Plan, *supra* note 83, at 25.

strategy is to rely on the evidence-based principle that past behavior is one predictor of the likelihood of future behavior."[103]

192.   In fact, scientifically valid instruments and criteria capable of predicting which prisoners pose an ongoing risk of violence existed before VDOC introduced the Step-Down Program.  As late as 2017, however, VDOC maintained that it was "aggressively looking for evidence-based information to help predict the likelihood of future violence from an offender that has a history of extreme violence whether or not they have been compliant and well behaved for even extensive periods of time."[104]  VDOC has exaggerated its pseudo-scientific claims, now asserting that "though there is well founded belief that change is possible, *science* shows that a strong predictor of future behavior is past behavior."[105]  Based on its experience since the days of the failed Mecklenburg Phase Program and SMU, VDOC knows that a prisoner's past behavior is not a valid basis for holding him in solitary confinement permanently, and that its Pathway Criteria allows assignment of prisoners to the IM Pathway who never committed any act of extreme or deadly violence while incarcerated.[106]

193.   For example, VDOC has recidivism-risk assessment tools at its disposal, but refuses to use these tools for the inmates it holds in long-term solitary confinement.  Upon information and belief, VDOC relies upon the "COMPAS Risk

---

[103] *Id.*

[104] Ex. 8, 2017 Step-Down Plan, *supra* note 62, at 46.

[105] *Compare id.* (emphasis added), *with* Ex. 10, 2015 Step-Down Plan, *supra* note 81, at 27 ("[I]t has been decided that the safest strategy is to rely *on the evidence-based principle* that past behavior is one predictor of the likelihood of future behavior." (emphasis added).

[106] *See supra* ¶¶ 144-45.

& Need Assessment System," created by NorthPointe, Inc., to evaluate the institutional risk posed by all other prisoners incarcerated in its prison system, even those in the general population. But VDOC does not use COMPAS for prisoners it classifies Security Level S and holds in long-term solitary confinement. VDOC designates Security Level S as a "non-scored security" status, meaning that VDOC does not use COMPAS, or any other "evidence based" tool, to determine whether prisoners classified Security Level S (on the SM or IM Pathways) pose a continuing risk. Upon information and belief, labeling Level S as "non-scored" security status allows local prison staff to keep prisoners in solitary confinement based on discretion and economic considerations untethered to the risk posed by a particular prisoner.

194. Upon information and belief, VDOC has now jettisoned its purported goal of developing an adequate assessment tool. As it has done repeatedly in the past, rather than look to independent experts and real science, VDOC chooses to rely instead on the "professional judgment" of its inadequately trained prison staff to assess an inmate's institutional risk.

195. VDOC also uses the Step-Down Program's vague criteria and terms to conceal the true number of prisoners in solitary confinement at Red Onion and Wallens Ridge. VDOC has falsely claimed that the Step-Down Program has reduced the number of prisoners and average time that prisoners stay in long-term solitary confinement,[107] and that the Program has prevented the release of

---

[107] In 2016, VDOC claimed a "68% reduction in the number of security level S inmates" since the Step-Down Program's inception, carefully omitting inmates it held in solitary confinement in the

prisoners from long-term solitary confinement directly into the public at large.[108] VDOC can make these claims only because it falsely labels the IM Closed and Reentry Pods as general population units.[109]

## IX.   VDOC's Solitary Confinement Conditions and Step-Down Program Cause Serious Mental and Physiological Harms.

196.   The mental and physiological harms caused by long-term solitary confinement are grave, well-known, and indisputable.   The Supreme Court recognized the deleterious effects of long-term solitary confinement in 1890 when it noted that prisoners quickly exhibited a "semi-fatuous condition" and "violen[t] insan[ity]" or committed suicide.[110]   By the time VDOC instituted the Step-Down Program in 2012, medical and scientific literature had consistently documented the severe and often permanent damage caused by prolonged solitary confinement.[111]   Subsequent studies have established that long-term solitary

---

IM-SL-6 Closed Pod.  U.S. Dep't of Justice, Report and Recommendations Concerning the Use of Restrictive Housing 77 (Jan. 2016).

[108] Brian J. Moran, *Virginia's Corrections System Is a Model for Other States*, Wash. Post (June 15, 2018), https://www.washingtonpost.com/opinions/virginias-corrections-system-is-a-model-for-other-states/2018/06/15/9ded0dda-6e61-11e8-bf86-a2351b5ece99_story.html?noredirect=on&utm_term=.6a1b4d66b06b.

