# Exhibit 1-B

Program was designed can be achieved for the great majority of inmates who are appropriately assigned to and treated in such a program. It is nevertheless anticipated that a small number of the Commonwealth's most disruptive inmates will remain hopelessly incorrigible, and these few should be dealt with appropriately by placing them in isolation.

It is the Committee's expectation that, if used to its potential, the Mecklenburg Correctional Center could be a model facility in Virginia and nationally.

The Study Committee therefore recommends:

**Recommendation 2:** DOC should continue to place disruptive inmates who have been transferred to MCC in a special program designed to treat these inmates to the point where they change their behavior and can safely be returned to the general inmate population of other institutions in the Commonwealth. DOC should assemble a team to reassess and redesign the MCC Phase Program consistent with appropriate clinical practice. The program team should include DOC personnel responsible for both correctional security and treatment, **as well as other individuals with special expertise who are not employees of DOC.** A proposed program team and work plan should be submitted to the Board of Corrections by January 1, 1985, for approval. The work of this program team should be completed and a report provided to the Board by no later than July 1, 1985.

**Recommendation 3:** In redesigning the program, particular attention should be given to:

(a) structuring a more voluntary inmate commitment to participation in the program;

(b) program management by on-line security and treatment personnel who will be responsible for implementing the program;

(c) the need for immediate positive reinforcement of inmates who demonstrate appropriate, desired behavior;

(d) to the extent possible, the provision of

meaningful work opportunities for inmates in the program;

(e) specific, objective criteria to guide classification decisions; and

(f) the need for a process to evaluate and reassess the program to be implemented.

<u>Recommendation 4</u>:  Although there have been significant improvements in the process for assigning inmates to MCC, the Committee remains concerned that assignment criteria are not, at this time, sufficiently precise.  The Committee recommends a further review of the MCC assignment criteria in conjunction with Recommendations 2 and 3 to ensure that only the truly disruptive inmate is transferred to MCC.

<u>Recommendation 5</u>:  DOC should consider seeking technical assistance and funding from the National Institute of Corrections (NIC) in implementing Recommendations 2-4.  NIC currently is soliciting grant proposals for the development of a national model to "guide the management and confinement of disruptive maximum security inmates."

C.   OTHER INMATE POPULATIONS AT MCC:

   1.   Background:

      a.   Special Purpose Assignments:

   DOC Departmental Guideline 825 (DGL 825) (see Appendix B)
describes four "Special Purpose Assignments" to MCC:
administrative transfers, investigative holds, inmates sentenced
to death, and protective custody.

            (1) Administrative Transfer:

   "Administrative transfers" are inmates transferred to MCC
"for [their] own protection or for the protection of others."[32]   In
practice this assignment is used in emergency situations where
there is a need to move an inmate quickly and temporarily from
some other institution.

            (2) Investigative Hold:

   "Investigative hold" covers an inmate "under active
investigation by the [DOC] Internal Investigation Unit,
Department of State Police, or other law enforcement agencies for
any alleged offense [while incarcerated] which poses a threat to
the safety to persons or property."[33]   DGL 825 does not list
example offenses.  This assignment can be used to transfer an
inmate to MCC or to reassign an inmate already at MCC from some
other assignment.  Inmates assigned to MCC as "administrative
transfers" or "investigative holds" are treated the same as
inmates in Phase I of the Phase Program--i.e., they remain in
their cells except for individual showers and recreation time.

            (3) Death Sentence:

   Inmates sentenced to death apparently have been assigned to
MCC because of the maximum security nature of the institution and

because the size of the death row population now requires a larger
facility than is available at the State Penitentiary if death row
inmates are to be confined in one unit. At the time of
the Committee's two visits to MCC, only 22 of the State's 28
death row inmates were confined at the facility.
As of October 25, 1984, this figure increased to 27 with the
return of five of the death row escapees who had been confined
temporarily at the Powhatan Correctional Center and the State
Penitentiary for security reasons following the May 31 escape.
The 28th death row inmate recently was executed.

There is a television on each side of the death row pod at
MCC. Death row inmates are permitted to have certain personal
articles (magazines, clothes) in their cell, and they have access
to MCC counselors. Ordinarily, for certain periods each day they
are permitted out of their cells into the pod day room to talk,
play cards, watch television, eat their meals, etc. Since the
May 31 escape, however, death row inmates have been on
"lockdown"--i.e., they have been confined to their cells except
for showers and individual inside recreation time in the pod
area. There are no special programs for death row inmates.

### (4) Protective Custody:

Inmates who have "serious personal security needs as
determined by the DOC Central Classification Board" in Richmond
may be assigned to MCC for "protective custody"--for example,
because they were State witnesses, were victims of assaults by
other inmates, etc.[34] DGL 825 provides that "[t]hese will be
high security inmates who have a documented threatening situation

and not merely weak passive inmates seeking a safe assignment."[35]
Normally protective custody inmates remain at MCC for a minimum
of six months.

The major "program" for protective custody inmates is the
tailor shop on the ground floor of Building #4.  About half the
protective custody inmates have been found suitable for the
program and work in the shop making clothing.  Other "privileges"
available to protective custody inmates include the television on
each side of the pod, permission to keep a limited number of
personal articles (magazines, clothes) in their cell, time each
day to be in the pod day room, and 5-7 hours of recreation time
each week (outdoor recreation if weather and staffing permit;
indoor recreation otherwise).

> b.  Segregation:

"Segregation" is a term MCC officials use for disruptive
inmates transferred to MCC from other institutions who do not
wish to participate in the Phase Program.  According to the MCC
Assistant Warden for Programs, some inmates "can't face the fact
that they're at the bottom of the barrel," which is what they
feel the Phase Program connotes, and they therefore refuse to
enter the program.  These inmates are confined separately from
inmates in the Phase Program, but in terms of "programs" or
"privileges," they are treated the same as inmates in Phase I.
When the inmate appears to have adjusted to segregation, he often
is given an opportunity to "skip" Phase I and proceed directly to
Phase II.  Thus, the inmate "can deal with his ego" by  feeling
he was not forced to participate in the Phase Program and
believing either that he has beaten the system by "refusing" to

participate and begin at Phase I or that he is being "permitted"
to begin at Phase II.  The Assistant Warden for Programs reported
to the Study Committee that many inmates respond well to this
approach and subsequently adjust well to the conditions of Phase II.

The only practical difference between segregation and Phase
I is that an inmate is likely to spend a somewhat longer time in
segregation than in Phase I before proceeding to Phase II.

c.  Isolation:

"Isolation" is an assignment of an inmate to confinement in
his cell for a specified period of time by an Institutional
Adjustment Committee as punishment for conviction of a violation
of institutional rules or procedures.  In terms of "programs" or
"privileges," an inmate in isolation is treated the same as an
inmate in segregation or in Phase I.  However, the inmate
generally is moved to, and serves his time in, specifically
designated segregation and isolation pods (currently two pods in
Building #1 and part of one pod in Building #2).

d.  Maximum Security Unit:

According to DGL 825, an inmate can be assigned to the
Maximum Security Unit at MCC if he meets certain general or
specific criteria.  The "general criteria" are as follows:

> "Inmates selected for assignment to the Maximum
> Security [Unit] (non-phase) will be those designated
> inmates who require assignment to a maximum-
> security setting in [sic] virtue of the danger they
> represent to the community and/or to persons
> (staff or other inmates) within the correctional
> system and who either cannot safely be assigned to
> another maximum security setting or require the
> maximum degree of security available within the
> correctional system."[36]

In addition, an inmate who meets one of the three following

- 61 -

criteria also can be assigned to the unit:

"1.   Sentence in excess of 50 years for a crime(s)
       of violence.

"2.   Potential escape or attempted escape from a
       correctional institution.

"3.   Inmates completing the phase-program who
       cannot be returned to another maximum security
       setting for any reason."[37]

These criteria "are intended only as representative of
the type of factors to be considered and are not to be considered
either exhaustive of the criteria to be employed or of such a
nature as to automatically result in an assignment to" MCC.[38]

The major "programs" and "privileges" for inmates in the
Maximum Security Unit are essentially the same as for inmates in
protective custody, with the exception that maximum security
inmates are not permitted to work in the tailor shop; instead,
those maximum security inmates deemed suitable are permitted to
work in the MCC kitchen.

e.   Mental Health Unit:

There is a small "mental health" unit (8 inmates at the time
of the Study Committee's October 9-10 visit) in a portion of one
pod at MCC.   Some of the inmates have been transferred to the
unit from other portions of the facility by the MCC psychologist
because of mental health problems which it is believed can be
better dealt with in a separate setting.   If the inmate is
diagnosed as having a serious psychiatric disorder, he can be
transferred to Central State Hospital; most are not so
transferred, however.   Other inmates assigned to the unit have
been transferred from Central State Hospital for "observation" to

determine if they are likely to be able to readjust to a prison
setting before being further transferred to another correctional
facility. Other than the psychological services provided
by the MCC staff and the normal privileges (showers, recreation
time, etc.) accorded to Phase I, segregation, and isolation
inmates, there are no special programs for "mental health"
inmates.

2. Findings and Recommendations:

a. General:

MCC no longer is being used solely for its original
purpose--i.e., as a place to confine and control the
Commonwealth's most disruptive inmates. There has been a
proliferation of "assignments" or "programs" at MCC over the past
seven years. Some of those programs seem to have been developed
at, or transferred to, MCC in large part merely to meet a need--a
legitimate need--for bedspace at other correctional facilities
by filling empty cells at MCC. Many of these programs are
directed at very different inmate populations and, because of
their different goals and requirements, have caused confusion and
frustration among both correctional personnel and inmates. The
Study Committee is deeply concerned about this proliferation of
programs and the resulting confusion and frustration. The
Committee is particularly concerned that the special purpose of
MCC not be jeopardized merely to meet space needs. Therefore,
the Committee makes the following two recommendations:

> **Recommendation 6:** The special purpose of MCC
> should not be jeopardized by the assignment of
> inmates to the facility primarily for the purpose
> of utilizing available bedspace.

- 63 -

**Recommendation 7:** The number of "assignment categories" at MCC should be reduced to ensure that the facility will be able to fulfill its original function of being a special purpose facility for the confinement of the Commonwealth's most disruptive inmates.

The subsections which follow discuss specific recommendations with regard to the various MCC "assignment categories" other than the Phase Program.

## b. Administrative Transfer, Investigative Hold, Segregation, and Isolation:

Inmates in these four assignment categories have essentially the same "programs" and "privileges" as inmates in Phase I of the Phase Program. Perhaps for this reason, many MCC staff--including both correctional officers and higher ranking staff--were not able to define these four separate assignment categories, to distinguish among them, or to distinguish them from the various phases of the Phase Program. In fact, several correctional officers were not certain of the assignment categories of the inmates in the pod for which they were responsible on the day of the Committee visit. However, correctional personnel were easily able to distinguish between inmates in the Phase Program and inmates on death row, in protective custody, or in the maximum security or mental health units.

The Committee found that, based on the purposes for which they are used, there was good reason to retain the "administrative transfer" and "isolation" assignments at MCC. The Committee also found that the "segregation" assignment was an appropriate and effective alternative for disruptive inmates transferred to MCC who do not wish to participate in the Phase Program. However, the Committee questioned the need to have "investigative hold" inmates

confined at MCC except for those already assigned to MCC before
the "investigative hold" assignment was appropriate.

Therefore, the Study Committee recommends:

**Recommendation 8:** "Administrative transfer,"
"isolation," and "segregation" assignments should be
continued at MCC. The "investigative hold" assignment
should be discontinued except for the assignment of
inmates already confined at MCC before an "investiga-
tive hold" assignment was appropriate. If there is to
be any difference in the meaning of various assignments
at the facility--for example, between "isolation" and
"segregation"--then there must be perceivable dif-
ferences between the assignments. No meaningful dis-
tinctions probably can or should be made on the basis
of "privileges," such as television, etc. Thus, ef-
forts should be made at least to confine inmates as-
signed to "isolation" separately from other inmates,
and to confine inmates assigned to "segregation"
separately from those in the Phase Program. Because of
their temporary nature, it does not appear that special
steps are needed to confine "administrative transfers"
and "investigative holds" separately from other
inmates.

    c.   <u>Death Row</u>:

Although the May 31 escape from death row at MCC might seem
to indicate a need to confine inmates sentenced to death in a
number of different facilities, the Study Committee does not
believe that confinement of death row inmates in other
institutions is necessary or advisable.

Death row inmates certainly have an incentive to escape. The
Committee is not persuaded, however, that death row inmates are
any more inclined to escape than either inmates who already have
demonstrated their violent or otherwise disruptive nature at
another institution, or maximum security inmates who have been
sent to MCC because of a sentence in excess of 50 years for a
violent crime. In fact, many MCC correctional staff reported that
death row inmates were in general "less disruptive" and "less

likely to get into fights" than many other inmates at MCC.  In
this regard, it should be noted that 18 of the 24 inmates confined
on death row at MCC on the night of the escape decided--for many
reasons--not to escape from the facility.

Furthermore, the Study Committee believes that the primary
reason for the May 31 escape from death row at MCC was a
series of failures on the part of correctional staff at the
facility to follow the unit's standard operating procedures.  The
inmates were aware of laxness on the part of correctional
staff in following prescribed procedures and exploited it.
Simple adherence to established and well-publicized security
procedures would have prevented the escape.

Death row inmates have a right to, and a particular need for,
access to law library materials which the Commonwealth is required
to provide.  Death row inmates also are likely to have more
visitors, especially attorneys and paralegals, than other inmates.
Thus, because of their unique status, the Commonwealth certainly
has a legitimate need to develop special procedures for handling
death row inmates.  It probably is easier to implement those
procedures if death row inmates are confined in the same
institution.  Furthermore, since it is not uncommon for one
attorney to represent more than one death row inmate, a death row
inmate's access to counsel is likely to be enhanced if all death
row inmates are confined in the same facility--a goal the
Commonwealth certainly should support if it can do so without a
substantial risk to security.

There always is the risk of unrest among inmates, especially

death row inmates, when another inmate is executed. Thus, the Study Committee believes it would be advisable to confine death row inmates somewhere other than the State Penitentiary, where the electric chair is located. For this reason, because of space contraints at other institutions, and because of the other categories of inmates confined at MCC, the Committee believes it is appropriate to confine all death row inmates at MCC.

