# Exhibit 3

PC-VA-001-017

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

*Filed 4/5/85*
*order provisionally*
*approving, subject for lim*
*notice - 4/6/85*
*Final approval 8/8/5*

ALAN BROWN, et al.,

      Plaintiffs,

v.

                                CIVIL ACTION NO. 81-0853-R

ROBERT M. LANDON, et al.,

      Defendants.

## SETTLEMENT AGREEMENT

This agreement between all of the parties supersedes all prior agreements, specifically the agreement of April 8, 1983, and replaces all prior orders of the Court in this action, specifically the preliminary injunction order of October 2, 1984. The Virginia Department of Corrections is hereafter referred to as DOC and the Mecklenburg Correctional Center is hereafter referred to as MCC. The use of the term DOC in this agreement includes all of the defendants, their agents, employees and successors in office.

1. The DOC has discontinued the phase program and does not intend to reinstate any similar program in the future. If in the future a similar program is considered by the DOC, before any such program is initiated, the Court and all counsel of record in this litigation will be notified by the DOC. This notice shall be in writing and shall include a detailed description of the proposed program. All counsel of record will have 60 days from the receipt of said notice to file written comments with the DOC or to take any appropriate action with the Court.

2.     Inmates transferred under the two-year rule or as a result of the abolition of the phase system who remain in segregation at the receiving institution shall have their classification reviewed by DOC central office personnel and others to determine the inmates' appropriate classification status.

3.     The Special Management Unit has been and will remain abolished.

4.     With the exception of Death Row, inmates assigned to MCC will generally be "C" custody.  The classification at MCC, with the exception of Death Row, will be similar to those at other institutions in Virginia such as the Virginia State Penitentiary and Powhatan Correctional Center.

5.     The DOC agrees to continue the practice of having all cell lights subject to internal controls.  If necessary for security purposes, certain special status cells may also be equipped with night lights under external control.  Steel desks and attached stools will continue to be provided in all individual cells.  Inmates will be informed that upon request, they will be provided with light bulbs up to 100 watts.  Individual window knobs will continue to be provided in all cells unless the inmate misuses the knob or there is a security reason for restricting use of the knob.  Any such situation will be documented in writing.

6.     The DOC will continue to have a written policy defining the circumstances under which toilets in segregation and isolation can be turned off.  Such policy shall designate the decision-maker and the lengths of time during which a toilet may

be turned off. In addition, such policy shall provide that toilets shall be turned off only as a result of deliberate flooding or similar misconduct and that no inmate shall be required to consume a meal in a cell with an unflushed toilet.

7.    The DOC agrees to follow the provisions regarding in-cell restraints contained in IOP 411.M, 412, 413 and 871.1. In addition, security staff will check a person placed in restraints for suicidal or self-mutilative behavior every fifteen (15) minutes, and all others every hour or less unless otherwise directed. The use of restraints in psychiatric problem cases shall be monitored by the psychological staff, and in all restraint cases there shall be immediate consultation with the psychologist or medical doctor at the first available opportunity. Except in emergency situations the use of restraints will only be used after consultation with and personal observation by the ranking psychologist or medical doctor available at the institution who will thereafter review the progress at 24 hour intervals, or less, as they deem appropriate. During times when there is no psychologist or physician at the institution, the on-call psychologist or physician will be notified. A psychologist or physician will interview the inmate when he next comes to the institution. In the event an inmate should need to be restrained in excess of 48 hours, the Deputy Director of the DOC will be notified.

The use of mechanical restraints within the cell shall be limited to those circumstances in which the inmate is engaging in suicidal, self-mutilative, self-destructive or other behavior

which appears likely to cause injury to himself or others. In all cases, there must be written documentation of the reasons for placement in restraints, documentation of observation of the individual at fifteen minute or one hour intervals (as appropriate and as outlined above) by security staff, and documentation that the individual was released or partially released at reasonable intervals for eating and use of the toilet. The DOC will attempt to use leather restraints wherever possible. If the DOC determines that non-metal restraints are unsatisfactory in a particular case it shall document the reasons for such determination.