[109] *Compare* 2018 830.A at 2 (describing Security Level 6 as the "first step down from Level S into general population" for IM inmates), *with* 2018 830.A, at 7 ("IM Closed Phase I offenders in Level 6 will continue to be managed per Special Housing Guidelines policy 861.3 to include single celled housing, segregated recreation, and out of cell restraints.").

[110] *In re Medley*, 134 U.S. 160, 168 (1890).

[111] *See e.g.*, Drs. Stuart Grassian & Terry Kupers, The Colorado Study vs. The Reality of Solitary Confinement, Corr. Mental Health Rep. (May/June 2011); Drs. Craig Haney & Mona Lynch, Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement, 23 N.Y.U. Rev. L. & Soc. Change 477 (1997); Dr. Stuart Grassian, Psychopathological Effects of Solitary Confinement, 140 Am J. Psychiatry 1450 (1983).

confinement not only leads to psychological trauma, but also demonstrable neurological and physiological damage.[112]

197.    The psychological harms caused by prolonged solitary confinement far exceed the discomforts and depression or anxiety associated with ordinary life in prison.  Indeed, lengthy periods of time in solitary confinement cause a range of psychological symptoms:  inability to maintain an adequate state of alertness and attention; memory deficits; lethargy; headaches; decreased appetite; nightmares; irritability; apathy; panic; major depression; paranoia; psychosis; hallucinations; loss of self-control; aggression; rage; "social death;" loss of perceptual constancy; hypersensitivity to stimuli; suicidal and self-harming acts or ideation; restlessness.  Due to disruptions in the genes that control the body's natural circadian rhythms, lengthy periods of time in solitary confinement also cause insomnia—which exacerbates all of the above symptoms.

198.    Long-term solitary confinement also creates physical harms. Remaining in a small cell with light on at all hours of the day and night damages prisoners' vision.  Chronic stress damages the hippocampus, as well as the growth factor that has antidepressant-like properties, creating a vicious cycle.[113]  After only one month in isolation, neurons in sensory and motor regions of the brain shrink 20 percent.[114]  Loneliness and lack of meaningful social contact produces "social pain"—which registers in the nerves as physical pain—and is treated with

---

[112] Dana G. Smith, *Neuroscientists Make a Case against Solitary Confinement*, Sci. Am. (Nov. 9, 2018), https://www.scientificamerican.com/article/neuroscientists-make-a-case-against-solitary-confinement/.

[113] *Id.*

[114] *Id.*

medication used for physical pain.  "Out of control stress response[s]" brought on by lengthy solitary confinement "result[] in higher cortisol levels, increased blood pressure and inflammation,"[115] heart palpitations, narrowed arteries, stroke, digestive diseases, and physical wasting.  Long-term solitary confinement has also been associated with development of type 2 diabetes.  As a result, "[p]rolonged solitary confinement is associated with a 26 percent increased risk of premature death."[116]

199.  Likewise, VDOC's use of indefinite and long-term solitary confinement at Red Onion and Wallens Ridge deprives prisoners of various basic human needs, including, but not limited to, meaningful social contact, adequate environmental stimuli, adequate sleep, adequate exercise, and mental and physical health.

200.  VDOC's Step-Down Program does not ameliorate these deprivations, harms, or risks; rather, it exacerbates them.  Upon information and belief, for thousands of prisoners housed in VDOC prisons, VDOC uses metrics to assess the risk that they pose and to accordingly determine what level of security they require.  Inexplicably, VDOC refuses to use those tools for prisoners placed in solitary confinement at Red Onion and Wallens Ridge, asserting that its available tools are not adequate to determine if such prisoners still pose a substantial risk to the general population.  VDOC instead relies on the Step-Down Program, which not only allows VDOC to hold prisoners in long-term solitary confinement for

---

[115] *Id.*

[116] *Id.*

reasons that bear no rational relationship to valid penological goals (as stated *supra* 134-151), but also punishes behavior that is recognized as symptomatic of the very harms solitary confinement causes.