There are some disadvantages, however, to confining all death row prisoners in one facility. As a group, death row prisoners probably receive more attention--from the media and others--than other inmates. The greater the attention, the greater the distraction to correctional personnel from other duties. Furthermore, the need for and right to access to legal materials and the larger number of visitors may require more movement of death row inmates than other inmates. The greater the need for movement, the greater the risk to security. Nonetheless, the Study Committee believes these problems can be overcome through the development and proper implementation of special procedures for death row inmates. Therefore, the Study Committee recommends:

> **Recommendation 9:** DOC should confine all death row inmates in one facility; that facility should be separate from the one at which inmates are executed. MCC is an appropriate such facility. In general, the Board of Corrections should support DOC's former policy of permitting death row to be operated as a general prison population area separate from the other inmate populations at MCC, rather than requiring death row inmates to remain in "lockdown" (i.e., confined to their cells except for periodic showers and individual exercise times in the pod area). However, in order better to control movement of death row inmates, assure appropriate access to attorneys, and thereby reduce risks to security, DOC and MCC

staff should jointly develop special procedures
for handling death row inmates.  These procedures
should be developed and reported to the Board by
January 1, 1985.

    d.  <u>Protective Custody</u>:

According to DOC guidelines, only those inmates with "<u>serious</u>
personal security needs" are to be assigned to the protective
custody unit at MCC.[39]  Given the fact that the entire facility
was designed to provide maximum security and that it is easier to
segregate protective custody inmates at MCC and provide them with
the necessary protection at MCC than it is at most of the Commonwealth's
other correctional facilities, the Comittee believes it is
appropriate for a protective custody unit to be continued at MCC.

Because of their unique status, protective custody inmates
seem to have greater incentive to follow institutional rules and
regulations and to refrain from being disruptive.  Correctional
personnel reported that protective custody inmates were "very
little trouble."  In fact, many correctional personnel considered
assignment to the protective custody unit--currently all three
pods in Building #4--as a "time out" or "relief assignment" from
dealing with the other inmates at MCC.

Furthermore, unlike the confusion regarding the
"administrative transfer," "investigative hold," "segregation" and
"isolation" assignments, there seemed to be no confusion among MCC
staff or inmates concerning protective custody.  This may have
been due to the type of inmate in protective custody, but it
probably also was due to the building in which they were confined.
Building #4 is different from the other buildings at MCC--it is
the only one not to have bar grillwork separating the entrance

- 68 -

hallway to each pod from the pod area itself.  Heavy Lexan (a
clear plastic) doors separate the areas.  Lexan is supposed to be
unbreakable, but the Committee observed that one of the doors had
been cracked and had a small hole in it.  MCC staff did not seem
to think the use of Lexan doors in this particular building posed
a major security hazard.  In fact, the doors appeared to serve as
a symbol that correctional officers and inmates were indeed in a
"different" setting.

There is, however, some risk inherent in this "different"
setting.  <u>The possibility exists that correctional personnel will
become too relaxed and complacent in this "time out" area</u>.  The
Study Committee found no direct evidence of such complacency but
the "time out" attitude expressed by many correctional personnel
in describing the protective custody unit caused the Committee
concern.

Protective custody inmates viewed relations with
correctional officers in general as "good."  However, they
expressed concern and frustration that following the May 31
escape and the August 4 hostage situation they were placed in
lockdown (i.e., confined to their cells) with the remainder of
the institution even though they had played no part in either
incident.  This was particularly frustrating for inmates who had
been witnesses for the State--including some in cases against other
inmates for assaulting correctional officers--and who therefore
felt they deserved "fairer" treatment from the State.

Finally, in addition to the regular "privileges" of
recreation time, a limited number of outgoing telephone calls
each month, etc., the only "program" available for protective

- 69 -

custody inmates is the tailor shop, where inmates are paid

piecework for the clothing they make. The only complaint the

Committee received was that inmates would like to be permitted to

begin work at 8:00 a.m., the starting time prior to the May 31

escape and August 4 hostage situation, rather than at the current

starting time of approximately 9:00 a.m. No complaints were

received by the Committee about a lack of "programs" other than

the tailor shop. However, the Committee believes that DOC and

MCC should explore the potential for other programs for

protective custody inmates--e.g., in light of the Committee's

recommendation below to eliminate the maximum security unit at

MCC, explore the possibility of having protective custody inmates

work in the MCC kitchen.

> **Recommendation 10**: Because it is easier to
> segregate protective custody inmates and provide
> them with the necessary protection at MCC than it
> is at most of the Commonwealth's other
> correctional facilities, and because sufficient
> bedspace is available at MCC, a protective custody unit
> should be maintained at MCC. DOC and MCC should
> develop special procedures for handling protective
> custody inmates, keeping in mind that they are in
> general not as disruptive as the Phase Program,
> segregation and isolation inmates, and should
> explore the potential for programs in addition to
> the tailor shop for protective custody inmates.

     e. Maximum Security Unit:

There are several advantages to assigning certain maximum

security inmates to MCC. At least in theory, the only maximum

security inmates who are assigned to MCC are those who present a

potential for danger to other inmates or correctional staff

because of (1) their conduct within the correctional system, (2)

the nature of the original crime they committed (e.g., a violent

offense for which the inmate was sentenced to more than 50 years), (3) their potential for escape, or (4) the fact that they have just "graduated" from the Phase Program and they "cannot be returned to another maximum security setting for any reason.[40] The facility is designed to provide the appropriate level of security for these inmates. Furthermore, there are crowded conditions at some of the Commonwealth's other maximum security institutions, and there is space available at MCC. Finally, the presence of the maximum security unit at MCC provides a readily available group to work in the MCC kitchen.

However, the Committee believes that the advantages of locating a maximum security unit at MCC are far outweighed by the disadvantages. Both correctional personnel and inmates felt there were a number of serious disadvantges. The Study Committee agrees.

Such disadvantages include:

°     Two very different types of maximum security inmates are assigned to MCC;

°     Assignment criteria have been diluted;

°     It is much more difficult to operate programs for, and grant privileges to, maximum security inmates at MCC than it is at other facilities;

°     This lack of programs and privileges leads to an attitude problem on the part of the inmates which makes them more difficult to control; and

°     Correctional officers may have a tendency to relax somewhat in the maximum security areas, where in general there is a less tense atmosphere than in the Phase Program area.

The criteria for assignment outlined above have resulted in at least two very different types of maximum security inmates

- 71 -

being assigned to MCC:   (1) hardened "graduates" of the Phase
Program who by definition have demonstrated disruptive behavior in
the past and, despite completing the program, certainly have the
potential for such conduct in the future, and (2) recently
incarcerated offenders who were sentenced to long prison terms for
violent crimes but who have no prior prison experience.   The
Assistant Warden for Programs at MCC stated to the Committee that
this practice of mixing "inexperienced" inmates with "experienced"
and formerly disruptive inmates has led to difficulties and he
therefore has had to confine them separately.

MCC staff believe that the Institutional Classification
Committees (ICCs) at the institutions from which inmates are
transferred and the Central Classification Board have diluted the
"potential for dangerousness" requirement, especially the criterion
that an inmate must have received a sentence "in excess of 50
years for a crime(s) of violence." Some staff felt this dilution
had occurred to take advantage of available bedspace at MCC.

It is much more difficult to operate the same "programs" for,
and grant the same "privileges" to, maximum security inmates at MCC
than it is at other institutions.   Part of the problem is due to
lack of staff.   For example, no job skills training programs are
available for maximum security inmates at Mecklenburg other than
for those inmates employed in the kitchen.   In addition, MCC has a
small counseling staff--two psychologists and seven counselors.
It is therefore difficult to provide the often very different
types of counseling required by inmates in the Phase Program and
those in the maximum security unit.

A great part of the problem, however, is that the facility was designed for segregation and lockdown. Many of the programs and privileges available to maximum security inmates at other institutions such as more recreation and access to the library, involve inmate movement. MCC was not designed for such movement; indeed, inmate movement jeopardizes security. For example, because of the design of the facility, it is much more difficult to give maximum security inmates easy access to the recreation yard at MCC than it is at most other maximum security institutions in the Commonwealth. Correctional officers must accompany inmates from their cells to the yard since permitting inmates to go to the yard without supervision would jeopardize security.

This perceived security problem has been exacerbated by two other factors. First DOC officials indicated that the inmate population statewide is in general becoming more violent as more non-violent offenders are being placed in diversion programs such as community service or are being required to make restitution, rather than being imprisoned. Several correctional officials noted to the committee that while they in theory support alternatives to incarceration for non-violent offenders, they are concerned by the loss of the stabilizing influence such offenders previously provided in the prison setting. Second, the greater inmate movement necessary to meet the terms of the settlement agreement in Brown v. Procunier (see Chapter 5 for a discussion of this settlement agreement) which was signed by the Commonwealth in April 1983, and in particular the increased recreation time required by that decree, already has been difficult for MCC to manage. MCC and DOC staff therefore believed it was not possible

to provide more programs or privileges to maximum security inmates at MCC without seriously jeopardizing security.

In the words of one MCC staff member, "We never were able to realize that we needed to offer a regular maximum security unit program. Instead, we tried to superimpose the Phase Program on the maximum security unit." The result is not only in violation of DGL 825, which provides that an assignment to the MCC maximum security unit "will not involve any participation in the phase program,"[41] it is also a source of both deep frustration to the maximum security inmates and friction between those inmates and staff. One indication of that frustration was the response of maximum security inmates to the lockdown following the August 4 hostage situation: they, like the protective custody inmates, did not take part in the hostage situation; yet they still were subjected to a lockdown just like those who did participate. They felt they were being "made to pay" for the actions of other inmates. This perception leads to a serious attitude problem on the part of the inmates which makes them more difficult to control.

Finally, a number of MCC staff were concerned by what they described as the "flip-flop" problem. The basis for this problem is that maximum security inmates in general are perceived by staff as being much less disruptive than Phase Program inmates, especially those in Phases I and II, and therefore in less need of close scrutiny. One MCC staff member described the problem as follows: "Correctional officers have to remember where they are, and not be too tough in the maximum security unit or too relaxed

in the Phase Program units."

This perception has at least two troubling implications.
The Committee believes that maximum security inmates at MCC
are generally less disruptive than Phase Program inmates and that
there is therefore less tension for staff when they are assigned
to maximum security units than when they are on duty in Phase
Program units.  The Study Committee strongly takes the position
that correctional officers should use utmost care at all times
regardless of where they are on duty.  Nonetheless, the Committee
recognizes that settings involving less tension have the potential
for being ones in which officers relax somewhat--which is
precisely the problem; they may relax too much.  Many maximum
security inmates still have the potential for being dangerous.
Staff should not relax to the point where they become complacent
with maximum security inmates; the maximum security unit is not a
"time out" or "relief" area.

The other troubling implication is that staff will become too
relaxed with Phase Program inmates, perhaps unintentionally.
Unlike the protective custody building with its Lexan doors, there
is no convenient way for staff to distinguish between maximum
security and Phase Program areas.  Other than the protective
custody pod areas, all pods look approximately the same.  The
potential for confusion exists.  Less than 50% of the current MCC
inmate population is in the Phase Program.  If correctional
officers adopt a more relaxed attitude towards maximum security
inmates, there is a serious risk that the same attitude will be
adopted towards inmates in the Phase Program.

In summary, the presence of the maximum security unit at MCC

makes the safe and reasonable administration of the facility more complicated and difficult and has been a cause of concern to, and friction among, both staff and inmates.  Therefore, the Study Committee recommends:

> **Recommendation 11.**  The maximum security unit should be moved from MCC unless sufficient personnel and capital outlay funds are made available to enable MCC to provide the same level of counseling services, jobs skills training, and recreation programs as are provided to maximum security inmates at other institutions in the Commonwealth.  These inmates could be replaced, for example, by (1) inmates who would be appropriate for the Phase Program, (2) additional protective custody inmates currently confined in other institutions, or, possibly (3) if Recommendation 12 below is implemented, additional mental health inmates from other institutions. The Committee believes this "exchange" can be implemented smoothly if the transfer criteria in DOC Departmental Guideline 825 are properly applied.

### f.  Mental Health Unit:

There are at least two advantages to using MCC to confine inmates who have mental health problems but who are not so seriously ill as to warrant confinement at Central State Hospital or Marion Correctional Center.  The first is available bedspace at MCC, which the Committee has indicated previously it believes is not an appropriate basis for assignment to MCC.  The second is that the facility is designed for segregation and lockdown and therefore can be used to separate mentally ill inmates, especially those who are also violent, from the remainder of the prison population.

However, several disadvantages to locating the program at MCC were reported to the Committee.  The first and most important is

inadequate staffing. The MCC medical and counseling staffs reported that their staffing level was not even adequate to meet the needs of the non-mental health inmate population for psychological and counseling services. Thus, they did not believe they would be able to provide the level of services needed by patients truly suffering from mental health problems.

Second, many correctional staff felt that either the standards for assignment to the mental health unit were unclear or they were being implemented improperly. Instances of inmates "conning" their way into the mental health unit merely to avoid a more stressful environment elsewhere were reported to the Committee. The Committee was unable to determine the truth of these allegations but found it interesting to note that some correctional officers did not seem to realize that reaction to stress could be a mental health problem.

Third, some correctional officers felt that even in a maximum security institution such as MCC it was difficult to segregate mental health inmates sufficiently from other inmates, to the detriment of both groups.

Finally, the mental health unit at MCC is being used as a waystation for the "observation" of inmates who have been confined at Central State Hospital to determine if they can readjust to prison life before transferring them to another prison. Some MCC staff believed that this was not a proper use of bedspace at the facility.

Therefore, the Study Committee recommends:

**Recommendation 12:** A small mental health unit should be retained at MCC for the temporary confinement of MCC inmates who the MCC medical and

- 77 -

counseling staffs determine may have mental health problems.  However, <u>unless the additional psychological and psychiatric staff necessary for appropriate and adequate mental health care is made available, MCC should not be used for the long-term mental health care of inmates from MCC or other State correctional institutions</u>.  If such additional staffing can be provided, a larger mental health unit at MCC for long-term care of inmates with mental health problems might be appropriate, but such a unit should be a lower priority assignment category for use of space at MCC than the Phase Program and protective custody. Finally, MCC should not be used as a facility for the long-term care of the "criminally insane."

<u>Recommendation 13</u>:  As long as space in the MCC mental health unit is available, it is not inappropriate for that unit to be used for the temporary confinement of inmates from Central State Hospital or other State correctional facility for the mentally ill to determine if those inmates can readjust to a prison environment before they are sent to another correctional facility.

# CHAPTER 4

## MANAGEMENT AND OPERATIONS ISSUES

### A.    INTRODUCTION:

It is clear to the Committee that a number of management and operations problems existed at the Mecklenburg Correctional Center (MCC) at the time of the May 31 escape and August 4 hostage situation.  Many had existed for a long period of time, some since the facility began operations in 1977.

Most of the public discussion of problems at MCC has focused on security problems at the facility.  But other serious problems at MCC, and with DOC itself, involving general management and supervision, communication, staffing levels, procedures for terminating unsatisfactory employees, and staff morale also existed and contributed to the occurrence of the incidents at MCC this past spring and summer.

### B.    SECURITY:

#### 1.    Background:

MCC is located in  rural Mecklenburg County approximately 15 miles north of the Virginia-North Carolina border.  The facility is a modern, attractive institution, containing seven buildings within an elliptical-shaped perimeter fence.  Access to the compound is obtained through a two-story administration building at the head of the perimeter.  Four three-story security towers rise at different points around the perimeter.  Perimeter security

- 79 -

consists of a combination of fencing, barbed wire, and coiled razor wire. The institution's power plant and a 36-bed Bachelor Officers Quarters (BOQ) are located outside the compound.