8.   A segregation section shall not be re-established in Death Row.   Death Row inmates will be subjected to ordinary Death Row disciplinary and security procedures.

9.   All inmates, except those restricted for disciplinary confinement such as pre-hearing detention, cell restriction or isolation, and those under medical restriction, shall receive a minimum of 5 to 6 hours of outdoor recreation per week, weather permitting.   During the summer months between 6 and 7 hours of outdoor recreation will be provided, weather and staff permitting.   In addition, the DOC will develop a program of indoor recreation for certain categories of inmates.

10.  All inmates, except for those confined in cell restriction, medical restriction, isolation, pre-hearing detention and segregation, will receive all their meals outside of their cells in the pod area.   Inmates in isolation, pre-hearing detention,

cell restriction, medical restriction and segregation may be served their meals in their cells.

11. (a) The DOC will reiterate by special memorandum from the Director that it will be the policy of the DOC and the staff at MCC not to use excessive or unnecessary force including excessive use of chemical agents, i.e., that such force as may be used will be reasonable. The DOC will continue its current policy of review of all Serious Incident Reports (SIR's) generated from MCC by the Director or the Deputy Director who may institute such further investigation and disciplinary action as appears appropriate. Currently all SIR's are telecopied to the Deputy Director and the Regional Administrator. The Deputy Director then makes a copy of this SIR for review by the Director. The Deputy Director then personally reviews all SIR's and institutes such further investigation as may be necessary. The Deputy Director or the Director has authority to review any and all videotapes when necessary. Additionally, the Warden of MCC reviews all SIR's, and if a baton or a chemical agent was used, then the Warden reviews the incident with the officers and the inmates involved. The Warden also reviews the videotape, if one was made. Additionally, the DOC has one of the few administrative grievance procedures approved by the United States Department of Justice through which inmates may voice any complaints relative to their incarceration.

(b) The Director will agree for the period of one year hereafter to investigate complaints of excessive force from counsel for plaintiffs. Those complaints may be submitted to the

Director for his review. He may then forward the complaint to
the Warden, the Deputy Director, or the Inspector General for his
review. The Director will report to counsel for the plaintiff
his findings, conclusions, and actions taken on all use of force
complaints. In appropriate cases, the Director will make the
results of his investigation available to appropriate law
enforcement personnel. This subparagraph shall not apply to any
case in which the parties initially choose to litigate.

(c) The DOC agrees to use counseling staff with particu-
lar training and crisis-defusing skills as resources to resolve
problems without the use of force.

(d) The DOC will conduct an adequate training program
to enable all officers to understand and follow DOC policy on use
of force.

(e) The DOC believes that its present policies of
screening individuals considered for employment for propensities
for violence is appropriate and agrees that if there is any
indication in the record of a potential employee that the poten-
tial employee has a potential for violence, such as a prior
conviction for assault or other violent crime, this person will
not be hired unless the incident occurred years in the past and
appears to be an isolated occurrence and a current check in his
community reveals that there is no propensity for violence. Each
potential employee at MCC will be investigated by a Special
Department Investigator for a complete background investigation
with regard to his potential for violence. If the DOC deter-
mines, through an appropriate check with the Central Criminal

Records Exchange, that an application has been falsified regarding the existence of convictions in a potential employee's background, the potential employee will not be hired, or if he has been hired, then he will be immediately dismissed.

(f)   The DOC agrees that it will continue its practice of videotaping possible serious incidents for at least one year from the date of this agreement.

12.   The DOC agrees to develop a comprehensive plan for the improvement of medical and psychiatric care at MCC.  The plan will include at a minimum the following components:

(a)   If the DOC operates a mental health unit at MCC for the purpose of providing intermediate level psychological and psychiatric services for inmates not requiring psychiatric hospitalization, it will develop a plan to include adequate and appropriate staffing for this purpose.  Such a mental health unit is currently in operation at MCC and, accordingly, a staffing plan will be provided to plaintiffs' counsel by June 1, 1985. Subsequent to its adoption by defendants, the plan shall be appended to and incorporated by reference into this agreement.