201.   Specifically, VDOC policy requires ongoing solitary confinement of prisoners who exhibit symptoms, for example, of apathy, lethargy, or attention deficits.   This similarly applies to allegations of "poor grooming"; failure to maintain an orderly cell; failure to complete the *Challenge Series*; refusal to work; refusal to engage in programming; or lack of impulse control, which includes language, attitude, yelling through the cell door, impatience, and disrespect towards staff.   Moreover, these infractions allow VDOC officials to keep inmates in solitary confinement on the basis of discretionary and subjective judgments.

202.   When prisoners who suffer the effects of long-term solitary confinement fail to meet the Step-Down Program's requirements, due in part to their symptomatic behavior, they are forced to restart the Program or are regressed in Phase level, and remain in solitary confinement even longer.   This exacerbates their mental and physical harms.   Prisoners who enter long-term solitary confinement at Red Onion and Wallens Ridge with preexisting mental illness are doomed from the start.

203.   As such, VDOC's Step-Down Program deliberately inflicts unnecessary and wanton pain that shocks the conscience and violates the standards of decency that mark the progress of a maturing society.   VDOC and each of the individual defendants impose and/or condone this harm by creating,

administering, or implementing the Step-Down Program and/or by failing to properly diagnose or treat prisoners suffering the harms explained above.

204. VDOC and each of the individual defendants know or should know that the long-term solitary confinement practices at Red Onion and Wallens Ridge—the Step-Down Program included—cause the harms outlined above. VDOC and each of the individual defendants expressly condone and/or fail to oppose these practices. By continuing these practices nonetheless, VDOC and each of the individual defendants are deliberately indifferent to these harms.

## CLASS ALLEGATIONS

205. The Named Plaintiffs bring this action under Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the classes of prisoners who are, have been, or will be incarcerated in solitary confinement at Red Onion and Wallens Ridge at the "Level S" or "Level 6" security levels subject to any phase of the Step-Down Program as described above. Each of the Named Plaintiffs is or has been incarcerated in solitary confinement at Red Onion or Wallens Ridge at the "Level S" or "Level 6" security levels subject to the Step-Down Program. The Named Plaintiffs and class members are similarly situated with respect to their legal claims and harms.

206. As described above, the Named Plaintiffs have all been subjected to long-term solitary confinement, and have suffered harm due to this treatment. Given the Defendants' past and current practices, there exists for the Named Plaintiffs and the members of the class a cognizable danger that Defendants' conduct and the subsequent harms will recur.

207.   The Named Plaintiffs bring this action specifically on behalf of two classes of prisoners:

(i)   All persons who are currently, or will in the future be confined at Red Onion or Wallens Ridge at the "Level S" or "Level 6" security levels subject to any phase of the Step-Down Program (the "Injunction Class").

(ii)  All persons who from August 1, 2012 to the present have been confined at Red Onion or Wallens Ridge at the "Level S" or "Level 6" security levels subject to any phase of the Step-Down Program (the "Damages Class").

208.   **Numerosity**—Fed. R. Civ. P. 23(a)(1):  Plaintiffs allege that the class members are so numerous that joinder of all is impractical.  Upon information and belief, Red Onion and Wallens Ridge have hundreds of prisoners currently in long-term solitary confinement, and have been using long-term solitary confinement during the entire class period.[117]  The proposed classes also include prisoners who have been confined at Red Onion and Wallens Ridge at any time from August 1, 2012 to the present (Damages Class) as well as in the future (Injunction Class). Therefore, the proposed classes are so numerous that joinder of all class members to either is impracticable.

209.   **Commonality**—Fed. R. Civ. P. 23(a)(2):  As discussed more fully below, all prisoners classified "Level S" or "Level 6" subject to the Step-Down Program at Red Onion and Wallens Ridge are subject to the same VDOC policies and practices, including, but not limited to, Operating Procedure O.P. 830.A.  As

---

[117] *See* Sandy Hausman, *Prisoner Fighting for Reform from the Inside Placed in Solitary Confinement*, Radio IQ (Sept. 5, 2018), https://www.wvtf.org/post/prisoner-fighting-reform-inside-placed-solitary-confinement#stream/0.

such, there are multiple questions of law and fact common to both the Injunction Class and Damages Class, including but not limited to:

    a. Whether VDOC's current Step-Down Program is the equivalent of or is similar to the SMU and/or Phase Program and thus violates the Settlement Agreement;

    b. Whether VDOC breached the Settlement Agreement by re-implementing a program that is equivalent or similar to the Phase Program;

    c. Whether VDOC's Step-Down Program violates the rights to procedural due process of prisoners subject to it;

    d. Whether VDOC's Step-Down Program lacks adequate criteria to decide whether there is a valid penological purpose to place or retain an inmate in solitary confinement;

    e. Whether VDOC's use of solitary confinement pursuant to the Step-Down Program creates an unacceptable risk of significant mental and physical harms to prisoners;

    f. Whether VDOC's use of solitary confinement deprives prisoners of basic human needs; and

    g. Whether VDOC is deliberately indifferent to these harms, in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution.