Inside the compound, five two-story buildings are used to confine inmates. Each building is relatively self-contained, with three "pods," or housing areas on the second floor. Each pod contains 24 individual cells. Several of the pods, including the Death Row pod, are further subdivided by a concrete block wall into two 12-cell subunits. The first floor of each building provides space for programs, operations and storage. Each building has four control centers--one main control room on the first floor which provides access to the building and a control room for each pod area.

Part of the Study Committee's charge was to examine the "concept and design" of MCC. The issue of physical security was reviewed in detail during the summer by consultants retained through the National Institute of Corrections at the request of Virginia's Secretary of Transportation and Public Safety.[42]   The Committee examined these reports in detail and reviewed imple- mentation of the consultants' recommendations by DOC.

The Committee recognizes that issues of management and supervision and other personnel decisions and actions are as essential to the security of a correctional facility as building construction and design. Since the need for improvement of physical security at MCC already was addressed in detail this past summer by outside consultants and currently is being pursued aggressively by DOC, the Committee decided to focus its primary

attention on MCC security policies and procedures, and manage-
ment, supervision, staffing, and program implementation as they
affect security. The latter four areas are discussed in Chapter
3 and in Sections C and D of this Chapter. This section of the
report briefly reviews the status of earlier consultant recom-
mendations regarding security, describes certain basic design
flaws in the facility, and discusses MCC security procedures.

> 2. Findings and Recommendations:

>> a. Consultant Recommendations and Other Efforts to
>> Improve Security at MCC:

In June and July 1984, technical assistance reports prepared
by national consultants retained through funding from the
National Institute of Corrections were submitted to the Secretary
of Transportation and Public Safety. The reports reviewed
security and operations of the entire MCC facility, and provided
over fifty specific recommendations in these areas. The Study
Committee was briefed several times during its deliberation on
the implementation status of these recommendations. The major
recommendations and either the stage of their implementation or
DOC's reason for not implementing them are summarized below.[43]

>>> (1) Consultant Recommendations on Equipment
>>> and Physical Security

°   Procure body alarms for staff in all housing units.
This recommendation is under consideration by DOC for
inclusion in its appropriations request to the 1985 General
Assembly. The estimated cost to equip staff in all five
housing units with the devices is $70,500.

°   Install closed circuit televisions for surveillance of
strategic areas where visibility is impaired.

- 81 -

This recommendation is being initiated at an estimated cost of $375,000. No vendor has been selected, and the date for final installation of the system has not been established.

° <u>Increase utilization of two-way radios</u>.

Additional radios to equip staff during regular shifts have been ordered and are expected to be received within 60 days.

° <u>Install an open intercom system between towers, gates and control centers to assist in monitoring events throughout the institution</u>.

The installation of an open intercom system has not been implemented, although efforts have been directed to improving the operation and utilization of the existing intercom system.

° <u>Install mirrors at strategic locations where blind spots exist</u>.

Mirrors have been installed.

° <u>Install a walk-through metal detector at key traffic points in the institution</u>.

This recommendation has not been implemented because DOC does not consider the walk-through units to be as effective as searches utilizing hand-held metal detectors; the walk-through units also require high maintenance. Procedures have been implemented to increase the frequency of searches with hand-held metal detectors.

° <u>Install smoke detection equipment and a sprinkler system in all inmate housing areas</u>.

This recommendation has not been implemented. DOC believes it may not be feasible. Sprinkler systems will be included in the renovation of eight isolation cells

- 82 -

in Building #1, and are being planned for the tailor

shop.   Inadequate water supplies and the existing cell

construction present major difficulties in installing

the recommended system.

°    Install an electronic intrusion detection system for fence
     and roof areas.

DOC does not believe this recommendation is necessary in

light of other increased steps which have been taken to

secure the perimeter of the facility.

°    Install a gate interlock system on the vehicle entrance to
     the facility.

This has been accomplished.

°    Increase the number of recreation yards for the purpose of
     reducing the number of inmates in one area during recreation,
     and install handcuff ports in each gate in the yards.

Handcuff ports have been installed in each yard.   Plans have

been made for expanding the size of the existing recreation

yard for Building #5, as well as creating 12 five-foot

wide, 25-foot long enclosed individual recreation areas for

Building #1 by subdividing the existing Building #1

recreation yard.   The estimated cost for the project is

$37,000.

°    Install security doors on all inmate showers.

This recommendation has not been implemented.   MCC staff

believe security doors on inmate showers are not needed,

based on revised policies for the duration and staff

supervision of inmate showers.   However, DOC may include the

recommendation in its 1986-88 State biennial budget request.

°    Improve compound lighting by installing at least one high
     intensity, high-mast light.

- 83 -

The estimated cost for improved lighting is $144,000, and plans have been made to request an appropriation for the project from the 1985 General Assembly.

°   Modify locks on staff restrooms adjacent to control rooms in all buildings.

This has been accomplished.

°   Review locking procedures for housing unit control rooms.

A "sallyport" entrance to a room is a hallway or breezeway separated by two doors. An individual who wishes to enter the room enters the sallyport through the first door, which is then locked behind him before the second door is unlocked. DOC does not consider the installation of "sallyport" doors in the pod areas to be feasible. The recommendation has been addressed by procedures to restrict key access to these areas. DOC also is exploring other alternatives to provide additional structural security to the pod control rooms.

°   Close off access ports located in control centers, which are accessible from the pod areas.

These "access ports" are small openings between the pod control rooms and the pod day rooms which were intended to assist staff who were in the pod day room in exchanging keys and other equipment with staff in the control room. The problem identified by the recommendation has not been corrected.

°   Interlock sallyport doors of main control centers in each building.

The main control room on the first floor of each housing unit controls access to the building through sallyport doors. To "interlock" the sallyport doors

- 84 -

means to make certain one door cannot be opened until the other door has been closed and locked. These main control room sallyport doors were designed to interlock, but some of them have not been working properly. This recommendation is being addressed. The problem identified was not a design flaw, but rather a problem of routine electronic maintenance. Institutional maintenance personnel have now increased their scheduled maintenance, and a shift commander double checks the doors for correct adjustment on a daily basis.

° Establish a communications/command center at the facility staffed by Major, Captain or Lieutenant who is securely removed from inmate contact.

This recommendation is being implemented. A request for two additional Captains will be made to the 1985 General Assembly. Capital outlay for enclosing an area of the administration building for this purpose may be proposed by DOC in its 1986-88 State biennial budget request.

° Establish additional perimeter security by installing razor wire on the roof of the administration building.

Plans are underway to implement this recommendation at an estimated cost of $10,000. A request for a special appropriation will be made to the 1985 General Assembly.

° Establish a telephone "hotline" to the local Sheriff's Department and the State Police Divisional Headquarters.

Plans are being completed for installation of a "hotline" to the Sheriff's Department, which will relay communications to the State Police during emergencies.

(2) Consultant Recommendations on Operations, Policies and Procedures:

- 85 -

° __Increase the visibility of MCC administrators and mid-level managers within the institution.__

This recommendation is being addressed through regular tours and inspections of the facility by the Acting Warden, Acting Assistant Warden for Operations, Assistant Warden for Programs, and Chief of Security.

° __Increase emphasis on basic housekeeping and sanitation.__

In these areas one consultant described the situation he observed as "best characterized as unacceptable by contemporary standards."[44]  The problem was due at least in part to the State cutback in positions authorized for DOC. Much attention has been directed at correcting this problem since this past summer.  Two additional custodial staff have been employed, increasing the total number of such individuals to three; they are assigned custodial tasks in the Administration Building, BOQ and other non-inmate contact areas.  Housekeeping and custodial duties in the inmate areas are performed by inmates themselves under the supervision of the correctional staff.

° __Develop specific policy and operations guidelines for agency-wide and institutional security and security audits.__

This recommendation has not been implemented but is being addressed in a centralized fashion by DOC as part of the duties of the newly-created Inspector General position.

° __Specific, functional "post orders" should be developed for each manned post at the institution.__

Post orders were available at the time of the consultants' review.  They are currently being reviewed in depth and revised and updated as needed, with plans for periodic

reviews in the future.

o     Establishment of an Institutional Special Investigator for
      the facility should be considered.

      This position is one of twelve new positions for which

      authorization will be requested from the 1985 General

      Assembly.

o     Increase the number of shift supervisors by two.

      New positions for this purpose are being requested from the

      1985 General Assembly.

o     Remove the firearm from the officer assigned to the
      reception area at the main entrance to the Administration
      Building.

      This recommendation has not been implemented.   DOC believes

      continuation of this practice is necessary.

o     Increase the number of official inmate counts to five
      per day.

      This recommendation is being implemented.

o     Institute a system of "watch calls".

      The consultants recommended that shift commanders institute a

      system whereby correctional staff in the housing units and

      pod areas would report periodically by telephone or radio to

      the shift commander in the administration building.   This

      recommendation is being accomplished at regular intervals

      during non-daylight hours.

o     Improve the inmate identification system.

      This recommendation is being implemented.   Information on and

      photographs of all inmates have been collected and are kept

      in a central location for quick access in an emergency

      situation.

° <u>Upgrade key control and emergency key procedures</u>.

This recommendation is being addressed, but it has been of lower priority than other recommendations.  The staff time needed for individual key inventories and the establishment of a key control system delayed implementation.

° <u>Upgrade weapons and equipment inventory and storage procedures</u>.

This recommendation is being addressed.

° <u>Implement a system of security checks and inspections</u>.

This recommendation is being addressed.  A regular three-person search (shakedown) team has been established, and unannounced individual inmate searches are being conducted more frequently than in the past.

° <u>Reorganize and revise procedures for Death Row</u>.

This recommendation is being implemented.  Detailed procedures have been revised and are being reviewed administratively for approval.

(3) <u>Other Efforts to Improve Security at MCC</u>:

In addition to implementing most of the security recommendations made by the national consultants, DOC has initiated numerous other security measures to improve the security of the physical plant at MCC.  Among the more notable of these efforts are:  reinforcement of the glassed-in areas of control rooms with bar grill screens in most housing units; reinforcement of outside windows and panels in the administration and medical buildings; plans to secure inmate beds and lockers in individual cells; and substantial repair of the damage done to Building #5 by inmates during the August 4 hostage situation.

Many additional security measures also have been implemented in the form of new staff operations and procedures.  These include:  the establishment of a three-person search team; the establishment of a 13-person Tactical Team for riot response and supervision of recreation; and the implementation of a new employee identification system.

These improvements in physical plant and security procedures are among more than 80 problem areas identified between July and early September through a security audit conducted by the Acting Warden and his assistants.  The Warden's list, submitted to the DOC regional and central offices, included both major and minor security problems and the institution's plans for addressing them. The Study Committee commends the Acting Warden and his staff for the thoroughness with which they conducted the security audit for the facility this summer.

The Committee concluded that DOC is taking appropriate, prioritized steps to implement most of the security recommendations contained in the national consultant reports.  Both staff security procedures and security of the physical plant have been improved in recent months, and many additional improvements beyond those recommended by the consultants have been implemented by DOC and the Acting Warden at MCC.  Although it was not able to examine in detail all the technical and fiscal aspects of each request for funding DOC plans to submit to the 1985 General Assembly, the requests seemed reasonable and the Committee therefore generally endorses those requests.  Thus, the Study Committee recommends:

> **Recommendation 14:**  Completing the implementation of the security improvements at MCC recommended by the national consultants and DOC staff must remain a **high DOC**

priority.   The Board of Corrections should support all
necessary and reasonable DOC funding requests for these
improvements.

Recommendation 15:   DOC should be required to report its
progress in implementing recommended security improve-
ments to the Board of Corrections on a monthly basis.
DOC should also be required to report to the Board any
decision not to implement or not to seek funding for a
particular recommendation, and the reasons for that
decision.

   b.   Basic Flaws in Design:

During its study the Committee did not dwell at length on the
issue of physical design of the institution.   Continued use of MCC
as a correctional institution was, of course, never in question.
Since its expertise was not in the area of architectural design,
the Committee focused its attention on reviewing efforts to im-
prove the facility's physical plant and security procedures.

Nevertheless, even as laymen, the Committee feels compelled
to mention several facility design issues which it found question-
able.   First, the Committee does not understand why all inmate
cells were constructed on the second floor of each housing unit;
it appears to be a design flaw.   Because of this design, addi-
tional travel by inmates through stairways and hallways is re-
quired.   The Committee wonders why this design was not questioned
during the facility planning stages.

In addition, the Committee noted blind spots in some hall-
ways, and in some inmate housing areas where the correctional
officer in the pod control room cannot see the doors to several
cells in the pod.   There also were at one point open spaces under
stairwells where inmates could hide.   These problems also are
design flaws; they have been addressed through the installation of
mirrors and the use of cinder blocks and cement to close the open

- 90 -

areas under the stairwells.  Again, the Committee wonders why such
obvious design flaws were not addressed during planning for the
facility or in the first several years of its operation.
According to the national consultants and the State Police Bureau
of Criminal Investigation, these design flaws contributed to the
May 31 escape and August 4 hostage situation.

     c.   Security Procedures:

     As noted previously, staff compliance with established ope-
rating procedures is as critical to maintaining security as is the
physical plant itself.  Breakdowns in established procedures were
in large part the cause of both the May 31 escape from Death Row
and the August 4 hostage situation.  If correctional officers had
counted the Death Row inmates returning from recreation on the
evening of May 31, for example, the escape probably would not have
occurred. If the inmates returning from recreation on the morning
of August 4 had been handcuffed to their belt, rather than having
only their wrists handcuffed, they probably would not have been
able to subdue the supervising correctional officers and take over
the building.  Both these security procedures are expressly in-
cluded in established MCC operating policies and procedures.

     Furthermore, based on observations during both its announced
and unannounced visits to the facility and other information
provided to it, the Committee has concluded that inspections for
drugs and other contraband entering the institution may still
be inadequate.

     DOC must continue to address as a high priority the improve-
ment of security procedures at MCC, as well as consistency in the

- 91 -

implementation of, and strict staff adherence to, those proce-
dures.  Steps to improve physical security are being adequately
addressed; thus, <u>the Committee believes that the essential</u>
<u>ingredient for improved security in the future will be the</u>
<u>consistent implementation of, and strict adherence to, MCC</u>
<u>security procedures</u>.  Appropriate management and supervision by
both DOC and MCC, which are discussed in Section C of this
Chapter, are the key to ensuring such implementation and strict
adherence.

The Study Committee therefore recommends:

**Recommendation 16:  DOC and MCC should be directed to
continue as a <u>high priority</u> the development and consis-
tent implementation of, and strict staff adherence to,
adequate security procedures for MCC.**

Finally, the Committee wishes to make note of one consultant
recommendation which DOC has chosen not to implement and to sug-
gest that DOC reevaluate the merit of that recommendation.  The
consultant recommended the removal of the firearm presently worn
by the officer stationed at the reception desk at the front en-
trance to the Administration Building, outside the security peri-
meter.  The Committee believes this is a sound recommendation.  In
the Committee's view, as in that of the consultant, the potential
value of arming this officer is substantially outweighed by the
risk it presents.  Thus, the Study Committee recommends:

**Recommendation 17:  The Correctional Officer stationed
at the reception desk at the front entrance to the MCC
administration building should not be armed with a
firearm.**

C.  GENERAL MANAGEMENT AND SUPERVISION:

    1.  Background:

    Management of the inmate population in Virginia is a hierar-
cial responsibility in the Department of Corrections (DOC), begin-
ning with the Board of Corrections and the DOC central office and
continuing through the regional offices, institutional administra-
tors and line supervisors at the institutions.  Accordingly, the
Committee reviewed organizational responsibilities and management
controls from the top down both to assess why the recent incidents
at MCC occurred and to determine if management changes are re-
quired to minimize the potential for future such incidents.