(b)   The Mental Health Unit will under no circumstances be operated as a segregation unit and will not be used for long-term confinement of psychotics.

(c)   Medical assessments of inmates registering for sick call will ordinarily be made face-to-face, and not through the cell food slot.

(d)   The DOC will not employ PA IIs as presently defined by state law at MCC.

13. The DOC will develop a plan to provide the opportunity
to all inmates, except those in isolation and pre-hearing deten-
tion, for programming similar to other maximum security prisons
in Virginia. Among the basic programs to be considered are:
work, correspondence courses, educational and vocational training
programs, psychological counseling, alcohol and drug treatment,
program counseling, and religious programs. The DOC will provide
a detailed plan for all programming in place or being considered
to counsel for the plaintiffs by April 3, 1985. This plan shall
be appended to and be incorporated by reference into this agree-
ment. The plan will set forth reasonable starting dates for the
various programs.

14. The DOC had previously agreed to an expansion of the
time for those inmates who desire to use the law library, which
provisions remain in effect as originally agreed. If an inmate
visits the law library in the morning, he may remain at the law
library for the remainder of the morning until the mid-day meal,
if space permits, and if visits take place in the afternoon, then
such inmates will be allowed to remain in the law library until
the area must be made for the evening meal, if space permits.
It is further agreed that provisions will be made for extra
access by Death Row prisoners to the law library and that
requests for law library access may be sent by cellblock officers
as well as through intra-institutional mail. It is also agreed
that prisoners will be allowed to browse through the stacks or
have the assistance of a trained library assistant. It is also
agreed that photocopy services will be available to prisoners for

their legal documents. Death Row inmates may check out law library material overnight. The DOC will implement a priority system to give access to the law library as follows: (1) inmates who have pending court dates; (2) Death Row inmates; and (3) all other general requests.

15. The DOC agrees that the attorneys appointed by the Circuit Court of Mecklenburg County shall be allowed to consult with inmates in appropriate places within the housing units and shall not be limited to the visiting room.

16. The DOC agrees that all inmates other than those in isolation shall have daily access to newspapers and magazines unless any such inmate has within the prior two weeks misused paper or similar materials creating a security or sanitation hazard.

17. The DOC agrees to the continuation of Saturday mail service.

18. The DOC agrees to review periodically the operation of food services through its chief dietician to assure the proper cooking and preparation of all items.

19. The DOC agrees to make available dietary substitution for Nation of Islam prisoners that satisfy minimum nutritional needs and are consistent with the teachings of How to Eat to Live. Separate utensils shall be used for pork products. Such materials shall never be used for the serving of non-pork products. The DOC will continue to assure the noncontamination by pork of the meals of non-pork eaters. Upon request, a Nation

of Islam consultant may inspect the facilities and methods in the
food preparation area at MCC.

20.  Group religious activity, including religious services,
will be allowed subject to reasonable staff and security needs.

21.  The DOC agrees that the MCC will provide for Ramadan
observances by adherents of the American Muslim Mission and the
Nation of Islam.

22.  The DOC agrees to use reasonable search procedures at
MCC, which in all cases will comply with Division Guideline 413
or any subsequent Division Guideline regarding strip searches.
Whenever a strip search is conducted upon an inmate, it will be
conducted in private.  Strip searches may be conducted routinely
after contact visitation in a special room in the visiting area
where privacy will be maintained.  It will not be the policy at
MCC routinely to strip search inmates when such inmates are going
to the medical department.  MCC does, however, reserve the right
to conduct a strip search upon reasonable suspicion that contra-
band is being concealed.