210.   **Typicality**—Fed. R. Civ. P. 23(a)(3): Each of the Named Plaintiffs, like all putative Injunction Class and Damages Class members, is or has been subject to the Step-Down Program.  The Named Plaintiffs' claims are therefore typical of the Injunction Class and Damages Class claims.

211.   **Adequacy of Representation**—Fed. R. Civil. P. 23(a)(4): Each of the Named Plaintiffs will fairly and adequately represent the interests of the Injunctive Class and the Damages Class and will diligently serve as class representatives.  Their interests are co-extensive with those of both the Injunctive Class and the Damages Class and they have retained a team of counsel

experienced with class actions and actions alleging constitutional violations at correctional facilities.   Putative Class Counsel possess the experience and resources necessary to fairly and adequately represent the Injunctive Class and the Damages Class.

212.   **Defendants' Actions**—Fed. R. Civ. P. 23(b)(2):   Defendants have acted, or have failed to act, on grounds generally applicable to both the entire Injunction Class and the entire Damages Class.   Specifically, Defendants have designed the Step-Down Program without meaningful criteria or independent accountability and have continually and knowingly implemented the Step-Down Program in a manner that ignores the serious harms or substantial risks of serious harms posed by solitary confinement pursuant to the Step-Down Program at Red Onion and Wallens Ridge.   Defendants' acts and omissions make final injunctive relief and corresponding declaratory relief appropriate.

213.   **Predominance**—Fed. Rule Civ. P. 23(b)(3):   Common questions of law and fact regarding VDOC's Step-Down Program and VDOC's application of the Step-Down Program predominate over any questions individually affecting subclass members.   The proposed subclasses are ascertainable because VDOC maintains records of all prisoners incarcerated in VDOC institutions.

### Disabilities Subclasses

214.   Named Plaintiffs Riddick, Khavkin, Cavitt, and Wall additionally bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and subclasses of those prisoners who are, have been, or will

be incarcerated in long-term solitary confinement at the "Level S" or "Level 6" subject to the Step-Down Program and who suffer from mental health disabilities and are qualified as individuals with mental health disabilities under either the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, et seq., ("ADA") or the Rehabilitation Act of 1973, 29 U.S.C. § 701, et seq. ("Rehabilitation Act") (the "Injunction Subclass" and the "Damages Subclass").  Plaintiffs Riddick, Khavkin, Cavitt, and Wall have been diagnosed with mental health disabilities and are qualified as individuals with disabilities under the ADA and Rehabilitation Act, and are similarly situated with other prisoners so qualified with respect to their legal claims and harms.

215.   As discussed more fully above, Defendants are aware of the mental health disabilities of Plaintiffs Riddick, Khavkin, Cavitt, and Wall, and continue to place them and other members of the subclasses in long-term solitary confinement where they are subject to the Step-Down Program.   Defendants thereby place members of the subclasses at a substantial risk of serious harm by housing them in long-term solitary confinement, where, in addition to risks posed to their mental health, they receive no accommodations for their mental health disabilities.

216. **Numerosity**—Fed R. Civ. P. 23(a)(1):  Upon information and belief, Plaintiffs allege that the subclass members are so numerous that joinder of all of them is impractical.  Upon information and belief, Red Onion and Wallens Ridge have hundreds of prisoners currently in long-term solitary confinement, and have

been using long-term solitary confinement during the entire Class Period.[118]
Individuals with mental health disabilities are disproportionately represented in
prison populations generally and within solitary confinement populations
specifically.[119]   Individuals with a mental health need are disproportionately
represented in VDOC's prison population as well; in fact, according to VDOC's own
data, 25 percent of prisoners in general population and 45 percent of prisoners in
short-term restrictive housing have a mental health need, respectively.[120]   VDOC's
Operating Procedure 730.1, governing administration of Mental Health Services
states that "[a] significant percentage of the offender population requires some
level of mental health services."   The proposed subclasses also include prisoners
with mental health disabilities who have been confined at Red Onion and Wallens
Ridge anytime from August 1, 2012 to the present (the Damages Subclass) and
who will be confined in the future (the Injunction Subclass).   Therefore, the
proposed subclasses are so numerous that joinder of all class members to either is
impracticable.