    There are five basic levels of management responsible for
institutions in DOC.  They are:

    (1)  Board of Corrections -- The Board is a nine-
         member, part-time citizens board appointed by the
         Governor.  Prior to 1982, it was solely an
         advisory group.  The General Assembly amended the
         Code of Virginia, effective July 1, 1982, to
         provide that henceforth the Board would be a
         policy-making board with the broad responsibility
         to oversee DOC, set program and fiscal standards
         for DOC, and, in general, "to monitor the
         activities and effectiveness" of DOC.[45]  The Board
         was not given additional resources to perform
         these important and demanding new duties.  It
         still has the same staff today it did prior to
         July 1982 -- one full-time secretary -- even
         though it has indicated a need for additional
         staff since prior to July 1982.

    (2)  Central Office (Director, his deputies and support
         services) -- The Director, through his staff, has
         Code responsibilities to implement standards and
         goals of the Board and to supervise and manage
         correctional facilities.[46]

    (3)  Regional Offices (Adult Services) -- The adult
         correctional system is divided into five regions;
         each region is managed by a Regional Administrator
         and staff.  The region is intended to be the link
         between the central office and the institutions.

Regional staff commonly provide administrative support and coordination to institutions, as well as general management oversight.  MCC is located in Region II.

(4) <u>Wardens/Assistant Wardens</u> -- Wardens and Assistant Wardens are responsible for the day-to-day management of an institution.  Areas of responsibility are security, administration, operations, and inmate programs.  The MCC top management structure includes a Warden, an Assistant Warden for Programs, an Assistant Warden for Operations, and a Chief of Security (Major).

(5) <u>Line Supervisors (Captains, Lieutenants, Sergeants)</u> -- The line supervisors are responsible for supervision of correctional officers, correctional Corporals, and inmate control and movement.  At MCC a Captain is considered the shift commander; a Lieutenant performs administrative work or monitors overall activities for the Captain in the five buildings housing inmates; Sergeants are responsible for supervising activities in one or two buildings.  Occasionally, Corporals act as building supervisors.

The Committee believes the executive level of management (the Board and central office) responded quickly and effectively to the recent incidents and remaining management problems at MCC.  However, the Committee believes there are inherent structural and organizational problems at each level in DOC that contributed to the situation at MCC.

2.  <u>Findings and Recommendations</u>:

a.  <u>Board of Corrections/DOC Central Office Relationship</u>:

The incidents at MCC have caused the Board of Corrections to reassess its role and responsibilities.  The Study Committee believes that this study has provided the Board with considerable insight into the correctional system, while also highlighting the tremendous difficulties of "monitoring" on a part-time basis, and with only one secretary as its staff, the activities of a large, complex agency.  The Board does not have the time available to

review most correctional programs in the depth MCC was reviewed by this Committee. The key to successful Board oversight in the future is access to reliable information, the availability of necessary staff, and an adequate, independent budget.  The Study Committee therefore believes strongly that the newly-created Inspector General position for DOC should be included in the Board's budget and should report directly to the Board.

The Board is highly dependent on DOC and its staff to provide it with timely, accurate information on the internal management of the Department.  Information on the seriousness of morale and security problems at MCC was not presented to the Board prior to the May 31 escape.  Interviews with DOC management officials indicated they also lacked knowledge about the severity of problems at MCC.  There had not been what DOC officials would consider enough information (employee and inmate grievances or letters to the central office from MCC staff) which might have alerted them to the existence of serious problems at the facility.

It is understandably quite difficult for the Board or central DOC management officials to be aware of the internal problems of every institution, considering the scope of the agency's responsibilities.  However, the Committee believes that the incidents at MCC might have been prevented if the Board and DOC had the appropriate management controls in place.  For example, until recently DOC lacked an ongoing central office mechanism to assess the effectiveness of security in institutions.  Furthermore, the agency lacks an ongoing, viable internal audit program to assess financial and general management practices.  Although an

- 95 -

internal audit unit does exist in DOC, it conducts few routine, planned audits and rarely presents its findings or reports to the Board.  Additionally, while the agency has the appropriate management policies in place, presented in such documents as the Departmental Guidelines, no ongoing central assessment is conducted to determine if institutional policies conform to DOC guidelines and are, in fact, followed by the managers and line staff in the institutions.

Recent actions by the Secretary of Transportation and Public Safety and DOC are important first steps in strengthening management controls.  Examples of these efforts include:  a consultant is currently completing reviews of both physical security and security procedures at each adult institution; additionally, two positions were established, an Inspector General and a Security Analyst, whose duties will include statewide audits of institutional security practices.  However, the issue of access by the Board to these individuals and their audit reports has not yet been resolved.  The Committee believes that the Inspector General should report directly to the Board to ensure that the person can function independently of DOC, and to enable the Board to act swiftly, in concert with the DOC Director, to correct any deficiencies.

        b.   DOC Central Office

Development of a strong Inspector General (and internal audit) program should provide central management at DOC with timely, objective information on institutional deficiencies.  The Committee is also satisfied that DOC has taken aggressive, concerted actions to improve management problems at MCC, including:

the appointment of, and strong support for, the acting Warden and
Acting Assistant Warden; discussions with local community offi-
cials about their concerns; an in-depth study of employee concerns
and operational issues at MCC; and the initiation of a major
review of physical security.  <u>The Committee believes, however,</u>
<u>that the special attention being provided to MCC by DOC was</u>
<u>warranted long before the recent incidents occurred.</u>

The nature of the MCC facility -- a "super maximum security"
prison coupled with a special program to control the Common-
wealth's most disruptive inmates -- requires constant attention
from the DOC central office.  The constantly shifting objectives
and continuing weaknesses of the institution's Phase Program (see
Section B of Chapter 3), as well as the actions at MCC that led to
the 1981 lawsuit by, and settlement agreement with, the ACLU, are
indicators of a lack of management direction and attention to MCC.
Apparently, management concern about MCC did not translate into
action until serious incidents occurred there this past spring and
summer.  <u>The complacency of management in identifying and addres-</u>
<u>sing problems at an early stage was evident in interviews with</u>
<u>top officials, as well as in interviews with regional and</u>
<u>MCC staff</u>.

The Committee believes that a primary example of misguided
and ineffective management of MCC has been DOC's handling of the
1983 ACLU settlement agreement.  Rather than accepting the settle-
ment agreement as an integral part of the future operations at
MCC, DOC displayed a top-down attitude of disagreement with and
indifference to the agreement.  This continues to be reflected in
the attitude of many officers at MCC, most of whom have never seen

a copy of the agreement (see Chapter 5 for a discussion of the settlement agreement).  Management must provide leadership to demonstrate that the institution can operate effectively within the boundaries of the agreement.  This can be accomplished by more frequent meetings between the central office and MCC staff, an ongoing training program on the ACLU settlement, and a shift of additional positions to MCC, if necessary, to handle the require-ments agreed to by the Commonwealth.

      c.  <u>Regional Office</u>:

    <u>Responsibilities of the Region II office are not clearly defined</u>.  Discussions with DOC management, MCC officials, and the Region II Administrator highlighted organizational problems at the regional level that contributed to the incidents at MCC this past spring and summer.  These include:

        °     Each regional office is responsible for a number of institutions and programs, making frequent site visits difficult.  Region II is responsible for seven field units, two major institutions, nine probation and parole districts and 20 jails.  (The Committee also noted that recommendations to the General Assembly earlier this year would have further increased this workload by abolishing one of five existing regional offices.)

        °     It is not clear whether the primary objective and mission of the regional office is oversight or managerial support to institutions.  In Region II, the staff is oriented to operations (e.g., food

service) and training support, not administrative oversight.

° It is not clear how often the Region II Administrator conducts field visits to MCC. Estimates ranged from twice each month to once every four months.

° Field visits to MCC by the Region II Administrator do not seem to have a clear purpose.  For example, no specific activities or data are reviewed, buildings are rarely inspected, and line officers have little opportunity to talk with the Administrator or his staff.

° Regional offices lack timely, accurate, and consistent information on the attendance of institutional personnel at training sessions.

DOC now requires regional administrators and staff to increase their presence in the field.  This could be more difficult than in the past since budget cuts effective July 1, 1984 resulted in a loss of regional training officer positions and increased responsibilities for the remaining regional staff.  However, considering that the central office will be absorbing certain responsibilities -- security audits and training oversight -- in the near future, the regional administrators and their assistants should be able to increase their presence at the institutional level.

The responsibilities being added to the central office should not be viewed as a reduction in the regional office's authority or responsibilities.  The regional offices are responsible for the

adequacy of security, training, and other functions at the insti-
tutions in their region.  In addition, the regional office must
keep the central office better informed of institutional problems.
More frequent and clearly focused field visits and group meetings
between the Region II Administrator, wardens and superintendents
in the Region are necessary to ensure uniformity of management
practices in the Region.

> ### d.  Institutional Management

Wardens and assistant wardens are responsible for day-to-day
management of an institution.  Although it may be difficult to
know exactly "what is going on" throughout a facility at all
times, a warden and his staff are responsible for determining
"what is going on" and for developing appropriate management and
organizational processes to respond to potential and actual
problems.

Responsibility for the administration of MCC is, and should
be, a shared one.  But it is clear that certain management
practices of MCC staff contributed to the institution's recent
problems. These practices included:

- ° excessive delegation of authority to and centrali-
  zation of responsibility in, certain staff;

- ° an inability to provide leadership to staff in
  resolving concerns over the ACLU settlement
  agreement;

- ° ineffective communication mechanisms; and

- ° an inadequate balance between security needs and
  inmate programs.

The Committee's review of consultant reports and extensive
interviews with current and former MCC staff indicated that exces-

sive authority was delegated to the Warden's staff and that a
great deal of the responsibility for the facility was centralized
in one person.  The former Chief of Security, a recognized expert
in security matters, administered all hirings and promotions of
officers and supervisors, developed major security strategies,
handled crisis situations, and often acted as a shift commander
and building supervisor as well, despite the presence on each
shift of Captains, Lieutenants and Sergeants, who are normally
responsible for most of these functions.  He still performed many
of these same tasks when he became the Assistant Warden for Opera-
tions.  While this may seem appropriate considering the "chain of
command" structure within an institution, the lack of knowledge
displayed by line supervisors and officers during recent incidents
indicates that the Warden lacked appropriate controls to ensure
that qualified staff were hired and promoted, and that staff were
familiar with security procedures.  A review of the personnel
files of various supervisors indicated that the Warden provided
little written input on the performance of supervisors.
Similarly, the Assistant Warden for Programs exercised consider-
able authority over the Phase Program with little supervision from
the Warden and questionable success.

The Committee remains concerned about the continuing pattern
by former MCC managers of placing the blame for MCC's problems on
others.  The ACLU was, and still is, cited as the major cause of
institutional problems.  Many officers and supervisors "gave up"
after the decree, according to former managers.  However, one
measure of a successful manager is his or her ability to operate
effectively within known constraints.  The consensus within DOC

from the top down, then and now, is that the decree is workable
and should not have a major impact on operations at MCC.  This
philosophy was not clearly and consistently transmitted to MCC
staff through DOC management officials in the central office, at
the regional level, or at the institution.

Other communication problems existed as well.  While insti-
tutional managers provided an open environment for employees to
discuss their general concerns, <u>few mechanisms were developed to
transmit adequately security and procedural information from
management to staff.  For example, departmental and institutional
procedures for handling bombs, fires, and hostage situations were
not communicated to all line officers and staff -- even after the
May 31 escape.</u>  Similarly, reports of serious incidents were not
transmitted between shifts, leaving officers coming on duty un-
aware of the potential for further serious incidents.

The Committee also questions MCC management's ability to
maintain a proper balance between security and programs.  Allowing
ratios of inmates to guards of 12:2 and 12:3 during open recrea-
tion time surely was an invitation to serious incidents.  Security
and support staff noted inmates often moved freely in hallways
after outdoor recreation and that employees who had been on the
job as little as two weeks were at times operating control rooms,
unaccompanied by a more experienced officer.  Most disturbing to
the Committee, however, was the decision by MCC management not to
order more than a 3-4 day lockdown of the facility after the May
31 escape.  Not until the August 4 hostage incident were standard
lockdown procedures implemented to regain control of the facility.

The institutional managers at MCC did take a number of posi-
tive management actions prior to the escape.  Employee concerns
were directed to the Regional Administrator by the Warden and
openly discussed at the institution.  Shakedowns of inmates and
cells were conducted prior to the escape.  And several of the
physical security changes now in place were initiated by former
MCC managers.  Unfortunately, these actions and others by manage-
ment at different levels within DOC were inadequate to address the
problems at MCC.

While the Acting Warden and Acting Assistant Warden for
Operations have earned the respect of most staff through increased
communication (roll calls, staff meetings) and changes in
security measures, DOC and the new Warden still will face a
problem unresolved since the opening of the facility -- how to
balance security needs with the need for a degree of inmate move-
ment and involvement in programs.  The current lockdown status may
be more responsible for improved staff morale and respect for the
acting management than any other action taken.  But the facility
cannot remain locked down forever.

e.  Line Supervisors:

The "supervisors" -- Captains, Lieutenants, and Sergeants --
have on-line authority for management of an institution.  Only
exceptional problems should involve Majors, Assistant Wardens, or
the Warden.  The recent consultant reports were critical of the
skills and practices of line supervisors at MCC.  Two different
consultants noted that both correctional officers and supervisors
consistently failed to follow established written procedures
during the recent incidents, particularly the May 31 escape.  The

necessary components of supervision -- visibility, communication, exercise of authority, direction to subordinates, problem-solving and decision-making capability -- apparently were sorely lacking at MCC this past summer. Although improvements were noted during the Committee's on-site visits, extensive retraining and in some cases a thorough evaluation of performance may be necessary to improve substantially the quality of supervision.

Among the problems at MCC noted directly by the Study Committee were:

        °     Decisions often are passed up the line, first by Sergeants responsible for a building to Lieutenants and Captains responsible for the shift. This practice may be a holdover from recent organizational practices when the Chief of Security (later an Assistant Warden) operated as a line officer, making many of the decisions normally required of lower level supervisors. As noted by an officer on temporary assignment from another facility: "someone, preferably the Sergeant, should have unquestionable authority in each building; this does not occur here."

        °     The line supervisors with the most day-to-day contact with inmates and direct supervision of officers (Sergeants) receive the least amount of supervisory training in the correctional training program.