23.  Consistent with applicable legal procedures, the DOC
will allow Death Row inmates two routine telephone calls per
month and allow them unlimited and confidential calls to those
attorneys and para-legals on their attorney list.  Additionally,
such inmates may be allowed additional non-legal telephone calls
in special circumstances upon approval of special requests.

24.  The DOC agrees to substitute metal detectors where
feasible for strip searches and visual body cavity searches.

25. The DOC agrees that except when a reasonable suspicion of contraband exists, the MCC shall not search motor vehicles of visitors to the MCC.

26. The DOC agrees to maintain four (4) inch padding in appropriate places in transportation vehicles and will make a good faith effort to explore other possible measures designed to prevent accidental injury to prisoners during transportation.

27. The DOC agrees to make a general reading library available for all inmates except isolation, pre-hearing detention, Death Row and segregation. Additionally, the DOC will explore the possibility of extending general reading library services to Death Row inmates. Inmates not having direct access to the general reading library will be provided books by procedures including availability of books and magazines from portable carts brought to the prisoners' area not less than once each week.

28. The DOC agrees that prisoners on Death Row shall be permitted to list and have as visitors members of their family, not limited by any degree of consanguinity; common-law wives; fiancees; clergy; and friends and associates of long standing who were known by the prisoner prior to his incarceration subject to reasonable limitations upon the number of visitors that any inmate may maintain on a visiting list, subject to the reasonable approval of the Warden, and subject to reasonable limits on the number of persons that may be maintained on a visiting list as presently constituted or as may be constituted in the future, and giving defendants a reasonable time in which to investigate any

potential visitors. This provision shall not limit the possibility of special visitors as approved by the Warden.

29. The DOC will allow non-contact visitation for Death Row prisoners and will require that these prisoners be subjected to reasonable search procedures including a pat-down search before and after each visit. Strip searches, however, will not be required prior to or after a visit as a routine matter. Strip searches may be required before or after a visit if in the opinion of the officer in charge there is real suspicion to believe that such a search is necessary and then he may recommend such a search to the watch commander who may authorize it. Any such search shall be documented and maintained in writing. The DOC will maintain all telephones in the non-contact visit area in good working order and Death Row prisoners will be allowed weekend visits.

In addition, the DOC will develop a plan for the improvement of the security of the visiting program and facilities available to Death Row inmates. Subsequent to its adoption by the defendants, the plan shall be appended to and incorporated by reference into this agreement.

30. The DOC agrees that visitors to prisoners at the MCC will not be subjected to strip searches or partial strip searches prior to visitation, but the DOC maintains the right to deny visitation to any visitor upon real suspicion that the visitor is attempting to bring in contraband or would otherwise jeopardize the security of the institution. Under these circumstances the visitor may be requested to submit to a strip search or partial

strip search in accordance with applicable Division Guidelines and Institutional Operating Procedures, or if they refuse, then forfeit the right to visit. The DOC will provide an appropriate written notice to visitors setting forth their search procedures.

31. The DOC further agrees that each instance of strip search or partial strip search or request to strip search or partial strip search of any visitor at the MCC during visitation shall be documented and maintained in writing, setting forth the name of the visitor requested to be searched, the time, those persons conducting the search, and the reasons for the search or request for same.

32. It is understood and agreed that the DOC will not interfere with the attorney-client relationship between the plaintiffs and their counsel in this case by engaging in any of the following acts:

(a) Unreasonably delaying the production of inmates at the MCC for attorney-client interviews or unreasonably restricting the hours and the length of individual attorney client visits at the MCC. If the attorneys arrive at the MCC by approximately 9:00 a.m., they shall be afforded approximately 5 1/2 hours per attorney of actual interview time, not including time spent between interviews waiting for inmates to be produced. If the attorneys arrive at a later hour, then their actual interview time shall be pro-rated into the number of hours remaining in a normal work day. Unless there is a legal emergency, all interviews will take place during normal business hours.