---

[118] *See id.*

[119] *See, e.g.,* Office of the Inspector Gen., U.S. Dep't of Justice, *Review of the Federal Bureau of Prisons' Use of Restrictive Housing for Inmates with Mental Illness* ii (2017) ("[I]n 2015, the BOP's Chief Psychiatrist estimated . . . that approximately 40 percent of inmates have mental illness, excluding inmates with only personality disorder diagnoses."); U.S. Dep't of Justice, *Special Report: Use of Restrictive Housing in U.S. Prisons and Jails, 2011-12* 1 (2015), https://www.bjs.gov/content/pub/pdf/urhuspj1112.pdf ("Use of restrictive housing was linked to inmate mental health problems: 29% of prison inmates . . . with current symptoms of serious psychological distress had spent time in restrictive housing units in the past 12 months.").

[120] Vera Institute of Justice, *The Safe Alternatives to Segregation Initiative: Findings and Recommendations for the Virginia Department of Corrections* 29 (December 2018), https://storage.googleapis.com/vera-web-assets/downloads/Publications/safe-alternatives-to-segregation-virginia-department-of-corrections/legacy_downloads/segregation-findings-recommendations-virginia-dept-corrections.pdf.

217. **Commonality**—Fed. R. Civ. P. 23(a)(2):  As discussed more fully above, all prisoners classified to Level S Security at Red Onion and Wallens Ridge are subject to the same VDOC policies and practices, including but not limited to VDOC's Step-Down Program.  As such, there are multiple questions of law and fact common to both the Damages Subclass and the Injunction Subclass, including but not limited to:

    a. Whether VDOC's Step-Down Program discriminates against prisoners whose mental health disabilities make them incapable of completing the Program without accommodations.

    b. Whether reasonable alternatives to solitary confinement for individuals with mental health disabilities exists or could be reasonably provided.

    c. Whether the placement of individuals with mental health disabilities in the Step-Down Program violates the Eighth and Fourteenth Amendments to the U.S. Constitution.

218. **Typicality**—Fed. R. Civ. P. 23(a)(3):  Named Plaintiffs Riddick, Khavkin, Cavitt, and Wall, like the other members of the Damages Subclass and the Injunction Subclass, are or have been subject to the Step-Down Program on equal terms and conditions as prisoners without mental health disabilities.  The Named Plaintiffs' claims are therefore typical of other members of the Damages Subclass and the Injunction Subclass.

219. **Adequacy of Representation**—Fed. R. Civ. P. 23(a)(4):  Named Plaintiffs Riddick, Khavkin, Cavitt, and Wall will fairly and adequately represent the interests of the subclasses and will diligently serve as class representatives. Their interests are co-extensive with those of the subclasses and they have retained a team of counsel experienced with class actions and actions alleging constitutional and statutory violations at correctional facilities.  Putative Class

Counsel possess the experience and resources necessary to fairly and adequately represent the subclasses.

220. **Defendants' Actions**—Fed. R. Civ. P. 23(b)(2):  Defendants have acted, or failed to act, on grounds generally applicable to the subclasses. Specifically, Defendants have designed the Step-Down Program without regard to prisoners with mental health disabilities and applied it to prisoners with mental health disabilities on equal terms and conditions as prisoners without mental health disabilities and with deliberate indifference to the harms posed by their actions to the members of the subclasses.  Defendants' acts and omissions make final injunctive relief and corresponding declaratory relief appropriate.

221. **Predominance**: Fed. R. Civ. P. 23(b)(3): Common questions of law and fact regarding VDOC's Step-Down Program and VDOC's application of the Step-Down Program predominate over any questions individually affecting subclass members.  The proposed subclasses are ascertainable because VDOC maintains records, including medical records, of all prisoners incarcerated in VDOC institutions.

## CAUSES OF ACTION

### Count I:  Breach of Court-Ordered Settlement Agreement

222. Plaintiffs repeat and reallege paragraphs 1 to 221 as if fully set forth herein.

223. In 1985, VDOC and the individual Defendants became bound to the *Brown v. Landon* Settlement Agreement.  With respect to the Phase Program and

SMU, VDOC entered into permanent and binding obligations that required no ongoing court supervision.