        °     Captains, and particularly Lieutenants, often have

more administrative than operational duties to
perform, which causes them to spend more time as
administrators in the Central Administration
building than as supervisors in the five housing
units.

°   Manpower shortages often place supervisors in posi-
tions for which they have little experience or
training.  For example, Sergeants occasionally have
served as shift commanders; and on the 12 p.m.-8
a.m. shift, a Corporal is the building supervisor.
According to MCC Institutional Operating Proce-
dures, these functions should normally be performed
by Captains (or Lieutenants) and Sergeants,
respectively.

°   Many of the supervisors interviewed seemed unaware
of basic supervisory requirements -- visibility of
supervisors in the buildings remains inconsistent;
many supervisors have limited knowledge of major
security procedures (e.g., for handling bomb or
hostage situations); and few supervisors were able
to explain their specific responsibilities and
authority, particularly with regard to security.

°   Performance evaluations of supervisors are not used
as an effective management tool.  Performance goals
are general and easily attained, as evidenced by
consistently high scores on the performance evalua-
tion forms for supervisors.  Furthermore,
supervisors whose evaluations cite the need for

more training in supervisory skills and communica-
tion are still rated extremely high, thereby re-
ducing their incentive to improve those skills.
Overall, neither DOC's nor the consultants' criti-
cisms of the capabilities of MCC supervisors are
reflected in performance evaluations.

Despite these problems, several supervisors appear to be
doing an effective job and others may have the capacity for im-
proved performance.  Supervisors must be re-educated as to their
responsibilities and authority, provided with more opportunities
to develop their skills, and held accountable for their perfor-
mance.  If these actions do not result in significant improve-
ments, it may be necessary to return some supervisors to line
correctional officer positions.

The Committee therefore recommends:

**Recommendation 18:**  MCC should continue to be a top
priority of DOC management.  A Board of Corrections
subcommittee and DOC management should meet with em-
ployees at MCC to discuss the findings and recommenda-
tions of this report.  The Board should also request
regular status reports from DOC on the implementation of
the various recommendations in this report.

**Recommendation 19:**  The reporting relationship of the
new Inspector General to the Board of Corrections, the
Director of DOC, and the Secretary of Transportation and
Public Safety should be clearly defined and established
by December 1, 1984.  The Committee believes it is
imperative that the Inspector General report directly
to the Board and be included in the Board's budget.  The
Board is ultimately responsible for monitoring the
activities of the Department and must have the informa-
tion to do so.  In turn, the Inspector General must have
the independence and authority to:  review security
practices; investigate serious incidents; audit finan-
cial and management practices; and assist in developing
management standards and controls.  As is the practice
in other State agencies and private institutions, the
Committee believes direction and oversight of the audit

function by an agency's Board is the most effective way
to ensure this independence and authority.  Hiring and
evaluation of the Inspector General should be a joint
responsibility of the Board and Director, while report
distribution should be simultaneous to the Board,
Director, and Secretary.

Recommendation 20:  The DOC regional offices should
increase their oversight of field activities.  In
particular, the Region II Administrator and his staff
should have clearly defined responsibilities for
implementing this Committee's recommendations specific
to MCC.  In order to ensure consistency among the
regions in management oversight, the Committee also
recommends that DOC report to the Board in the near
future on the purposes and responsibilities of all
regional offices.

Recommendation 21:  The vacant Warden's position at MCC
should be filled by an applicant experienced in both
security and programs.  The reestablishment of strong
security measures initiated by the Acting Warden should
remain the focal point of the new Warden during the next
few months.  Programs, however, are a necessary
component of the facility and should be reviewed and
refined.  The Committee recommends that the new Warden
take the following actions, among others, to continue
improvements initiated in recent months:

(a)   establish better communication mechanisms;

(b)   develop a management reporting system (e.g.
      "management by objectives") to ensure that top MCC
      staff have clearly defined objectives and that, in
      turn, the Warden can monitor the progress of his
      staff;

(c)   make certain that the provisions of the 1983 ACLU
      settlement agreement continues to be integrated
      into institutional operations;

(d)   revise institutional operating procedures; and

(e)   review the operation of the Phase Program.

The new Warden should be instructed to meet with the
Board as soon as practicable to discuss his goals and
objectives for MCC and the findings and recommendations
of this report.  MCC is a special institution which
requires continuing Board involvement.

Recommendation 22:  DOC should take the following
actions in order to improve supervision at MCC:

(a)   Revise performance evaluation practices at MCC.

Supervisors need to be retrained to use the employee performance evaluation system effectively. More emphasis should be placed on identifying tangible goals and objectives for a supervisor to meet, and identifying skill deficiences requiring improvement. The central DOC personnel office should participate in this process.

(b)   Involve line supervisors (i.e. Captains, Lieutenants and Sergeants) in the revision of institutional operating procedures. This action would increase knowledge of procedures by these supervisors.

(c)   Increase individual supervisory training. Group training does not always account for individual weaknesses and constitutes only a short-term solution. (See Chapter 8 for more details).

(d)   Develop written definitions of job requirements <u>specific to MCC</u> for Corporals, Sergeants, Lieutenants and Captains. These should include descriptions of each supervisor's responsibility in specific situations as well as such general managerial duties as the performance evaluation of employees. Most importantly, a Sergeant's responsibility as a "building supervisor" should be well-defined.

(e)   Rotate MCC supervisors to other institutions to increase their knowledge of the correctional system and of more effective management practices.

(f)   Increase the number of Sergeant positions to ensure adequate supervisory coverage on evening shifts. This could be done without staff increases by reclassifying and training several Corporals or by eliminating Corporal position(s).

D.   STAFFING ISSUES:

   1.   Background:

      At the direction of the 1984 General Assembly, the Joint
Legislative Audit and Review Commission (JLARC) is conducting a
long-term study of staffing in DOC.  A major segment of the study
is security staffing at adult institutions, including MCC.  This
segment of the JLARC study originally was scheduled to be com-
pleted prior to the 1986 Session of the General Assembly.  As a
result of the May 31 escape of six death row inmates from MCC,
however, JLARC decided to submit an interim report on DOC insti-
tutional security staffing by December 1984, in time to be con-
sidered by the 1985 General Assembly.  The study is not limited to
MCC and includes such areas as adequacy of manpower assigned to
each institution, adequacy of DOC's methods for determining man-
power, the appropriate use of security staff (i.e., to perform
security rather than non-security duties), and a general review of
security procedures.  DOC is also conducting an internal review of
security manpower levels at adult security institutions and the
methodology for determining those levels.

      Both the JLARC and DOC manpower studies were underway before
this Study Committee was appointed.  The national consultants who
reviewed the May 31 escape and August 4 hostage situation at MCC
also addressed staffing issues.[47]  Given the depth of these other
manpower studies--especially the JLARC study--and the time
constraints of, and other issues to be addressed by, this report,
the Study Committee decided to limit the scope of its review to a
general examination of staffing at MCC, particularly the methods

used by MCC staff to determine their security staffing needs.

In the Committee's interviews with MCC staff, the most frequently mentioned employee concern was "understaffing." MCC employees generally believe that the institution has insufficient numbers of staff in relation to the type of inmate confined at MCC and the amount of inmate movement which takes place there. Management and employees also raised other staffing issues: turnover and recruitment problems with correctional officers; staff quality; and the use of security personnel to perform non-security duties. The consultant reports focused primarily on these latter issues, although recommendations were made to establish several specific positions at MCC and to expand certain security functions. By reviewing consultant reports, DOC staffing documents, statistics on staffing, and the methods used by DOC to determine staffing needs, the Committee developed several conclusions and recommendations on MCC staffing which are set forth at the end of this section of the report. However, the final decision on MCC staffing needs also should take into account the results of the JLARC study and DOC's internal assessment of MCC staffing needs.

2. Findings and Recommendations:

a. Overall Staffing Levels:

Overall staffing levels (i.e., both security and non-security positions) for each institution are established by the Governor and General Assembly after an assessment of DOC staffing requests. From 1980, when 26 correctional officer positions were added, to June, 1984, authorized staffing levels at MCC (the "manpower

employment level") have been relatively stable. Table 2 illu-
strates the overall staffing level during the past four years.
MCC is currently authorized to fill 335 positions.

The decrease in authorized positions in July 1984, from 346
to 335, resulted from the Governor's recommendations to reduce
DOC's overall employment level by 201 positions.  Fourteen posi-
tions were to be eliminated at MCC, but the DOC central office
permitted MCC to retain three positions and absorbed the cuts
elsewhere in the Department.  The 11 positions abolished were non-
security positions.

Within overall staffing levels, DOC has the authority to
determine the number of security positions for each institution.
The total number of authorized and filled security positions at
MCC is illustrated in Table 3.  While the number of authorized
security positions remained constant over the past four years, MCC
recently experienced difficulties in filling vacant positions.
The recent vacancies are being filled temporarily with officers
from other institutions.

During the Committee's on-site visits to the facility, MCC
management was preparing a revised budget request for 1985-86.
The request, which is currently under review by the DOC central
office, asks for an authorized total employment level (security
and non-security positions) of 347, an increase of 12 positions
over the current authorized level.  Due to time constraints and
higher priority issues identified in its charge, the Study
Committee did not attempt to validate the exact number of
positions needed at MCC.  However, the Committee did review in

## Table 2

### Authorized Positions at MCC[48]

| Date | Authorized Positions |
|------|----------------------|
| 7/1/80 | 320 |
| 11/80 | 346 |
| 11/81 | 344 |
| 11/82 | 346 |
| 11/83 | 346 |
| 7/84 | 335 |

---------------------------------------------------------------------

## Table 3

### Security Staffing at MCC[49]

| Date | Auth. Security Positions | Filled |
|------|--------------------------|--------|
| 7/80 | 233 | Not Available |
| 10/80 | 259 | Not Available |
| 12/81 | 259 | Not Available |
| 12/82 | 259 | 250 |
| 12/83 | 259 | 250 |
| 7/84 | 257 | 236 |
| 9/84 | 257 | 223 |

some detail the <u>methods</u> used by DOC and MCC to project overall staffing needs as well as the justification given for adding 12 positions.

      b.   <u>Security Staffing Levels</u>:

DOC uses a formal system-wide process to determine authorized security staffing levels at each institution. Institutions determine their staffing needs and submit requests to the regional and central office for review and approval. This process is outlined below:

      (1)  **Institution:**

Institutional management conducts a "Post Audit" in two phases. The Warden or Assistant Warden first determines (a) the number of posts essential to the security of the institution and the custody and control of the inmate and (b) the number of hours and days of the week a post must be manned. For example:

| # Posts | # Hours/Post | # Days/Week |
|---|---|---|
| 30 | 24 hour posts | 7 days a week |
| 25 | 16 hour posts | 7 days a week |
| 15 | 8 hour posts | 7 days a week |
| 8 | 8 hour posts | 5 days a week |

The institution then applies a formula to each post that takes into account the "administrative" aspects of an employee's job--days off, annual and sick leave, holidays, and training days. The formula--called the "Sharp formula"--was developed by DOC and a consultant (Sharp) in 1975 and updated in 1982. For example, while a 24-hour correctional officer post manned seven days per week theoretically requires only three officers, if the institution only staffed the post with three officers, there would be no one to cover it when one of the officers was sick or

on vacation.   Under the DOC formula, a 24 hour, seven day per
week correctional officer post therefore requires 5.05 officers
(See Appendices C and D for a detailed example).

(2)   **Regional Office:**

The Regional Administrator analyzes the request and either
asks for a revised post audit or approves the request and
forwards it to the Central Office.

(3)   **Central Office/Adult Service Division:**

The DOC Deputy Director for Adult Services and his staff
review the request from the standpoint of (1) posts essential for
security, (2) proper use of formula, and (3) other DOC
priorities.   Final recommended staffing levels are approved by
the Director.

The Study Committee's review of the process by which MCC
management estimated its security staffing needs indicated some
inconsistencies, which made it difficult to determine accurately
MCC's actual staffing needs.   Among the problems identified by
the Committee were:

- The post audit process was inconsistent,
  was geared too specifically to MCC, with
  little reference to the criteria used by other
  maximum security institutions, and was overly
  subjective.

- MCC management failed to apply the Sharp
  formula properly, due either to a
  misunderstanding of the formula or an attempt
  to stay within previously authorized funding
  levels (i.e., to make certain no more
  positions were requested than were already
  authorized).

- The Sharp formula does not include overtime
  as a component.   Staff at MCC work a large
  number of overtime hours.

- 114 -

°     The justification for all new positions was not adequately detailed.

The Committee reviewed three post audits conducted by MCC--May 1982, January 1984, and September 1984.  Table 4 illustrates <u>the inconsistencies which can occur when a post audit is conducted only by institutional personnel.</u>

--------------------------------------------------------------------

<u>Table 4</u>

<u>MCC Post Audits</u>[50]

| | May, 1982 | January, 1984 | September, 1984 |
|---|---|---|---|
| 24 hour posts/7 days | 30 | 29 | 34 |
| 16 hour posts/7 days | 20 | 23 | 20 |
| 8 hour posts/7 days | 9 | 3 | 10 |
| 8 hour posts/6 days | 0 | 2 | -* |
| 8 hour posts/5 days | 20 | 31 | 37* |
| 8 hour posts/2 days | 0 | 5 | -* |
| Total posts | 79 | 93 | 101 |

*Unclear from data whether all 37 posts were 5 days a week. However, large majority are 8 hour 5 day a week with a few 8 hour, 2 day.

--------------------------------------------------------------------

Not only has the number of necessary posts apparently increased during the past two years, but the requested coverage for particular posts also varies significantly.  This inconsistency extends to individual buildings:[51]

| MCC Building | Manpower Projection (8:00 a.m.-4:00 p.m.) | |
|---|---|---|
| | 1/84 | 9/84 |
| Bldg #1 | 8 | 12 |
| Bldg #2 | 7 | 8 |
| Bldg #3 | 7 | 9 |
| Bldg #4 | 7 | 8 |
| Bldg #5 | 7 | 8 |

The importance of consistency in determining necessary coverage of a post is illustrated by the examples of an actual and a hypothetical post audit in Table 5.  The Sharp formula itself, which tells a manager how to take into account sick leave, training, vacation, etc., when determining staffing levels, generally provides a consistent and objective approach to staffing.  However, in the end, manpower requests still are driven by an institutional manager's assessment of the number of posts and amount of coverage for each post which are necessary.  The MCC Actual post audit in Table 5 shows the number of 24 hour and 16 hour posts, 7 days a week, which MCC management estimated were needed in 1982.  To illustrate how subjective the post audit process can be, the Committee developed a hypothetical post audit. In the hypothetical example, five of the 16-hour posts are shifted to be 24-hour posts.  This increases the number of 24 hour posts and in turn increases staffing requirements after application of the Sharp formula.  In the example, the difference is 8.45 positions.  The key issue then is how management decides the number of posts needed and the hours per day those posts need to be covered.  The Committee does not at all question the intent or

## Table 5

### Actual vs. Hypothetical Post Audit at MCC[52]

#### 1982 MCC Post Audit (Actual)

<u>30</u>      24 hour posts – 7 days a week = 30 x 5.05 = 151.50

<u>20</u>      16 hour posts – 7 days a week = 20 x 3.36 = _67.20_

                              Total positions  218.70

#### 1982 MCC Post Audit (Hypothetical)

<u>35</u> (+5)  24 hour posts – 7 days a week = 35 x 5.05 = 176.75

<u>15</u> (-5)  16 hour posts – 7 days a week = 15 x 3.36 = _50.4_

                              Total positions  227.15

### Difference:  8.45 positions

professionalism of the MCC staff in carrying out its post audit
responsibilities.  The Committee's purpose in comparing MCC post
audits in 1982 and 1984 and in developing the hypothetical case is
to demonstrate the subjective and inconsistent nature of the
process.