(b) Refusing to allow fewer than three contact attorney-client visits at any given time. The DOC will have discretion to determine the manner in which contact visits will be provided.

(c) Refusing to allow and insure that all attorney-client visits and telephone calls take place in a manner that assures confidentiality, consistent with applicable legal procedures.

(d) Requiring that the inmate interviewed remain in restraints during the interview, unless requested by the attorney or unless the Chief of Security at MCC determines, in light of the institutional behavior of a given inmate, that the safety of the institution dictates that the inmate be in restraints. The Chief of Security shall maintain a written record documenting the reasons, if and when such restraints are ordered.

For the purpose of this provision, the term "attorney" includes a paralegal acting under the general supervision of an attorney pursuant to MCC policies regarding paralegals.

The procedures outlined above will be incorporated into guidelines at MCC.

33. This agreement is not to be construed to establish or change the standard of culpability for civil or criminal liability of any official, employee, agent, or representative of the Commonwealth of Virginia other than for the sole and limited purpose of enforcement of this agreement and any decrees which may issue herein.

34. This agreement was voluntarily and mutually agreed upon by the defendants and plaintiffs as a compromised settlement of disputes between the parties and no decrees which may issue, nor this agreement, nor any actions taken pursuant hereto constitute admissions that any condition, policy, procedure or acts or omissions of the DOC and/or the MCC or any state official, employee, or agent was, or is, in any way improper, negligent, unconstitutional, or in violation of any rights of the plaintiff class or any member thereof, or caused or causes any injury or other deprivation or damage to the plaintiff class or any member thereof.

35. This agreement shall not be admissible in evidence in any proceedings or trials other than for the sole and limited purpose of enforcement of this agreement and the decrees on file herein. It is understood and agreed that Rules 407 and 408 of the Federal Rules of Evidence and the Advisory Committee's notes to Rules 407 and 408, and the provisions of Section 8.01-418.1, Code of Virginia (1950), as amended, are applicable to this agreement and any decrees which may issue herein.

36. In the event of an emergency caused by a riot, fire or other events at the facility not caused by the defendants, their agents, employees, successors in office, and those acting in concert with them, which makes compliance with the terms of this agreement or any decrees on file herein inconsistent with security at MCC, it may be necessary to suspend temporarily all or certain provisions of this agreement and the decrees on file herein.

In such event, within five days the defendants will notify counsel for the plaintiffs of the following:

(1)   the part or parts of the agreement or decree suspended;

(2)   the nature of the emergency situation with appropriate detail;

(3)   the reasons for the opinion that compliance with the specified part or parts of the agreement or decree would be inconsistent with security; and

(4)   the expected duration of the suspension.

If the plaintiffs believe that the suspension, or its duration, is unjustified, unreasonable, or taken in bad faith, they may request appropriate relief from this Court.  This agreement is not intended to supersede the normal disciplinary process of the MCC.

37.   The parties shall submit this agreement to the Court in full settlement of all remaining issues in this case, except costs and attorneys' fees, and the parties shall request that the Court retain jurisdiction for such time as the Court deems neces- sary to enforce compliance with this agreement and any decrees which may issue herein.

38.   The DOC agrees that the Counterclaims contained in their Answers to the Complaint and the Amended and Supplemental Complaint herein are hereby withdrawn without prejudice.

Witness the following signatures and seals:

ALLYN SIELAFF, et al.                    ALAN BROWN, et al.


_Allyn Sielaff_, Director               _Alvin J. Bronstein_
Allyn Sielaff, Director                 Alvin J. Bronstein
Virginia Department of Corrections


_Burnett Miller III_                    _Elizabeth Alexander_
Burnett Miller III                      Elizabeth Alexander
Senior Assistant Attorney General


_Richard F. Gorman III_                 _Gerald T. Zerkin_
Richard F. Gorman III                   Gerald T. Zerkin
Assistant Attorney General


Attorneys for Defendants                Attorneys for Plaintiffs


Dated this _5th_ day of _April_ , 1985