224.   The IM program is the equivalent or is similar to the SMU under the Settlement Agreement.

225.   The SM program is the equivalent or is similar to either the SMU or Phase Program under the Settlement Agreement.

226.   The Step-Down Program is the equivalent of or is similar to the Phase Program under the Settlement Agreement.

227.   The Settlement Agreement stated that VDOC would never reestablish anything like the SMU or Phase Program.

228.   VDOC and the individual Defendants have breached their obligations under the court-ordered Settlement Agreement, and that breach is continuing today.

229.   As a result of the breach, the Named Plaintiffs and class members have suffered actual damages and substantial psychological and physical harms which are present and continuing.

230.   VDOC should be enjoined from continuing to operate the Step-Down Program pending a determination at trial of the damages due to Named Plaintiffs and the class members for the harms caused by VDOC's breach of the Settlement Agreement.

**Count II: Violation of the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution**
**(Procedural Due Process; 42 U.S.C. § 1983)**

231. Plaintiffs repeat and reallege paragraphs 1 to 221 as if fully set forth herein.

232. Plaintiffs possess a protected liberty interest in avoiding long-term solitary confinement in Red Onion and Wallens Ridge pursuant to the Step-Down Program. This interest arises from (1) VDOC policies mandating periodic review of prisoners in long-term solitary confinement, including the Step-Down Plan and O.P. 830.A; and (2) the prisoners' conditions of long-term solitary confinement, which impose atypical and significant hardship in comparison to the ordinary incidents of life in VDOC's general population housing units.

233. Thus, Named Plaintiffs and class members are (or were) entitled to meaningful periodic review of whether there is (or was) a sustaining and valid reason for continuing to hold them in long-term solitary confinement. Defendants have failed to provide this meaningful review, as explained *supra* paragraphs 154-178.

234. Defendants' acts or omissions were and are the legal and proximate cause of Plaintiffs' injuries and pain.

235. Defendants, individually and collectively, have thereby violated Plaintiffs' rights to procedural due process under the Fourteenth Amendment to the U.S. Constitution.

**Count III: Violation of the Equal Protection Clause of the Fourteenth
Amendment to the U.S. Constitution
(42 U.S.C. § 1983)**

236.   Plaintiffs repeat and reallege paragraphs 1 to 221 as if fully set forth here.

237.   Defendants are aware that many Plaintiffs have similar criminal histories and disciplinary infractions, and yet Defendants chose to continue to apply vague and overbroad criteria for placement in either the IM or SM Pathway, leading to divergent classifications for similarly situated prisoners who pose no threat to the safety and security of VDOC.

238.   As a result of the overlapping criteria for placement in either the IM or SM Pathway, Defendants are allowed to arbitrarily assign or reclassify prisoners to security classifications and privilege levels based upon nothing more than their own judgment.   Whether assigned to the IM or SM Pathway, a prisoner's ability or timeline in which to progress into the general population unit and a prisoner's access to VDOC resources and services are vastly different.

239.   The lack of meaningful criteria and independent accountability for Defendants' decisions has created a system in which staff freely classify similarly situated prisoners differently without valid penological reasons or purposes.  The subjective and discretionary decision-making process deprives Plaintiffs of any reliable and concrete steps they can take to progress out of the program, which disincentivizes prisoner improvement in behavior or self-development to earn privileges or lower restrictions.

-89-

240. Defendants are also aware that the Step-Down Program's requirements severely disadvantage Plaintiffs with mental illnesses or mental health disabilities, effectively denying them any opportunity to progress out of long-term solitary confinement.

241. Defendants are aware that because the Step-Down Program's programming and periodic reviews do not allow staff to meaningfully consider whether a prisoner has a mental illness or mental health disability or to make allowances for those circumstances, such affected prisoners are kept in long-term solitary confinement longer than prisoners who do not have such a condition. Despite knowledge of the different treatment and care needed by such Plaintiffs, Defendants have condoned the continued exacerbation of mental and physical harms through administering or implementing the Step-Down Program.

242. Defendants' decision to hold prisoners suffering mental impairments indefinitely is not based upon any legitimate penological reason, but for the primary purpose of filling beds.