The Committee is not in a position to justify or refute any
of the post audits conducted by DOC or MCC staff.  Such an
assessment is best left to corrections professionals who must
periodically reassess security requirements.  However, the
Committee is seriously concerned that the inconsistencies in the
MCC approach to conducting post audits may be resulting in either
an over- or under-estimation of staffing needs.  DOC is currently
reviewing the MCC post audit system in an effort to ensure greater
accuracy and consistency in that system.

A closer examination of the MCC post audit system also caused
the Committee to question whether the post audit process and the
Sharp formula are being used consistently statewide.  The Committee
noted, and brought to the attention of DOC management, MCC's
inaccurate determination of the number of relief officers
necessary to ensure that all administrative aspects of an
officer's position are covered (i.e., leave, training, etc.).  The
Sharp formula was developed to ensure consistency statewide.  Yet,
in comparing MCC to the State Penitentiary, for example, the
Committee noted that MCC's use of the Sharp formula varied
significantly from the manner in which it was used by the
Penitentiary staff.

Table 6 illustrates that inconsistency between the two
institutions.  The first two columns show the actual staffing

requests and how those were determined by the two institutions.
Apparently, MCC computed the number of required relief officers
differently from the Penitentiary.  The third column--"MCC
(Actual)" is the Committee's computation of staffing needs at MCC,
based only on the assumption that the MCC post audit is correct
and then applying the Sharp formula properly.  Under these
assumptions, an increase of 42 positions would be required.  The
Committee is not recommending this increase since we are concerned
about the inconsistencies in the post audit process.  The
inconsistency also caused the Committee to question why the State
Penitentiary is apparently funded and staffed closer to identified
needs and MCC is apparently staffed to meet overall DOC budget
objectives.

Officials at MCC indicated that their staffing computation
(the "MCC" column in Table 6) was developed in consideration of
their current authorized employment levels and the likelihood that
increases would not be approved, rather than actual requirements.
The Committee believes that the judgment on final staffing
requests should be made by the DOC central office, not the
institution, in relation to other priorities in the Department.
Then, the Governor and General Assembly should authorize what is
appropriate in relation to statewide priorities.

The Committee also identified a third major staffing
concern--neither the post audit process nor the Sharp formula
accounts for overtime hours worked by correctional officers or
other employees.  At MCC, combined overtime and compensatory time
hours worked by employees during 1983 equalled the man hours of

## Table 6

## Post Audits — Use of "Sharp" Formula at
## MCC and VA State Penitentiary[53]

### 1984

|  | Penitentiary | MCC | MCC (Actual) |
|---|---|---|---|
| Total Positions* | 197 | 189 | 189 |
| Total Relief Officers | 115** | 68 | 110** |
| Total | 312 | 257 | 299 |

*Number of security positions <u>without</u> considering administrative requirements.

**Computed using Sharp formula for administrative requirements.

approximately ten officers.  Thus, including overtime and compensatory time in the Sharp formula's equation would increase actual staffing needs at MCC even higher than the Committee projected.

The Committee noted that MCC already has the highest security officer-to-inmate ratio of adult institutions in the Commonwealth-- 1:1.2 (when using the authorized 257 security positions and the average daily population from 1982-84 of approximately 320).  If staffed at 299 (257 + 42 new officers) or higher, MCC security per- sonnel currently would outnumber the 286 inmates at MCC (August 1984).

The Committee is not reluctant to endorse more staff for MCC and the continuation of the high ratio of officers to inmates.  As designed and constructed, the facility requires a high staff-to- inmate ratio.  In addition, the incidents which occurred at the facility this past summer, the fact that the Commonwealth's most disruptive inmates are confined there, and the high annual number of inmate assaults on staff and other serious incidents all point to high staffing requirements if the facility is to operate effectively.  The alternatives are to close the facility or to change significantly the type of inmates and programs there.  The Committee does not support either alternative.  However, the inconsistent methods used at MCC to project staffing needs and the conflicting information contained in the post audits conducted at the facility over the past several years made it difficult for the Committee to assess properly MCC's actual staffing needs.  The Committee fully supports the steps DOC has taken to reassess both MCC's overall staffing needs and its

request for 12 new positions.

Based on its study, including its two on-site visits to the facility, the Committee generally endorses MCC's requests for the 12 positions, although more detailed justification is warranted. The extent of that need is not clear at this time.   The results of the JLARC study should be most helpful in making a more accurate determination of the need for additional staffing at the facility, as would a new comprehensive post audit of the facility.

   c.   Turnover and Recruitment of Security Personnel:

   Regardless of the number of correctional officers and other staff actually required to staff the facility, MCC management is likely to have continuing problems filling officer positions. While supervisory turnover rates at MCC have remained fairly stable, even after the escape and hostage situations this summer, the institution has experienced significant turnover among correctional officers over the past nine months.  Recruitment of new officers has become exceedingly difficult despite aggressive recruiting efforts by MCC management and DOC's central personnel office.   Table 7 illustrates the stability of the workforce in 1983 and, in turn, the sharp decline in filled security positions from December 1983 to August 1984.  While the number of filled correctional officer positions began to decline in early 1984, significant turnover did not occur until after the August 4 hostage incident.  At that point, 20 security employees, primarily correctional officers, resigned within a two-week period.  Between 1982-1983 and 1983-84, turnover of security personnel at MCC increased from 15% to 33%, even excluding the August 1984 data.

## Table 7

### Mecklenburg Correctional Center
### FTE Positions Filled54

| Year | Month | Security | Non-Security | Total |
|------|-------|----------|--------------|-------|
| 1982 | December | 250 | 90.75 | 340.75 |
| 1983 | January | 256 | 91.25 | 347.25 |
| 1983 | February | 257 | 92.25 | 349.25 |
| 1983 | March | 257 | 92.25 | 349.25 |
| 1983 | April | 255 | 92.25 | 347.25 |
| 1983 | May | 252 | 91.25 | 343.25 |
| 1983 | June | 252 | 91.75 | 343.75 |
| 1983 | July | 253 | 91.75 | 344.75 |
| 1983 | August | 252 | 90.75 | 342.75 |
| 1983 | September | 250 | 89.25 | 339.25 |
| 1983 | October | 248 | 89.25 | 337.25 |
| 1983 | November | 245 | 88.25 | 333.25 |
| 1983 | December | 250 | 86.25 | 336.25 |
| 1984 | January | 249 | 84.75 | 333.75 |
| 1984 | February | 243 | 83.75 | 326.75 |
| 1984 | March | 239 | 82.75 | 321.75 |
| 1984 | April | 238 | 82.75 | 320.75 |
| 1984 | May | 234 | 84.25 | 318.25 |
| 1984 | June | 238 | 80.75 | 318.75 |
| 1984 | July | 236 | 72.75 | 308.75 |
| 1984 | August | 220 | 73.75 | 293.75 |
| 1984 | September | 223 | 71.25 | 294.25 |

DOC acted quickly to solve the manpower shortage. Vacancies were filled by transferring correctional officers from other State institutions to MCC on a temporary basis, ranging from two weeks to 90 days.  In addition, the Acting Warden and DOC central office initiated an intensive recruiting effort statewide and in the northern portion of North Carolina.  Newspaper and radio advertisements and other expensive recruiting devices were used. This first recruiting effort generated only 200 applications, of which approximately 20% were qualified and only 5% offered positions.

The low number of "qualified" applicants is in part due to the stringent background investigation being conducted by the DOC Internal Investigative Unit on all applicants for MCC employment. However, the Committee and many DOC officials also believe the qualified applicant pool in the areas surrounding MCC has been depleted and may remain so for an extended period.  Historically, MCC has not had difficulty recruiting from the surrounding community.  But during both our interviews with MCC staff and the public hearing with officials from surrounding local communities, <u>it was apparent that the difficulties at MCC had become a major public relations problem, at least as far as recruitment is concerned</u>.  Officers are not recommending that family or friends apply for jobs, and local officials indicated many people who may have applied in the past will not now do so because of a fear for personal safety.  Several local officials also raised the issue of the quality of both the applicant pool and some current members of the MCC staff, questioning the ability

of local residents who were known to have had difficulty completing high school to function effectively as career correctional officers.

The number of vacancies, the frustrations of current security personnel, the poor public image of both the facility and the position of "correctional officer," and the poor recruitment statistics clearly indicate that staff turnover and recruitment are serious problems confronting MCC.  The Committee believes MCC is a unique institution and requires a creative solution to what are likely to be continuing problems in recruitment and the quality of corrections officers.

During the Committee's study, DOC officials proposed that the rotation of correctional officers and supervisors from other institutions to MCC, begun as an emergency measure to meet manpower needs at the facility after the incidents this past summer, be continued.  This practice would permanently reduce manpower shortages at MCC, would provide staff from other institutions with on-the-job training in the handling of more disruptive inmates, and would expose MCC permanent staff to new and different perspectives on how other maximum security facilities in the Commonwealth are operated.  The Committee strongly endorses this proposal and suggests two other additional steps for consideration: (1) requiring a temporary tour of duty at MCC to be one qualification for officer promotion throughout Virginia's corrections system, and (2) requiring MCC officers also to rotate on a temporary basis to other facilities.  However, before either the DOC's proposal or the Committee's suggestions are implemented, a cost-benefit analysis should be completed to determine whether

additional staff would be required for such a rotation system and what the cost would be to build housing or to provide a housing allowance to staff on temporary assignment.

       d.   Staff Quality:

Throughout the study, numerous comments were made from a variety of sources about the low quality of staff at MCC, both at the supervisory and line-officer level. Evaluating the quality of staff is often a highly subjective process--and certainly is when conducted at a "study committee" level. Even so, the Committee is concerned that the low quality of staff has been exaggerated in the news media. During its interviews, public sessions and tours of the facility, the Committee met a number of MCC security per-sonnel and other staff who exhibited considerable professionalism and an adequate knowledge of security. However, the overall quality of staff at MCC is suspect due to a number of factors, several of which are beyond the control of MCC employees or management:

> °    According to the national consultants who studied the facility, many MCC supervisors and officers are unable to exercise sound judgment in crisis situations and are complacent in following established security procedures.[55]

> °    Of 17 supervisors at MCC, approximately 25% have obtained advanced education, either of a general nature or in a public safety curriculum.

> °    The performance evaluation process at the institution is poorly handled by supervisors.

> °    The institution is relying on inexperienced recruits more than in the past due to manpower shortages, and often is forced to have them occupy sensitive posts at the facility.

- ° The stated job qualifications for a correctional officer are generally low compared to other public safety positions and job requirements. This problem is exacerbated at MCC due to the depleted pool of qualified applicants.

- ° Many correctional officers at MCC have never worked in another institution, which dramatically limits their experience and perspective.

- ° Employees reported that promotions were tied to favoritism and the "buddy" system. The overall quality of supervisors observed by the Committee partially validates this perception.

- ° Special training on the requirements of working in a maximum security institution is not currently provided to correctional officers at MCC or elsewhere.

Unfortunately, there is no simple answer to improving staff quality. Many of the concerns raised above are discussed in other parts of this Chapter and in other Chapters. Changes in the level of compensation and training for correctional staff, higher standards for promotion, proper use of the State's employee performance evaluation process, and an increase in the qualification standards to become a correctional officer all must occur in order to improve the quality of staff at MCC and other institutions. The rotation of correctional staff to and from MCC, as proposed in the previous subsection, also should improve staff quality.

  e.   <u>Duties and Assignments for Security Personnel</u>:

A major source of employee concern--and low morale--at MCC was the use of security personnel to perform non-security duties. The Committee identified these duties as being in one of three categories (1) security officers in each housing unit performing

menial low-level tasks in addition to their normal duties,
(2) security officers in positions which could be handled by
either security or support personnel, (3) security personnel
performing strictly support duties.

The first category is the one of greatest concern to the
Committee and officers.  At the time of our two on-site visits to
the facility, correctional officers were washing inmate clothes,
mopping floors, and delivering food to inmates.  In a number of
instances, officers were cleaning up food and other debris
(including human waste) which had been thrown on walls, ceilings,
and floors by inmates.  This contributed to the perception that
officers were the servants of inmates and in turn to the low
morale of many officers.  The Acting Warden noted that the
particular group of inmates which would normally perform
housekeeping duties were confined in that portion of the
institution which was still under "lockdown" (i.e., inmates are
confined to their cells except for showers and brief periods of
individual exercise time) since the August 4 hostage situation and
therefore could not leave their cells.

The Acting Warden has taken several steps to reduce the need
for officers to perform these tasks.  In September, he received
DOC authorization to hire two housekeeping employees.  In
addition, he has been given funds by the DOC central office to
construct a central laundry facility--to be staffed by inmates--in
one of the housing units.  The Committee fully supports these
steps.  But more needs to be done.  During its unannounced on-site
visit in October the Committee observed officers wearing hats

similar to those worn in a "fast-food" establishment, and plastic
gloves, serving food to inmates, and other officers mopping the
floors in the pod area.  <u>The Committee believes it is virtually
impossible for correctional officers to maintain a sense of
professionalism and pride in their work when they are asked to
perform such duties</u>.  The Committee does not support correctional
officers being asked to perform such duties, regardless of the
security reasons or budgetary shortages which may have prompted
their assignment.

The Committee did not review in depth the duties of
correctional officers assigned to support positions, although we
did note several examples.  For example, a security officer
operates a water supply truck full-time.  Employees in security
positions should perform security-related functions to the
greatest extent possible.  This should not, however, be seen as a
blanket endorsement to increase the number of security positions
at the facility.  The fact that some security positions have been
assigned support duties should be considered in the reassessment
of the MCC post audit.

The Committee reviewed one additional issue relating to
security staff duties--functions performed by female correctional
officers.  Approximately one-third of the security work force at
MCC is female.  However, female officers are normally assigned to
less dangerous posts such as the main control rooms on the first
floor of each housing unit and the guard towers along the
perimeter of the facility.  Reasons for this practice were not
entirely clear.  Some officers noted serious concerns about having
female officers "back them up" in a pod area if the use of force

against an inmate becomes necessary.  Regardless of the reasons
for the practice, however, post assignments are made more
difficult if an inordinate number of male officers are absent on a
given shift.  One solution is to ask male officers to work
overtime, which could lead to the regular use of overtime to fill
many of the more dangerous posts at the facility.  The assignment
of female officers to favored posts also could lead officers
to raise questions of equity and discrimination.

     f.   Recommendations:

Based on its review of staffing issues at MCC, the Study
Committee recommends:

**Recommendation 23:**  DOC should be directed to
conduct a new Post Audit of security staffing needs
at MCC.  It should be conducted by a team composed
of DOC central office, regional and institutional
personnel and at least one team member with
special expertise not employed by DOC by February 1,
1985.  The current inconsistent post audit process and
incorrect use of the "Sharp formula" to determine
actual manpower needs at MCC are of great concern to
the Committee since accurate staffing levels at this
special purpose maximum security facility are of
critical importance to the security of the facility.