243. Defendants thereby intentionally discriminated against Plaintiffs based on non-penological reasons and violated their rights under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

244. Defendants' intentional discrimination against Plaintiffs was and is not rationally related to a legitimate government purpose.

245. Plaintiffs have suffered damages because of Defendants' discriminatory behavior, including but not limited to physical and psychological

harm; weight loss; auditory and visual hallucinations; emotional distress; severe sensory deprivation; and denial of access to recreation, programming, and other VDOC services.

### Count V:  Violation of the Eighth and Fourteenth Amendments to U.S. Constitution
### (42 U.S.C. § 1983)

246.   Plaintiffs repeat and reallege paragraphs 1 to 221 as if fully set forth here.

247.   VDOC and each of the individual Named Defendants have violated Plaintiffs' Eighth and Fourteenth Amendment rights by subjecting them to indefinite and long-term solitary confinement that serves no legitimate penological purpose and that results in serious deprivations of basic human needs, significant mental and physical harms, and substantial risk of such harms.  VDOC and each of the individual Named Defendants have been deliberately indifferent to such harms and risk of harms.

248.   Further, Defendants have increased and continue to increase prisoners' time in solitary confinement in response to behavior that is symptomatic of being subjected to long-term solitary confinement.  Through this feedback loop, Defendants exacerbate the significant mental and physical harm prisoners experience and deliberately inflict unnecessary and wanton pain.

249.   Defendants know and have known of the harms and deprivations set forth herein, and have designed, condoned, or have been deliberately indifferent to the conditions that cause them.

### Count VI:  Violation of the Americans With Disabilities Act of 1990
### (42 U.S.C. § 12101 et seq.)

250.   Plaintiffs repeat and reallege paragraphs 1 to 221 as if fully set forth here.

251.   Named Plaintiffs Riddick, Khavkin, Cavitt, and Wall are class members with mental health disabilities who are qualified individuals with disabilities as defined in the ADA.  They have an impairment that substantially limits one or more major life activities, they have a record of such impairment, or they are regarded as having such an impairment.  All Named Plaintiffs and class members with mental health disabilities incarcerated at Red Onion and Wallens Ridge meet the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by Defendants, including access to those programs and activities available to prisoners housed in VDOC's general population.  42 U.S.C. § 12102(2); 42 U.S.C. § 12131(2).

252.   VDOC (by and through the individual Defendants, operating in their official capacities) is a public entity as defined under 42 U.S.C. § 12131(1)(A).

253.   VDOC (by and through the individual Defendants, operating in their official capacities) violates the ADA by failing to ensure that people with mental health disabilities have access to, are permitted to participate in, and reap the benefits of, programs, services, and activities.   42 U.S.C. § 12132; 28 C.F.R. § 35.152(b)(1).  In particular, VDOC holds prisoners in solitary confinement despite or because of their mental impairments, and fails to account for prisoners' mental illness in periodic reviews of their solitary confinement.

254. VDOC (by and through the individual Defendants, operating in their official capacities) violates the ADA by failing to make "reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability . . . ." 28 C.F.R. § 35.130(b)(7). In particular, VDOC does not provide mentally ill prisoners or prisoners with mental health disabilities with alternative means to progress out of solitary confinement and fails to account for these illnesses and disabilities in solitary confinement reviews and assignments.

255. VDOC (by and through the individual Defendants, operating in their official capacities) violates the ADA by failing to "ensure that inmates or detainees with disabilities are housed in the most integrated setting appropriate to the needs of the individuals." 28 C.F.R. § 35.152(b)(2). Rather than complying with the ADA's integration mandate, VDOC warehouses prisoners with mental illness in solitary confinement.

256. As a result of Defendants' policies and practices, Plaintiffs Riddick, Khavkin, Cavitt, Wall, and other class members with mental health disabilities do not have equal access to prison activities, programs, and services for which they are otherwise qualified.

257. VDOC's discrimination is intentional and/or represents deliberate indifference to the strong likelihood that the actions and omissions—and, to the extent applicable, the adoption of the policies that led to these actions and omissions—would likely result in a violation of federally protected rights.

258.   As a proximate and foreseeable result of the Defendants' discriminatory acts and omissions, Plaintiffs suffered injuries including pain and suffering, emotional distress, and an exacerbation of their mental illness.