**Recommendation 24:**  The Board of Corrections
should direct DOC to use the new Post Audit of MCC as
an opportunity to identify possible systemwide de-
ficiencies in the Post Audit process and in the appli-
cation of the Sharp formula. This action also may help
remove the apparent confusion within both other State
agencies and the General Assembly as to what DOC
security staffing levels are necessary and appropriate.

**Recommendation 25:**  The new post audit to determine
MCC's current staffing needs should consider a number
of issues which arise from general observations on
staffing made by the Committee during its two on-site
visits to the facility.  These include:

(a)  whether surveillance equipment (e.g.,
television cameras mounted on the wall in the
hallways outside the pod areas) will lead to
a reduction in the need for security positions;

(b)   whether use of a tactical team is the most
      appropriate method to respond to special
      security needs, what the appropriate size of
      the team should be, and what the impact is on
      overall staffing.

(c)   whether the officer and supervisory staffing
      level on the 12:00 midnight to 8:00 a.m.
      shift is too low;

(d)   whether seven transportation officers and two
      mail room officers are required;

(e)   whether the number of posts to which female
      officers are assigned should be expanded;

(f)   how soon the use of security officers to do
      janitorial tasks and administrative support
      duties can be eliminated.

<u>Recommendation 26</u>:  DOC should implement a
rotation system in which correctional staff from
other institutions are rotated periodically to MCC
on a temporary basis.  Similarly, MCC correctional
staff should be rotated periodically to other
institutions to enhance their job experiences and
broaden their perspectives.  A "tour of duty" at
an institution <u>other than</u> the officer's "home"
institution, <u>and</u> a tour of duty at MCC for every
officer in the adult corrections system, should be
a factor considered in career progression and
promotion.

E.    STAFF DISCIPLINARY AND GRIEVANCE PROCEDURES:

1.    Background:

The smooth operation of any organization involves a delicate and difficult balance in management–employee relations.  Both management and employees need personnel policies and procedures to guide their actions.  In addition, in order to supervise and administer an organization effectively, management needs the authority to discipline employees for noncompliance with those policies and procedures--including the authority to suspend, demote, and dismiss where necessary and appropriate.  On the other hand, in order to ensure that they are treated fairly, employees first need the opportunity to discuss their problems and complaints with management; if those discussions fail to resolve the matter, employees then need access to a more formal dispute resolution process.

The Commonwealth's personnel policies and procedures governing management–employee relations are contained in the Department of Personnel and Training Policies and Procedures Manual.  Authority for management to discipline employees for unacceptable conduct is contained in Policy No. 1.05 of the Manual, "Standards of Conduct."  The Standards are intended to establish a fair and objective process for responding to unacceptable conduct, distinguish between serious and less serious conduct, and, in general, limit "corrective action" to unacceptable conduct occurring when the employee is on the job or otherwise representing the Commonwealth in "an official or work-related capacity."

The process established by the Commonwealth to ensure the fair and timely resolution of disputes between State agencies and their employees is the "Grievance Procedure" set forth in the Virginia Personnel Act, Code of Virginia, §§ 2.1-114.5:1 through 2.1-114.5:6, and in Policy No. 1.06 of the Manual.  In 1978, the General Assembly created the Office of Employee Relations Counselors as an independent agency reporting directly to the Governor and reponsible for establishing a grievance procedure to resolve employee disagreements with management.

As designed by the Office of Employee Relations Counselors, the Commonwealth's grievance procedure consists of three "management steps" and a "panel hearing":  (1) a series of verbal and written communications about the complaint between the employee and his or her immediate supervisor; (2) review of the employee's written complaint by the next direct level of management; (3) review by either the agency head or the director of the facility where the employee is employed, whichever is lower; and (4) review by a three-person hearing panel, with one member appointed by the employee, one by management, and one by the other two or, if they cannot agree, by a circuit court judge.  Section 2.1-114.5:1(D)(4) of the Code of Virginia provides that "[t]he decision of such panel shall be final and binding and shall be consistent with law and written policies."

The grievance procedure has been subject to ongoing review by the Office of Employee Relations Counselors to ensure that the process is responsive to the needs of employees, management, and the Commonwealth.  The procedure also currently is being reviewed by a joint subcommittee of the House and Senate General Laws

Committees pursuant to Senate Joint Resolution No. 38, which was adopted during the 1984 Session of the General Assembly.

2.   Findings and Recommendations:

Given the scope of its specific charge and the limited time available for this study, the Committee was not able to conduct an in-depth review of all the various disciplinary and grievance procedure issues which could potentially affect DOC and MCC.

However, the Committee did conduct a limited review of three perceived problem areas:

(1)   Reversals of DOC management decisions by grievance hearing panels;

(2)   Alleged misuse of the State grievance procedure;

(3)   Certain statutory exceptions to the grievance procedure.

a.   Reversals of DOC Management Decisions by Grievance Hearing Panels:

Section 2.1-114.5:1(D)(4) of the Code of Virginia provides that the decision of the hearing panel "shall be final and binding." Several persons with whom the Committee spoke noted that DOC management decisions had in fact been reversed in the past and that such reversals were frustrating and demoralizing to DOC staff--management and employees alike--and "undermined the efforts of management to insist that employees adhere to appropriate standards if they wish to continue in correctional service." As one person noted, "In effect, it has become impossible to fire anyone, for incompetence or even criminal conduct."

To determine the validity of these perceptions, the

Committee examined data on DOC employee grievances filed under
the State grievance procedure.  The data indicated that the
number of grievances filed by employees at MCC is in line with
the number filed at other comparably staffed DOC adult
institutions, and in fact is lower than some:  during 1983-84,
for example, eight grievances were filed and completed by MCC
employees; 23 were filed and completed by employees at Buckingham
Correctional Center; 30 at the State Penitentiary; and six at
Brunswick Correctional Center.[56]   The grievances filed by MCC
employees appeared to be routine employee issues, except for
grievances filed by two employees who were terminated following
the May 31 escape from Death Row and one by an employee who was
suspended and transferred after this past summer's incidents.
(It should be noted that no grievances were filed in three other
terminations resulting from the escape.)

     A comparison of DOC with other State agencies indicates that
DOC and the Department of Mental Health and Mental Retardation
usually have the highest number of grievances each year.  The
Office of Employee Relations Counselors noted, however, that a
high number of grievances does not necessarily reflect poor
management, but in the case of DOC probably reflects, at least in
part, both the fact that more persons are employed by DOC than by
most State agencies and the stressful nature of the work,
particularly for correctional officers.

     As Table 8 below indicates, DOC has been fairly successful in
resolving employee management disputes before they reach the
hearing panel stage of the grievance procedure:  over the past

three years, approximately 75% of DOC employee grievances were resolved before reaching a hearing panel; 25% were resolved by a panel.

### Table 8

#### DOC Employee Grievances Which Reached the Hearing Panel Stage[57]

| Fiscal Year | 1981-82 | 1982-83 | 1983-84 |
|---|---|---|---|
| # Grievances | 186 | 248 | 239 |
| % to Panel | 28% | 13% | 26% |

These percentages are comparable to those for other State agencies.[58]  However, the Committee was concerned about the 13% increase between 1982-83 and 1983-84 in the employee grievances which reached the hearing panel stage.  This increase may indicate that DOC management--at the central office, regional, and institutional levels--needs to review its internal processes for handling grievances.  The Study Committee therefore recommends:

> **Recommendation 27**:  **DOC should further emphasize training on management and supervisory responsibilities under the State grievance procedure, especially at the first two "management steps" of the procedure, which involve attempts to resolve management-employee disputes at the immediate supervisor and next highest supervisory levels.**

Table 9 below indicates that over the past three years DOC management decisions have been upheld in approximately 60% of the disputes which reached the hearing panel stage.  During 1983-84, for example, 65% of DOC management decisions reaching the hearing panel stage were upheld.  In State government as a whole, however, only 46% of management decisions were upheld.[59]  These figures caused the Committee concern.

## Table 9

### Hearing Panel Decisions on DOC Employee Grievances[60]

| Fiscal Year | 1981-82 | 1982-83 | 1983-84 |
|---|---|---|---|
| DOC management upheld | 68% | 48% | 65% |
| DOC management modified | 15% | 30% | 29% |
| DOC management reversed | 17% | 21% | 6% |

The figures for cases involving termination of an employee are approximately the same as in cases where less-serious disciplinary steps were taken (e.g., suspension, demotion). During 1982-83, DOC management was upheld in 8 of 9 employee termination cases (89%); during 1983-84, management was upheld in 14 of 22 terminations (64%).

A closer examination of these nine termination cases over the past two years in which DOC management was not upheld caused the Committee even more concern. Four of those nine cases involved situations where the employee was terminated after being convicted by a court of a criminal offense: <u>stealing State property (Corporal), petty larceny for stealing State property (carpenter foreman), possession of marijuana and drug paraphernalia (Corporal), and hit-and-run (Correctional Officer). A fifth case was one in which a Corporal was charged with stealing money from an inmate</u>. According to DOC files, the decisions were reversed because of "mitigating circumstances," such as the employee's "good work record."[61]

The Study Committee was told of widespread concern in DOC that the high percentage of management decisions which had been modified or reversed by a grievance hearing panel over the past several years was undermining the effectiveness of DOC management.

The Committee was not able to determine the extent to which the effectiveness of DOC management had in fact been affected by these modifications and reversals.   However, the Committee did note with concern that in four of nine cases which involved employee termination and in which management's decision to terminate was not upheld, the employee had been dismissed following a criminal conviction.   In a fifth, the employee had been charged with a criminal offense.   Cases involving termination generally receive more public attention than non-termination cases, and the failure of a hearing panel to uphold management's decision therefore is more visible in termination cases.

At least two suggestions were made to the Committee for reducing or eliminating the possibility that a DOC management decision to terminate an employee convicted of a criminal offense would be reversed:   make the termination mandatory under such circumstances, or transfer the decision-making authority from a hearing panel to some other entity.

It is the Committee's understanding that merely by changing its Departmental Guidelines, DOC could provide that an employee convicted of a criminal offense would be terminated automatically. DOC apparently has elected not to so change its guidelines because it believes both that it would be difficult to determine which offenses should result in mandatory termination and that it should be permitted to exercise discretion in certain cases to consider mitigating circumstances, such as the employee's good work record.

The Committee was not able to study this issue in detail.   It therefore is not prepared to recommend that every criminal convic-

tion should result in mandatory termination.  However, the Committee believes it is _extremely_ important that correctional staff set a good example both for one another and for inmates.  It is difficult for other correctional staff and inmates to understand how a staff member convicted of a criminal offense, especially one involving moral turpitude (such as theft of State property or possession of drugs), can retain his or her position at a correctional facility.  Serious morale problems can result.  Perhaps mandatory termination is not the appropriate response in every case; perhaps mandatory reduction in pay or rank, or transfer, would be more appropriate, depending on the seriousness of the offense.  The issue has not previously been reviewed by the Board of Corrections. _It should be_.  Therefore the Study Committee recommends:

> **Recommendation 28:**  **The Board of Corrections and DOC should explore the possibility of amending DOC Departmental Guidelines to provide that mandatory disciplinary action be taken at least against employees who are convicted by a court or jury of a criminal offense, perhaps with the particular action taken being dependent upon the seriousness of the offense.**

A second alternative is to transfer the "final and binding" decision-making authority from a hearing panel to some other entity.  A joint subcommittee of the State Senate and House General Laws Committees is currently considering a proposal which would substitute a circuit court judge for the three-member hearing panel in grievances involving employee termination following a criminal conviction or probation in a drug case.  A number of objections to this approach have been raised:  (1) it in effect delegates all difficult DOC personnel decisions to the circuit courts, since the court hearings contemplated in the

proposal apparently are not intended merely to determine whether
the management decision was "arbitrary and capricious" or repre-
sented an "abuse of discretion," but instead apparently would
result in a·new hearing on the merits of the case; (2) it raises
Constitutional separation of powers issues concerning the duties
of the legislature and the judiciary; (3) it would place a sub-
stantial new burden on circuit court judges; and (4) it might make
DOC management even more reluctant to take appropriate measures
against employees who are incompetent or engage in unacceptable
conduct.   The purpose of substituting a circuit court judge for a
three-member hearing panel apparently is a belief that judges
would be less willing to reverse a management decision than a
three-person hearing panel.   It is not clear that this belief is
accurate.

     However, there is precedent in the Virginia Personnel Act
itself for such judicial involvement.   Section 2.1-114.5:1(C) of
the Code of Virginia provides that permanent classified employees
of the Department of Mental Health and Mental Retardation who are
terminated for patient abuse may pursue a grievance through the
circuit court "in lieu of a panel hearing" if the earlier internal
"management steps" do not resolve the matter.   Note, however, that
this provision provides an option to the employee of a three-
person panel or a circuit court judge to hear the case.

     A second suggestion made to the Committee was that a hearing
panel's decision should be subject to the review of the "agency
head" (in DOC, the Director) who would be given 15 days to modify or
reverse the panel decision or it would then become final and

- 140 -

binding.

The advisability of transferring the grievance procedure decision-making authority--at least in cases where an employee has been terminated because of a criminal conviction--from a hearing panel to some other entity has not been reviewed by the Board of Corrections.  It should be.  The Study Committee therefore recommends:

> **Recommendation 29:**  **The Board of Corrections and DOC should request the Office of Employee Relations Counselors to review the Commonwealth's current grievance procedure--and in particular the hearing panel step of that procedure--to determine whether, in its judgment, reversals of DOC management decisions in cases where the employee was terminated because of a criminal conviction were justified.  If not, the Board and DOC should request that the grievance procedure be amended to provide for either (1) the transfer of the final grievance procedure decision-making authority in such cases from the current hearing panel to some other entity or (2) mandatory disciplinary steps against employees so convicted, as described in Recommendation 28.**

b.  Alleged Misuse of the State Grievance Procedure:

The Committee heard several disturbing rumors about alleged misuse of the State grievance procedure.  These rumors are mentioned here only because they have damaged the department.  A number of recent incidents involving DOC, including recent events at MCC, were ones in which DOC received highly visible public criticisms.  DOC management was rumored to have developed a practice in response to such incidents of (1) taking disciplinary action against employees which would be perceived as favorable by the public (e.g., dismissal) but which DOC "knew" would be reversed by a hearing panel if the grievance were heard after the public reaction had subsided; and of (2) informally telling employees who

could not file a grievance because they were exempt from the
grievance procedure that they would be reinstated at some point
after public reaction had subsided.