### Count VII:  Violation of Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 701 et seq.)

259.   Plaintiffs repeat and reallege paragraphs 1 to 221 as if fully set forth here.

260.   Plaintiffs Riddick, Khavkin, Cavitt, Wall, and other class members have disabilities as defined in Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

261.   VDOC (by and through the individual Defendants, operating in their official capacities) receives federal funding within the meaning of the Rehabilitation Act.

262.   VDOC (by and through the individual Defendants, operating in their official capacities) violates Section 504 of the Rehabilitation Act by discriminating against people with mental health disabilities solely on the basis of their disabilities.  29 U.S.C. § 794.

263.   VDOC (by and through the individual Defendants, operating in their official capacities) violates Section 504 of the Rehabilitation Act by failing to reasonably accommodate people with mental health disabilities in its facilities, programs, activities, and services.

264.    VDOC's (by and through the individual Defendants, operating in their official capacities) policy and practice of discriminating against people with mental health disabilities in the use of long-term solitary confinement is not reasonably related to legitimate penological interests because (1) it worsens their psychiatric conditions; (2) there are no alternative means for them to access programs, services, and activities; (3) there are alternative means to safely and cost effectively house them out of long-term solitary confinement; and (4) it is an exaggerated response as they do not require long-term solitary confinement on the basis of their mental health disabilities.

## RELIEF SOUGHT

WHEREFORE, Plaintiffs seek a judgment against Defendants:

265.    Declaring that Defendants have breached the *Brown v. Landon* Settlement Agreement;

266.    Declaring that Defendants have violated Plaintiffs' rights to procedural due process under the Fourteenth Amendment to the U.S. Constitution;

267.    Declaring that Defendants have violated Plaintiffs' rights pursuant to the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution;

268.    Declaring that Defendants have violated Plaintiffs' rights pursuant to Eighth Amendment to the U.S. Constitution;

269.    Declaring that Defendants' failure to accommodate Plaintiffs' mental illness or mental health disabilities violates the Americans with Disabilities Act and the Rehabilitation Act;

270.    Granting specific performance with respect to the Settlement Agreement, to wit, ordering Defendants to:

(1)    abolish the Step-Down Program; and

(2)    end long-term solitary confinement at Red Onion and Wallens Ridge.

271.    Irrespective of the Settlement Agreement, ordering Defendants to:

(1)    abolish the Step-Down Program; and

(2)    end long-term solitary confinement at Red Onion and Wallens Ridge.

272.    Granting permanent injunctive relief enjoining Defendants and their successors, agents, and assigns from further violation of the Eighth and Fourteenth Amendments of the U.S. Constitution, the Americans with Disabilities Act, and the Rehabilitation Act;

273.    Appointing a special master pursuant to 18 U.S.C. § 3626(f) to inspect long-term solitary confinement conditions at Red Onion and Wallens Ridge, and to undertake the fact finding necessary to determine how to bring the prison into compliance with court orders;

274.    Awarding Plaintiffs compensatory damages for Defendants' contractual, constitutional, and statutory violations, including damages for emotional pain and suffering;

275.    Awarding Plaintiffs nominal damages in the event that a trier of fact were to determine that their constitutional rights have been violated but that compensatory damages are not warranted;

276.    Awarding Plaintiffs costs and reasonable attorneys' fees; and

277.    Granting such other equitable relief as the Court deems just and proper.

Dated: May 6, 2019                      Respectfully submitted:

/s/ *Alyson Cox*

Alyson Cox (VSB No. 90646)
Daniel Levin (*pro hac*)
Kristen J. McAhren (*pro hac*)
Maxwell J. Kalmann (*pro hac*)
Timothy L. Wilson, Jr. (*pro hac*)
**WHITE & CASE** LLP
701 Thirteenth Street, NW
Washington, DC  20005
T: (202) 626-3600
F: (202) 639-9355
alyson.cox@whitecase.com

Owen C. Pell (*pro hac*)
**WHITE & CASE** LLP
1221 Avenue of the Americas
New York, New York 10020
(212) 819-8200

Vishal Agraharkar (VSB No. 93265)
Eden Heilman (VSB No. 93554)
AMERICAN     CIVIL     LIBERTIES     UNION
FOUNDATION OF VIRGINIA
701 E. Franklin St., Suite 1412
Richmond, Virginia 23219
(804) 644-8022
vagraharkar@acluva.org
eheilman@acluva.org

*Counsel for Class Plaintiffs*