One example reported to the Committee of the former alleged
practice was an employee in the DOC central office who was dis-
missed for making a serious error in projections for the Governor
and General Assembly of future DOC prison bedspace needs.  DOC
indicated that the dismissal "was due because the negligence was
so damaging to the Department and the error, if left unnoticed,
would have cost the Department 1000's of dollars . . . not to
mention the public and political embarrassment."  The hearing
panel voted 3:0 to reinstate the employee in the same grade level
he occupied before the dismissal, with full back pay.

The Committee could not conclude that DOC had in fact dis-
missed this employee "knowing" or "with the hope" that he would be
reinstated.  Even rumors of such practices, however, can be
damaging to management.  Therefore, the Study Committee
recommends:

> **Recommendation 30:**  DOC management and
> supervisory staff should continue to take only
> those disciplinary actions against an employee
> which are deemed appropriate in the circumstances
> of the particular case.  In order to protect DOC
> management, the Board of Corrections, through the
> newly-appointed Inspector General, should
> investigate any allegation that disciplinary
> action was taken against a DOC "managerial
> employee," warden or assistant warden for reasons
> other than that the employee's conduct warranted
> the action.

c.   Exceptions to the State Grievance Procedure:

The Virginia Personnel Act provides that certain employees
are not eligible to file grievances under the Commonwealth's

grievance procedure. The two most important exceptions for the purposes of this report are set forth in Section 2.1-114.5:1(C)(2) and (4) of the Code of Virginia:

> "2. Agency heads . . .; [and] 4. Managerial employees who are engaged in agency-wide policy determinations, or directors of major state facilities or geographic units as defined by regulation, except that such managerial employees below the agency head level may file grievances regarding disciplinary actions limited to dismissals."

Subsection (2) would include the Director of DOC; Subsection (4) would include the Deputy and Assistant Directors of DOC and the Warden at each of the major DOC institutions, including MCC, but not the Assistant Wardens or Chief of Security. Thus, the Director of DOC is not eligible to file a grievance for any disciplinary action taken against him. Deputy and Assistant Directors and Wardens may file a grievance only if they are dismissed. Assistant Wardens and Chiefs of Security may file grievances in any case involving disciplinary action against them.

Some members of the Committee were concerned that failure to take disciplinary action for incompetence on the part of "managerial employees" (e.g., the Deputy Directors and Wardens) and their assistants could be rationalized on the grounds that if disciplinary action were taken against the employee, the employee might prevail in a grievance filed to reverse the action. The problem, of course, is that such rationalizations can be--and often are--made at every managerial level in State government.

The Committee was persuaded that many of these problems can be avoided through the proper use of the Commonwealth's perfor-

- 143 -

mance evaluation process (the process for rating employees), which is discussed in Section C of this Chapter, and which will document the incompetence or other personnel problems and therefore make it much more likely that management will be upheld at each of the internal "management steps" and by the hearing panel.  However, members of the Committee also believe that Superintendents, and other correctional security personnel with a rank higher than Major, should not be permitted to file a grievance under the State grievance procedure for disciplinary actions taken against them, including termination.  Recognizing that this policy would require an amendment to the Virginia Personnel Act, the Committee decided to recommend that the Department of Personnel and Training and the Office of Employee Relations Counselors be asked to review the issue.  Thus, the Study Commitee recommends:

> **Recommendation 31:  The State Department of Personnel and Training and the Office of Employee Relations Counselors should be asked to review the exceptions to the State grievance procedure to determine if the "agency head" and "managerial employees" exceptions should be expanded, with a view to providing that DOC Superintendents, and other correctional personnel with a rank higher than Major, would not be permitted to file a grievance under the State grievance procedure for disciplinary action taken against them, including termination.**

F.    STAFF MORALE:

   1.   Background:

The morale of an organization is often defined as its state of "health."  The healthier an organization, the more likely it will attain its goals and objectives.  National studies indicate that the nature of correctional work is inherently stressful,

leading to low morale and ineffectiveness in institutions. Keeping these factors in mind, the Study Committee examined the level of morale of the employees at MCC and isolated unusual problems affecting morale.

The Committee reviewed DOC documents relating to morale problems at MCC and conducted follow-up interviews as well as an open forum with MCC staff.  Overall, morale has been extremely low for a number of months; this is true despite recent positive actions by DOC, and is likely to remain so without further steps to address real and perceived problems.

2.  Findings and Recommendations:

The recent incidents at MCC may be partially attributable to low staff morale.  Turnover, a strong indicator of morale, increased from 15% at MCC in fiscal year 1982-83 to 33% in fiscal year 1983-84.  Apparently officials at MCC became concerned about staff morale soon after the ACLU settlement in April 1983.  Documents reviewed by the Committee indicate that their concern increased when significant employee turnover began in early 1984. Staff morale and turnover problems were reported by the previous Warden in correspondence to the Regional Administrator on May 3, 1984, four weeks prior the May 31 escape.  The Warden advised that employees indicated the following problems:

° workload too great;

° lack of control over inmates as a result of ACLU settlement decree;

° fear for personal safety and job stress;

° concern about compensation because of freeze of merit pay and lack of hazardous duty pay;

° lack of support by the "administration";

- 145 -

° work schedule;

° quality of new employees; and

° harassment by supervisors.

Internal steps were initiated by the former Warden in early May 1984--several weeks before the escape--to address these employee concerns (initiating open meetings with employees, paying employees for overtime work rather than merely giving them compensation time, increasing efforts to recruit officers, requesting a DOC review of pay issues).

A DOC-initiated study of morale at MCC began in June 1984 in response to the Warden's May 3 letter and the May 31 escape.  The study used an employee survey, conducted in August 1984, to document further MCC employee concerns.  The most prevalent concerns were:  fear for personal safety; excessive inmate privileges; loss of control due to the ACLU settlement; and pay.

During its on-site visits in September and October 1984, the Committee found morale improved.  This appears to be due to a number of recent actions taken by DOC and other State agencies, including:  the DOC study of the key stress factors affecting officer morale; meetings with employees by top DOC officials; appointment of an Acting Warden and Acting Assistant Warden (and their efforts to strengthen security and make other internal changes); and the concern shown by the Governor in appointing this Committee.  The Committee noted, to a degree, a greater sense of teamwork and cooperation among supervisors and staff during our visits, compared to that reported earlier in the year.

The Committee believes, however, that the improved morale at

- 146 -

MCC is tenuous.  While many staff cited improvements in recent months -- particularly in security, workload and communications -- many of the same issues cited earlier were raised.  Besides pay (particularly, lack of merit pay) and understaffing, the staff noted problems of poor security practices by certain officers, inappropriate duties assigned to officers (doing inmate laundry, cleaning pod areas), lack of supervisory visibility in the buildings, favoritism in promotion, and sexual harassment.  The primary area of concern was the feeling that due to the ACLU settlement agreement, officers could no longer control inmates.

The Committee believes that there is no single answer to improve staff morale at MCC.  The institution continues to operate on rumors and hearsay rather than fact.  Many of the issues raised by the staff during the Committee's visits have been followed up by the Committee and DOC.  Problems that were verified and of a significant nature are addressed in other sections of this report. Whether factual or not, the perception that many issues are factual has undermined DOC's ability to manage the institution effectively.  The major issues should continue to receive the attention of the Board of Corrections and DOC.  Over time, substantive change must occur in a number of areas in order to improve staff morale.

Thus, the Study Committee recommends:

**Recommendation 32: Implementation of the recommendations in this report should significantly improve staff morale at MCC.  Additional actions should be taken to improve morale and ensure employees do not feel "isolated" or unsupported by the DOC administration. These actions should include:**

(a) **Periodic visits to Mecklenburg by DOC officials and members of the Board of**

Corrections -- These visits should be both
announced and unannounced and should occa-
sionally include closed meetings with
employees.

(b)   Formation of employee teams  -- The
establishment of a Tactical Team to respond
to situations in which inmates are disruptive
and to supervise outdoor recreation is the
first step in fostering a teamwork approach
to solving problems and operating the
facility.   Rotating staff assignments to the
Team would be an appropriate second step.

(c)   Involve officers and other security personnel
in program planning and management --
Officers have valuable insights into inmate
behavior which could be helpful in program
planning.   Another potential area for staff
involvement is in the revision of Institu-
tional Operating Procedures (IOPs).   Use of
supervisors _and_ staff in this process should
result in improved quality of these proce-
dures and greater staff knowledge of them.

## CHAPTER 5

## IMPACT OF LEGAL PROCEEDINGS

A.   INTRODUCTION:

Over the past decade there have been an increasing number of cases filed against corrections systems alleging poor prison conditions and guard brutality in many of our nation's correctional institutions, particularly state prisons and local jails. These "prisoner's rights" cases have addressed a wide variety of issues, including:  physical safety for inmates, the physical condition of cells, cell space, overcrowding of facilities, public health matters, and access to educational, vocational, and religious programs.

Many state prisons and local jails were in fact in deplorable condition; some still are.  Nationally, corrections typically has not been a high priority budget item--until a crisis occurs, such as the prison riot at the Attica state prison in New York several years ago, or a lawsuit is filed by or on behalf of inmates in a facility and a court orders, or the parties settle the case and the state or locality agrees, to make certain improvements in its physical facilities or programs.  A large number of courts--state and federal--from all over the country, including here in the southeast, have been willing to order such improvements, and many states and localities have decided not to litigate these cases but instead have signed settlement agreements in which they have agreed to make certain improvements in their prisons and jails. This fact alone is strong evidence that something is lacking in

the physical condition of, and programming available at, many of
our nation's prisons and jails.

B.  RECENT LEGAL PROCEEDINGS INVOLVING MCC:

    1.  Background:

        a.  April 1983 ACLU Settlement Agreement Case:

The Commonwealth's corrections system has not been immune
from prisoner's rights litigation alleging poor prison conditions
and guard brutality.  The two most relevant such cases for the
purposes of this report are (1) a suit filed against the Depart-
ment of Corrections (DOC) in 1979 by a group of inmates at the
Powhatan Correctional Center (Powhatan) on behalf of all inmates
at the facility, alleging that the conditions of their confinement
were unconstitutional; and (2) a suit filed against DOC in Septem-
ber 1981 by inmates at the Mecklenburg Correctional Center (MCC)
charging that "the totality of the conditions at MCC falls beneath
standards of human decency, inflicts needless suffering on pri-
soners and creates an environment which threatens prisoners' men-
tal and physical well being and results in the unnecessary de-
terioration of prisoners confined there."[62]  Both cases were filed
in Richmond in the United States District Court for the Eastern
District of Virginia but were handled by two different federal
judges.  Neither case went to trial; both were settled.

The former suit was settled by the Commonwealth in 1981 and
resulted in a "consent decree" (a decree entered by a court
setting forth a binding agreement between the parties to a law-
suit) dated February 12, 1981, in which the Commonwealth agreed to

improve certain conditions at Powhatan.[63]  A second consent decree was entered in this case in June 1983 in which the Commonwealth agreed to pay certain damages to inmates who were confined at Powhatan between February 1976 and February 1981.[64]  The relevance of the Powhatan consent decree to this report is that it involved an institution comparable in many ways to MCC.

The second case, Brown v. Procunier,[65] was a suit against MCC alleging inhumane prison conditions and guard brutality.  The case was filed in September 1981 after almost four years of discussions between DOC officials and representatives from the American Civil Liberties Union (ACLU) National Prison Project in Washington, D.C. concerning conditions at MCC.  The case was terminated by a "settlement agreement" (a binding agreement, or contract, signed by the parties to settle a case) dated April 8, 1983.  The inmates in the case were represented by two Virginia attorneys and representatives from the ACLU National Prison Project--hence the title "April 1983 ACLU settlement agreement/consent decree case" has been used to describe the case by virtually everyone with whom the Study Committee spoke.

The settlement agreement is quite long (19 pages).  Because of the importance so many persons with whom the Committee spoke have attached to this agreement, those of its more important provisions which are most relevant to this report are described below.  Among other things, DOC agreed to:

     (1)  implement several changes in the Phase Program:

          (a)  Inmates will begin in Phase II, not Phase I, if they "satisfactorily adjust" during orientation.

          (b)  Inmates in a particular phase "normally" will

be reviewed for advancement to the next phase after half the time required for a particular phase.

    (c)  "Under ordinary circumstances which will be further defined by the parties," DOC will transfer an inmate to another institution after two years at MCC, even if he did not complete the Phase Program.

(2)  "tighten significantly screening . . . [and] criteria for assignment to MCC."

(3)  develop a written plan for transferring to another facility persons who complete the Phase Program or who are found to be inappropriate for permanent assignment to MCC.

(4)  increase "outdoor recreation" for all inmates except those in special detention categories (e.g., isolation, segregation) to "a minimum of between 5 to 6 hours . . . per week, weather permitting.  During the summer months, between 6 and 7 hours of outdoor recreation will be provided, weather and staff permitting."

(5)  "implement by special memorandum from the Director that it will be the policy of the DOC and the staff at MCC not to use excessive or unnecessary force including excessive use of chemical agents, i.e., that such force as may be used will be reasonable."

(6)  continue its current policies and procedures for reviewing "Serious Incident Reports."  The DOC Director agreed for a period of one year "to investigate complaints of excessive force [received] from counsel" for the inmates, and "to review 15 past instances of use of force complaints [which are] submitted by counsel" for the inmates and which occurred during the prior two years.

(7)  "use counseling staff with particular training and crisis-defusing skills as resources to resolve problems without the use of force."

(8)  have applicants for positions at MCC be investigated by a special DOC investigator to help screen out applicants who might have "propensities for violence."

(9)  continue its past practice of videotaping "possible serious incidents" for at least the next year.

(10)   "develop a comprehensive plan for the improvement of medical and psychiatric care at MCC."  Almost two pages of the agreement were devoted to this issue.

(11)   dedicate one of the five MCC housing units for assignment of non-Phase Program maximum security inmates.  "This population will be separate from MCC and will include programming and vocational opportunities similar to other maximum security institutions."

(12)   "make jobs available for all Phase III inmates and for as many Phase II inmates as possible."

(13)   give more out-of-cell time to Phase III and Phase II inmates and permit "[c]ounselling . . . [to] take place as appropriate."

(14)   expand the time for inmate access to the law library, especially for Death Row inmates.

(15)   provide "daily access to newspapers and magazines" unless the inmate misused such materials within the prior two weeks thereby "creating a security or sanitation hazard."

(16)   restore Saturday mail service.

(17)   "review the dietary requirements of adherents of the Nation of Islam" and ". . . . assure the non-contamination by pork of the meals of non-pork eaters."

(18)   permit "group religious activity . . . subject to reasonable staff and security needs as determined by DOC."

(19)   "use reasonable search procedures," but was permitted to continue certain strip searches.

(20)   allow Death Row inmates two non-legal telephone calls per month and unlimited calls to their attorney, and permit them to have family members and certain other enumerated individuals visit them in the MCC visitation area in the administration building.

(21)   "explore the possibility" of college courses for certain inmates.

(22)   "make a good faith effort" to provide more program activities to protective custody inmates.